# 25-2079 (L), 25-2250 (CON)

In the United States Court of Appeals for the Second Circuit

SOROBAN CAPITAL PARTNERS LP,
SOROBAN CAPITAL PARTNERS GP LLC TAX MATTERS PARTNER

*Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

On Appeal from the United States Tax Court,
Nos. 16217-22 & 16218-22
Hon. Ronald L. Buch, *Judge of the United States Tax Court*

**OPENING BRIEF AND SPECIAL APPENDIX OF APPELLANTS SOROBAN CAPITAL PARTNERS LP AND SOROBAN CAPITAL PARTNERS GP LLC**

*Counsel information on inside cover*

Shay Dvoretzky
*Counsel of Record*
Parker Rider-Longmaid
Armando Gomez
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Kathleen Gregor
Elizabeth Smith
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116

Raza Rasheed
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Avenue of the Stars, Ste. 200N
Los Angeles, CA 90067

*Counsel for Petitioners-Appellants Soroban Capital Partners LP & Soroban Capital Partners GP LLC*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Soroban Capital Partners GP LLC, in its capacity as the tax matters partner of Soroban Capital Partners LP, states that no publicly held entity owns an interest in either Soroban Capital Partners GP LLC or Soroban Capital Partners LP.

# TABLE OF CONTENTS


**Page**

DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... v

GLOSSARY ..... xiii

REQUEST FOR ORAL ARGUMENT ..... xiv

INTRODUCTION ..... 1

JURISDICTION ..... 9

STATEMENT OF ISSUES ..... 10

PERTINENT STATUTES AND REGULATIONS ..... 11

STATEMENT OF THE CASE ..... 11

A. Legal background ..... 12

1. TEFRA prescribed a two-tiered system for centralized partnership audits to address issues affecting the partnership as a whole, while channeling partner-specific determinations to partner-specific proceedings. ..... 12

2. Since 1977, Congress has carved out limited partners' shares of a partnership's income from Social Security and Medicare taxes. ..... 15

B. Factual and procedural background ..... 18

STANDARD OF REVIEW ..... 21

SUMMARY OF ARGUMENT ..... 22

ARGUMENT ..... 32

**TABLE OF CONTENTS**
(continued)

**Page**

I. The IRS exceeded its authority and the Tax Court exceeded its jurisdiction because net earnings from self-employment can't be determined in a TEFRA partnership-level proceeding........................32

A. Net earnings from self-employment isn't a partnership item under TEFRA. ....................................................................33

1. A partner's net earnings from self-employment isn't "required to be taken into account for the partnership's taxable year." ...............................................34

2. Net earnings from self-employment isn't on Treasury's list of items appropriate for partnership-level proceedings.................................................................37

B. The Tax Court's contrary reasoning lacks merit.........................38

II. Soroban's limited partners' distributive shares of its income are excluded from net earnings from self-employment under I.R.C. § 1402(a)(13). ........................................................................41

A. I.R.C. § 1402(a)(13) applies to any partner in a limited partnership with limited liability.................................................42

1. When § 1402(a)(13) was enacted, the term "limited partner" referred to partners in a limited partnership with limited liability. .....................................43

2. Longstanding SSA and IRS guidance confirms that the term "limited partner" carries its ordinary meaning. ......................................................................45

3. Congress's rejection of the IRS's past efforts to narrow the definition of "limited partner" shows that "limited partner" carries its ordinary meaning.........49

**TABLE OF CONTENTS**
(continued)

**Page**

B. Soroban's limited partners are limited partners covered by I.R.C. § 1402(a)(13). ....................51

C. The Tax Court applied the wrong legal standard in determining whether Soroban's limited partners are subject to the limited partner exception....................53

1. The Tax Court's passive investor standard contravenes § 1402(a)(13). ....................54

a. In 1977, it was settled law that limited partners could participate in the business and didn't need to be passive investors. ....................54

b. Other textual indicators show that Congress didn't understand limited partners to be limited to passive investors....................57

c. The SSA and (until recently) the IRS have not understood limited partners to be passive investors. ....................63

2. The Tax Court's justifications for its passive investor standard lack merit....................64

CONCLUSION ....................70

CERTIFICATE OF COMPLIANCE ....................71

CERTIFICATE OF SERVICE ....................72

SPECIAL APPENDIX TABLE OF CONTENTS.................... SA1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allright Missouri, Inc. v. Billeter*,
829 F.2d 631 (8th Cir. 1987) .......... 45

*Alphonso v. Commissioner*,
708 F.3d 344 (2d Cir. 2013) .......... 21, 22, 31, 67

*Aquilino v. United States*,
363 U.S. 509 (1960) .......... 67

*Bittner v. United States*,
598 U.S. 85 (2023) .......... 29, 30,
.......... 45, 46, 63, 64

*Boechler, P.C. v. Commissioner*,
596 U.S. 199 (2022) .......... 64

*Burchell v. Helvering*,
115 F.2d 681 (2d Cir. 1940) .......... 67

*Callaway v. Commissioner*,
231 F.3d 106 (2d Cir. 2000) .......... 5, 14, 32

*CTS Corp. v. Dynamics Corp. of America*,
481 U.S. 69 (1987) .......... 44, 45

*Diebold Foundation, Inc. v. Commissioner*,
736 F.3d 172 (2d Cir. 2013) .......... 21, 22

*Esquivel-Quintana v. Sessions*,
581 U.S. 385 (2017) .......... 67, 68

*Estate of Borax v. Commissioner*,
349 F.2d 666 (2d Cir. 1965) .......... 59

*Estate of Keeter v. Commissioner*,
75 F.4th 1268 (11th Cir. 2023) .......... 12, 13

*Estate of Quick v. Commissioner*,
110 T.C. 172 (1998) .......... 23, 36

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Field v. United States*,
328 F.3d 58 (2d Cir. 2003) (per curiam) .................................................. 37, 38

*Freytag v. Commissioner*,
501 U.S. 868 (1991) .......................................................................................58

*Frigidaire Sales Corp. v. Union Properties, Inc.*,
562 P.2d 244 (Wash. 1977) ......................................................................... 27, 56

*Gitlitz v. Commissioner*,
531 U.S. 206 (2001) .......................................................................................61

*Grainger v. Antoyan*,
313 P.2d 848 (Cal. 1957) (en banc) ...............................................................56

*Lackey v. Stinnie*,
604 U.S. 192 (2025) .......................................................................................44

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ................................................................................. 45, 46

*Martin v. United States*,
605 U.S. 395 (2025) ................................................................................. 31, 68

*Monti v. United States*,
223 F.3d 76 (2d Cir. 2000) ............................................................... 14, 21, 23,
........................................................................................ 24, 32, 33, 35, 37

*Morgan v. Commissioner*,
309 U.S. 78 (1940) ................................................................................... 66, 67

*Morissette v. United States*,
342 U.S. 246 (1952) ............................................................................ 25, 43, 54

*Munoz-Gonzalez v. D.L.C. Limousine Service, Inc.*,
904 F.3d 208 (2d Cir. 2018) ..........................................................................43

*Olsen-Smith, Ltd. v. Commissioner*,
90 T.C.M. (CCH) 64 (2005) ..........................................................................39

*Redwing Carriers, Inc. v. Saraland Apartments*,
94 F.3d 1489 (11th Cir. 1996) ......................................................................45

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Russian Recovery Fund Ltd. v. United States*,
81 Fed. Cl. 793 (2008) ....................35

*Saltzman v. Commissioner*,
131 F.3d 87 (2d Cir. 1997) ....................67

*Silvola v. Rowlett*,
272 P.2d 287 (Colo. 1954)....................56

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)....................46

*Soroban Capital Partners LP v. Commissioner*,
161 T.C. 310 (2023).................... 11, 12

*Soroban Capital Partners LP v. Commissioner*,
T.C. Memo. 2025-52, 2025 WL 1517432 (May 28, 2025) .................... 11, 12

*Taylor v. United States*,
495 U.S. 575 (1990)....................67

*Tyler v. Hennepin County*,
598 U.S. 631 (2023)....................68

*United States v. Daugerdas*,
892 F.3d 545 (2d Cir. 2018) ....................46

*United States v. National Bank of Commerce*,
472 U.S. 713 (1985).................... 31, 67

*United States v. Stitt*,
586 U.S. 27 (2018)....................67

*United States v. Woods*,
571 U.S. 31 (2013).................... 12, 13,
.................... 14, 22, 23, 35

*Wesemann v. Commissioner*,
298 F.2d 527 (2d Cir. 1962) ....................67

*Wisconsin Central Ltd. v. United States*,
585 U.S. 274 (2018)....................43

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**STATUTES**

I.R.C. Subtitle A ........................................ 5, 6, 24,
........................................ 33, 34, 38, 39

I.R.C. § 469(h)(2) ........................................ 29, 62

I.R.C. § 701 ........................................ 15, 37

I.R.C. § 702 ........................................ 22, 34, 39

I.R.C. § 702(a)(8) ........................................ 34, 35

I.R.C. § 703 ........................................ 22, 34, 39

I.R.C. § 704 ........................................ 22, 34, 39

I.R.C. § 707 (1986) ........................................ 11, 28, 29, 60, 61

I.R.C. § 707(a) (1986) ........................................ 28, 60, 61

I.R.C. § 707(a)(2)(A) (1986) ........................................ 60

I.R.C. § 707(c) (1986) ........................................ 16, 28, 57,
........................................ 58, 59, 60, 61

I.R.C. § 1401(a) ........................................ 2, 15

I.R.C. § 1401(b)(1)-(2) ........................................ 2, 15

I.R.C. § 1401(a)-(b) ........................................ 2

I.R.C. § 1402* ........................................ 23, 24, 34,
........................................ 35, 37, 38, 39, 61

I.R.C. § 1402(a) ........................................ 2, 11, 15, 34, 35

I.R.C. § 1402(a)(1) ........................................ 36, 62

I.R.C. § 1402(a)(2) ........................................ 36

I.R.C. § 1402(a)(5) ........................................ 36

I.R.C. § 1402(a)(8) ........................................ 36

---

* The version of I.R.C. § 1402 that is in effect today is identical in all material respects to the version that was in effect for the 2016 and 2017 tax years.

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

I.R.C. § 1402(a)(10) ........ 28, 29, 36, 61, 62
I.R.C. § 1402(a)(10)(A) ........ 28, 29
I.R.C. § 1402(a)(13) ........ 2, 3, 8, 9, 10, 11, 16, 17, 18, 20, 21, 23, 25, 27, 28, 29, 30, 31, 41, 42, 43, 46, 49, 50, 51, 53, 54, 57, 59, 61, 64, 65, 66, 68
I.R.C. § 1402(a)-(b) ........ 15
I.R.C. § 6223(a)(2) (1982) ........ 9
I.R.C. § 6226 (1997) ........ 11
I.R.C. § 6226(a)(1) (1997) ........ 9
I.R.C. § 6226(f) (1997) ........ xiii, 5, 9, 10, 14, 32
I.R.C. § 6226(g) (1997) ........ 10
I.R.C. § 6231 (2002) ........ 11
I.R.C. § 6231(a)(3) (2002) ........ 1, 2, 5, 6, 7, 9, 10, 11, 22, 24, 32, 33, 34, 37, 38, 39
I.R.C. § 6231(b) (2002) ........ 10
I.R.C. § 7482(a)(1) ........ 10
I.R.C. § 7483 ........ 10
42 U.S.C. § 411 ........ 15
42 U.S.C. § 411(a)(9) ........ 62
42 U.S.C. § 411(a)(12) ........ 16, 46
42 U.S.C. § 412 ........ 15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Social Security Act,
Pub. L. No. 74-271, 49 Stat. 620 ....................................................3

Social Security Amendments Act of 1967,
Pub. L. No. 90-248, 81 Stat. 821 ....................................................61

Social Security Amendments Act of 1977 (1977 Act),
Pub. L. No. 95-216, 91 Stat. 1509 .................................... 12, 17, 30,
........................................................................ 46, 47, 48, 51,
........................................................................ 54, 55, 56, 63, 65, 66

Pub. L. No. 95-216, § 313, 91 Stat. 1509 ........................................16

Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA),
Pub. L. No. 97-248, 96 Stat. 324 ........................................... 1, 4, 5,
........................................................................ 6, 9, 10, 11,
........................................................................ 12, 13, 14, 19,
........................................................................ 20, 21, 22, 23, 24,
........................................................................ 32, 22, 37, 38, 40, 41

Taxpayer Relief Act of 1997,
Pub. L. No. 105-34, 111 Stat. 788 ........................................xiii, 8,
........................................................................ 18, 26, 27, 50

Bipartisan Budget Act of 2015,
Pub. L. No. 114-74, 129 Stat. 584 ....................................................14

6 Del. C. § 17-404 ....................................................................65

6 Del. C. Ann. § 17-303(a) (2008) ....................................................52

6 Del. C. Ann. § 17-303(b)(1) (2008) ................................................52

**REGULATIONS AND RULE**

20 C.F.R. § 404.1080(b)(3) ........................................... 7, 17, 26, 47

26 C.F.R. § 301.6231(a)(3)–1 ........................................... 6, 11, 24,
........................................................................ 37, 38, 40, 41

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

26 C.F.R. § 301.6231(a)(3)–1(a) ........ 40, 41

26 C.F.R. § 301.6231(a)(3)–1(a)(1)(i) ........ 40

26 C.F.R. § 301.6231(a)(3)–1(b) ........ 7, 24, 39, 40

43 Fed. Reg. 25422 (June 13, 1978) ........ 17, 46, 47

51 Fed. Reg. 13212 (Apr. 18, 1986) ........ 40

62 Fed. Reg. 1702 (Jan. 13, 1997) ........ 18, 26, 49, 50

Fed. R. App. P. 13(a)(1)(A) ........ 10

**OTHER AUTHORITIES**

*Anderson's Law Dictionary* (1913) ........ 44

*Black's Law Dictionary* (4th rev. ed. 1968) ........ 44

*Black's Law Dictionary* (5th ed. 1979) ........ 7, 26, 44

J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice* (Oct. 2025 update) ........ 65

*Cochran's Law Dictionary* (5th ed. 1977) ........ 44

143 Cong. Rec. 13168 (June 27, 1997) ........ 8, 18, 50, 51

H.R. Rep. No. 95-702 (1977) ........ 15, 16, 30, 31, ........ 55, 65, 66, 68, 69

Revised Uniform Limited Partnership Act (Uniform Law Commission 1976) (1976 ULPA) § 101(7) ........ 7, 26, 45

§ 303(a) ........ 7, 26, 45, 55

SSA, *Program Operation Manual System (POMS)*, RS 01802.302 (rev. Mar. 6, 1991), https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802302 ........ 47

SSA, *Program Operation Manual System (POMS),* RS 01802.304 (rev. Sept. 15, 1997), https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802304 ........ 29, 47, 63

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

2 The Compact Edition of the
Oxford English Dictionary (1971) ....................64

Uniform Limited Partnership Act
(Uniform Law Commission 1916)
(1916 ULPA) § 1 ....................7, 45

§ 12(1) .................... 27, 54, 55, 65

Webster's Third New International Dictionary (1961) ....................64

## GLOSSARY

| | |
|---|---|
| Code, Internal Revenue Code, I.R.C., or Tax Code | Title 26 of the United States Code |
| Form 1065 | The IRS form that partnerships use to report their income |
| IRS | Internal Revenue Service |
| Limited partner exception | The income excepted from net earnings from self-employment under 26 U.S.C. § 1402(a)(13) |
| Net earnings from self-employment | The income subject to self-employment taxes as specified in 26 U.S.C. §§ 1401 and 1402 |
| Partnership item | The tax items defined in 26 U.S.C. § 6231(a)(3) (2002) that can be properly addressed in TEFRA proceedings |
| POMS | Program Operations Manual System, the Social Security Administration's operational handbook for its employees |
| SSA | Social Security Administration |
| TEFRA | Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 |
| 1977 Act | Social Security Amendments Act of 1977, Pub. L. No. 95-216, 91 Stat. 1509 |

## REQUEST FOR ORAL ARGUMENT

These consolidated appeals present important legal issues of first impression that the Tax Court incorrectly resolved concerning the treatment of limited partner income under federal tax law. The Tax Court exceeded its jurisdiction under I.R.C. § 6226(f) (1997) to determine only partnership-level issues by determining a tax issue pertaining instead to individual partners and not appropriately resolved in a partnership-wide proceeding, and then improperly increased the amount of limited partner income subject to self-employment tax. In doing so, the Tax Court adopted an IRS argument about the definition of limited partner that broke not only with ordinary usage of that well-established term, but decades of IRS and Social Security Administration interpretations and guidance. These issues warrant full airing. The Fifth Circuit held oral argument in a case concerning many of these same issues. *See Sirius Solutions, L.L.L.P. v. Commissioner of Internal Revenue*, No. 24-60240 (5th Cir. argued Feb. 6, 2025). Appellants submit that oral argument would help the Court resolve these appeals.

## INTRODUCTION

This case raises two issues. The first question concerns authority and jurisdiction: whether the IRS and, in turn, the Tax Court, can determine the portion of partners' business income that is subject to self-employment taxes through special proceedings under the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401-07, 96 Stat. 324, 648-70. Until Congress changed the law in 2018, those "TEFRA" proceedings centralized determinations of tax questions turning on determinations common to the partnership as a whole, rather than individual partners. The second question, on the merits, is whether a limited partner's distributive share of partnership income is subject to self-employment tax.

The Tax Code provides straightforward answers to both questions. As for authority and jurisdiction, the portion of partners' income subject to self-employment taxes shouldn't be determined in TEFRA partnership-level proceedings because it isn't a "partnership item." TEFRA proceedings before the IRS can resolve only "partnership items," and the Tax Court's jurisdiction to review TEFRA determinations is similarly limited. The portion of partners' income subject to self-employment taxes isn't a partnership item because it flunks the statutory test—it isn't treated as a partnership issue in

"subtitle A" of the Tax Code or the relevant "regulations prescribed by the Secretary [of the Treasury]" identifying the items "more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3) (2002). As for the merits, "the distributive share of any item of income or loss of a limited partner, as such," must be excluded from Social Security and Medicare taxes. I.R.C. § 1402(a)(13). The Tax Court's contrary conclusions ignore the Tax Code, contravene decades of settled partnership law and agency guidance, and misapply governing Treasury regulations. The Court should reverse.

**1.** Self-employed individuals pay a tax on their business earnings that is used to fund Social Security and Medicare benefits and to calculate the individual's Social Security benefits in retirement. *See* I.R.C. § 1401(a), (b)(1)-(2); 42 U.S.C. §§ 411, 412. The tax applies only to an individual's "net earnings from self-employment"—a tax-law term that refers to "income derived by an individual from any trade or business," after taking into account certain other additions, deductions, and exclusions. I.R.C. §§ 1401(a)-(b), 1402(a). One exclusion is the limited partner exception. That provision carves out "the distributive share of any item of income or loss of a limited partner, as such," from net earnings from self employment, "other than

guaranteed payments … to that partner" as "remuneration" "for services actually rendered to or on behalf of the partnership." I.R.C. § 1402(a)(13). The upshot is that a limited partner's distributive share does not trigger self-employment tax (or increase eligibility for Social Security benefits), but certain narrowly defined guaranteed payments for services do.

For decades, the Social Security Administration (SSA) and IRS advised that a "limited partner," as that term is used in § 1402(a)(13) and the corresponding provision in the Social Security Act, is just a partner in a limited partnership who has limited liability under the law governing the partnership. Indeed, the IRS's instructions to the Form 1065 that partnerships use to report their income contained that exact definition for decades. Tax Ct. Doc. 13, Ex. A at 2, *also available at* https://www.irs.gov/pub/irs-prior/i1065--2016.pdf; Ex. B at 3, *also available at* https://www.irs.gov/pub/irs-prior/i1065--2017.pdf. The test was simple and easily administrable. And when the IRS tried to change it by regulation in 1997, Congress enacted a law blocking the regulation.

Soroban Capital Partners LP is an investment firm organized as a Delaware limited partnership. When Soroban and its partners filed their tax returns for the 2016 and 2017 tax years, they followed the IRS's

straightforward instructions in Form 1065 and omitted the limited partners' distributive shares of partnership income from the partners' net earnings from self-employment.

In 2018, however, the IRS launched an experimental enforcement campaign designed to restrict who counts as a limited partner by imposing an atextual test with no relationship to the statutory language or the well-established principles that language incorporates. In the IRS's view, only passive investors who do not participate in the partnership's business can qualify as limited partners. After opening a TEFRA partnership-level audit of Soroban's returns, the IRS decided to apply that test to Soroban's partners, who provide important management and other services to its business in their capacities as members of Soroban's general partner. The IRS thus concluded that Soroban's limited partners were not passive investors. As a result, it increased the partners' net earnings from self-employment for 2016 and 2017 by roughly $140 million.

Soroban turned to the Tax Court for relief. Soroban explained that (1) the IRS lacked authority to address its partners' self-employment taxes in TEFRA partnership-level proceedings, and (2) the IRS misapplied the limited partner exception to erroneously increase the partners' taxes. But the

Tax Court sided with the IRS. The court agreed with the IRS's new theory that only passive investors can count as limited partners. SA12. It concluded that the passive investor question can be answered in TEFRA proceedings. SA15-16. And it then concluded that Soroban's limited partners aren't passive investors, so they don't qualify for the limited partner exception. SA19-42.

That was error at each step.

**2.** To start, the Tax Court exceeded its jurisdiction when it determined that the IRS was allowed to address the partners' net earnings from self-employment in TEFRA partnership-level proceedings. TEFRA allowed the IRS to determine certain "partnership items" that affected the business as a whole under a specialized framework, while everything else had to be addressed through normal tax deficiency proceedings. *See Callaway v. Commissioner*, 231 F.3d 106, 108 (2d Cir. 2000). Reflecting this dichotomy, the Tax Court's "jurisdiction" on review of a TEFRA partnership-level audit is limited "to determin[ing] … partnership items" that the IRS had adjusted and certain related issues. I.R.C. § 6226(f) (1997).

As defined by the Tax Code, partnership items include only those items both (a) "required" by Subtitle A of the Code "to be taken into account

for the partnership's taxable year," and (b) listed in Treasury's "regulations" identifying the items "more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3) (2002). Net earnings from self-employment doesn't satisfy either requirement. Nothing in the Tax Code requires a partnership to take into account net earnings from self-employment as part of its taxable year. And Treasury's regulation defining partnership items doesn't list net income from self-employment. *See* 26 C.F.R. § 301.6231(a)(3)–1.

As a result, net earnings from self-employment isn't a partnership item. And that has two consequences. *First*, the IRS exceeded its authority by determining Soroban's partners' self-employment tax in TEFRA proceedings. *Second*, because the Tax Court's jurisdiction was limited to determining partnership items, it lacked jurisdiction to decide Soroban's partners' self-employment tax. All the court had jurisdiction to say is that net earnings from self-employment isn't a partnership item, meaning the IRS shouldn't have decided it in TEFRA proceedings.

The Tax Court's contrary conclusion contravened the Tax Code. The court concluded that net earnings from self-employment is a partnership item because there is a statute defining it. SA15-16. But neither that statute,

nor any other, requires net earnings from self-employment "to be taken into account for the partnership's taxable year." I.R.C. § 6231(a)(3) (2002). The court also reasoned that net earnings from self-employment falls within a regulation that defines "partnership item" to include the facts, legal conclusions, and methodologies underlying other partnership items. SA16; *see also* 26 C.F.R. § 301.6231(a)(3)–1(b). But net earnings from self-employment isn't itself a partnership item, and it isn't a component of some other partnership item. The Tax Court should not have shoehorned the limited partner question into proceedings that weren't designed to address it.

**3.** The Tax Court also erred on the merits by concluding that Soroban's limited partners aren't subject to the limited partner exception. The Tax Code doesn't define "limited partner," but the term had settled meaning when Congress enacted the exception in 1977. Under longstanding principles recognized nationwide, a limited partner is just a partner in a limited partnership with limited liability. *See, e.g.*, *Limited Partner*, *Black's Law Dictionary* (5th ed. 1979); Revised Uniform Limited Partnership Act §§ 101(7), 303(a) (Uniform Law Commission 1976) (1975 ULPA); Uniform Limited Partnership Act § 1 (Uniform Law Commission 1916) (1916 ULPA). The SSA has always used that definition, 20 C.F.R. § 404.1080(b)(3), as did the IRS

until it persuaded the Tax Court to junk it in this case. Tax Ct. Doc. 13, Ex. A at 2; Ex. B at 3. Indeed, when the IRS proposed a regulation to narrow that definition in 1997 to match its current position, the Senate decried the IRS's efforts to "effectively change the law administratively without congressional action," 143 Cong. Rec. 13168 (June 27, 1997), and Congress passed a law blocking the regulation, Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935, 111 Stat. 788, 882.

There is no dispute that Soroban's limited partners are partners in a limited partnership who enjoy limited liability under the Delaware law governing Soroban's organization. They are thus limited partners for purposes of § 1402(a)(13). That should have been the end of the matter.

The Tax Court's contrary reasoning is unpersuasive. The court reasoned that because the limited partner exception refers to "the distributive share of any item of income or loss of a limited partner, *as such*," I.R.C. § 1402(a)(13) (emphasis added), Congress must have intended to restrict the term "limited partner" to people actually acting as limited partners—*i.e.*, passive investors. SA12. But partnership law has never cabined limited partner status to passive investors. Reflecting that reality, the limited partner exception itself recognizes that limited partners might receive "guaranteed

payments" as "remuneration" "for services actually rendered to or on behalf of the partnership." I.R.C. § 1402(a)(13). Congress would not be talking about limited partners drawing a salary for services if it thought they were all passive investors.

The IRS and Tax Court lacked authority to increase Soroban's partners' self-employment taxes in TEFRA proceedings, and their increases independently violated the Tax Code. The Court should reverse.

## JURISDICTION

**a.** During the relevant time period, TEFRA allowed the IRS to audit "partnership item[s]" in partnership-level proceedings, I.R.C. § 6231(a)(3) (2002), and issue a notice of a "final partnership administrative adjustment," or FPAA, *id.* § 6223(a)(2) (1982), which could be challenged in the Tax Court within "90 days," *id.* § 6226(a)(1) (1997). The IRS issued FPAAs to Soroban for the 2016 and 2017 tax years on April 25, 2022. 1-JA77-90. On July 21, 2022, Soroban timely petitioned the Tax Court for readjustment. 1-JA1-42.

**b.** The Tax Court had "jurisdiction to determine all partnership items of the partnership" relevant to the FPAAs. I.R.C. § 6226(f) (1997). The IRS sought to adjust Soroban's partners' net earnings from self-employment in its audit. 1-JA82, 89. As explained below, however, a partner's net

earnings from self-employment is not a partnership item under TEFRA. *Infra* pp. 33-37. The Tax Court thus should have held that the FPAAs were invalid for failing to adjust any partnership item, and that the court lacked jurisdiction to consider the FPAAs on the merits. Instead, the court exceeded its jurisdiction by confirming the FPAAs.

**c.** The Tax Court entered its final decision on May 28, 2025. SA44-45. Soroban timely filed its notice of appeal on August 25, 2025. 14-JA3522; *see also* Fed. R. App. P. 13(a)(1)(A); I.R.C. § 7483. This Court has jurisdiction to review the Tax Court's decision under I.R.C. §§ 6226(g) (1997) and 7482(a)(1).

## STATEMENT OF ISSUES

**1.** Whether net earnings from self-employment is a partnership item that (a) can be adjusted in TEFRA partnership-level proceedings under I.R.C. § 6231(a)(3) (2002), and (b) is within the Tax Court's jurisdiction to determine under I.R.C. § 6226(f) (1997).

**2.** Whether Soroban's limited partners' distributive shares of partnership income are excluded from net earnings from self-employment under the limited partner exception, I.R.C. § 1402(a)(13).

## PERTINENT STATUTES AND REGULATIONS

Sections 707 (1986), 1402(a), 6226 (1997), and 6231 (2002) of the Tax Code, plus 26 C.F.R. § 301.6231(a)(3)–1, are reproduced in the special appendix.

## STATEMENT OF THE CASE

After an audit, the IRS used TEFRA partnership-level proceedings to increase Soroban's partners' net earnings from self-employment by nearly $140 million for the 2016 and 2017 tax years. SA44-45. Soroban challenged the audit results in the Tax Court. *First*, Soroban argued that the IRS lacked authority under I.R.C. § 6231(a)(3) (2002) to adjust the limited partners' net earnings from self-employment in TEFRA partnership-wide proceedings, rather than proceedings specific to the individual partners whose personal details were critical to that adjustment. Soroban thus asked the Tax Court to invalidate the IRS's FPAAs, and hold that it lacked jurisdiction to consider the FPAAs on the merits. *Second*, Soroban argued that under I.R.C. § 1402(a)(13), the IRS was required to exclude its limited partners' share of the partnership's income from the income subject to self-employment taxes. The Honorable Ronald L. Buch adopted the IRS's construction of the relevant Tax Code provisions, *see Soroban Capital Partners LP v. Commissioner*, 161

T.C. 310 (2023), and ultimately upheld the IRS's adjustments, *see Soroban Capital Partners LP v. Commissioner*, T.C. Memo. 2025-52, 2025 WL 1517432 (May 28, 2025).

### A. Legal background

This case involves two sets of questions: The first concerns what procedures the IRS and Tax Court could use to determine individual partners' net earnings from self-employment under the system for centralized partnership audits in place until 2018. The second is how the Social Security Amendments Act of 1977 treats allocations of income to limited partners for self-employment tax purposes.

#### 1. TEFRA prescribed a two-tiered system for centralized partnership audits to address issues affecting the partnership as a whole, while channeling partner-specific determinations to partner-specific proceedings.

**a.** Before 2018, the IRS conducted partnership audits under a system specified in TEFRA. "Under TEFRA, partnership-related tax matters [were] addressed in two stages." *United States v. Woods*, 571 U.S. 31, 39 (2013).

"First, the IRS [had to] initiate proceedings at the partnership level to adjust 'partnership items,' those relevant to the partnership as a whole." *Id.* "If the IRS disagree[d] with a partnership's reporting of partnership items,

it initiate[d] an audit against the partnership." *Estate of Keeter v. Commissioner*, 75 F.4th 1268, 1275 (11th Cir. 2023). "And if the IRS determine[d] that adjustments to partnership items [were] necessary, it issue[d]" an FPAA "to the partners informing them of the adjustments." *Id.* "If the partners dispute[d] the adjustments, the designated 'tax matters partner' [could] initiate a 'partnership-level proceeding' in court." *Id.*

"At step two of TEFRA, the IRS [had to] decide whether its partnership-level adjustments to 'partnership items' require[d] any individual partner-level adjustments to 'affected items.'" *Id.* Affected items were reports on the individual partners' returns "that [were] affected by (but are not themselves) partnership items." *Woods*, 571 U.S. at 39. "Unlike disputes over partnership items, 'which are addressed at the partnership level, issues relating to affected items [were] addressed at the individual partner level.'" *Estate of Keeter*, 75 F.4th 1268 at 1275. If affected items did "not require partner-level determinations," the IRS could directly adjust the partner's return, and the partner could challenge those "adjustments only in a post-payment refund action." *Id.* at 1275-76. But if the affected items did require "partner-level determinations," "TEFRA direct[ed] the IRS to make adjustments using

its normal deficiency procedures," which include "a pre-payment forum to dispute the adjustments." *Id.* at 1276.

**b.** The TEFRA structure is triggered only when the IRS seeks to adjust "partnership items." *Woods*, 571 U.S. at 39. Adjustments to non-partnership items cannot be handled through the TEFRA process. *See Callaway*, 231 F.3d at 108. "The text and structure of the Code, as well as the legislative history of the TEFRA provisions, leave no doubt that Congress intended" for the TEFRA process to apply to partnership items, while non-partnership items must be adjusted "pursuant to … notice of deficiency procedures" specified elsewhere in the Tax Code. *Id.* In turn, Congress limited the Tax Court's jurisdiction on review of the IRS's TEFRA adjustments to determining "partnership items of the partnership." I.R.C. § 6226(f) (1997). In short, the IRS and Tax Court must not "blur or erase … the distinction between proceedings involving partnership items and those involving non-partnership items … [that] Congress established by enacting TEFRA." *See Monti v. United States*, 223 F.3d 76, 82 (2d Cir. 2000).

**c.** Congress replaced TEFRA with a different system beginning in 2018. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101, 129 Stat. 584, 625-38. But TEFRA applies to the 2016 and 2017 tax years at issue here.

### 2. Since 1977, Congress has carved out limited partners' shares of a partnership's income from Social Security and Medicare taxes.

**a.** Self-employed individuals pay tax on their business earnings that are used to fund Social Security and Medicare benefits and to calculate the individual's Social Security benefits in retirement. *See* I.R.C. § 1401(a), (b)(1)-(2); 42 U.S.C. §§ 411, 412. Those taxes are keyed to an individual's "net earnings from self-employment"—a statutory term of art that refers to "income derived by an individual from any trade or business," after taking into account certain other additions, deductions, and exclusions. I.R.C. § 1402(a)-(b). Partnerships typically don't pay taxes as partnerships. Instead, individual partners are "liable for income tax only in their separate or individual capacities." *Id.* § 701. A partner's net earnings from self-employment includes his or her "distributive share (whether or not distributed) of income or loss" from the partnership. *Id.* § 1402(a).

Before the late 1970s, all partners' income from any partnership counted as self-employment earnings that could trigger eligibility for Social Security benefits. That created a problem. As the House Ways and Means Committee explained, "certain business organizations" began "solicit[ing] investments in limited partnerships as a means for an investor to become

insured for social security benefits." H.R. Rep. No. 95-702, pt. 1, at 40-41 (1977). That outreach was "directed mainly toward public employees whose employment [was] covered by public retirement systems and not by social security." *Id.* at 41. Partnerships "emphasize[d]" that public employees "who invest[ed]" their savings into "limited partnerships [would] qualify for minimum" Social Security "benefits" and thus obtain a "high return." *Id.* Put differently, the system allowed public employees with pensions to "double dip" on retirement benefits by making small-dollar investments in limited partnerships, thereby triggering Social Security benefits exceeding their investments.

Congress responded by passing the Social Security Amendments Act of 1977, Pub. L. No. 95-216, 91 Stat. 1509 (1977 Act). The 1977 Act amended the Social Security Act to specify that limited partner income doesn't trigger Social Security benefits. *Id.* § 313. To do that, the 1977 Act amended the definition of net earnings from self-employment to exclude "the distributive share of any item of income or loss of a limited partner, as such, other than" certain "guaranteed payments described in section 707(c)" received "for services actually rendered to or on behalf of the partnership." 42 U.S.C. § 411(a)(12); I.R.C. § 1402(a)(13). Since limited partners' share of partnership

income would no longer trigger Social Security benefits, Congress made an identical change to the Tax Code's definition of net earnings from self-employment to exclude the distributive share of a limited partner from self-employment taxes. I.R.C. § 1402(a)(13). Those two changes were for the same purpose: to limit what counted as self-employment income.

**b.** The 1977 Act doesn't define the term "limited partner." But for decades, both the SSA and the IRS settled on a common approach. Since shortly after the 1977 Act was passed, the SSA has defined a "limited partner" as "one whose financial liability with respect to the obligations of the partnership is limited to the amount of his or her financial investment in the partnership," 43 Fed. Reg. 25422, 25422 (June 13, 1978); *see also* 20 C.F.R. § 404.1080(b)(3) (same definition with minor wording changes). The IRS adopted the same definition. The IRS's instructions for the 2016 and 2017 tax years at issue here defined "limited partner" as "a partner in a partnership formed under a state limited partnership law, whose personal liability for partnership debts is limited to the amount of money or other property that the partner contributed or is required to contribute to the partnership." Tax Ct. Doc. 13, Ex. A at 2; Ex. B at 3.

In 1997, Congress shot down an IRS attempt to deviate from this definition. The IRS proposed a regulation seeking to narrow the definition of "limited partner" "for purposes of section 1402(a)(13)" to exclude, among others, partners who "participate[d] in the partnership's trade or business for more than 500 hours during the partnership's taxable year." *See* 62 Fed. Reg. 1702, 1703-04 (Jan. 13, 1997). The Senate immediately passed a resolution stating that the proposed regulation "exceed[ed] the regulatory authority of the Treasury Department" and decrying the IRS's attempt to "effectively change the law administratively without congressional action." 143 Cong. Rec. 13168 (June 27, 1997). Congress then passed a law blocking the regulation from going into effect before mid-1998. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935, 111 Stat. 788, 882. The IRS subsequently abandoned the proposed regulation.

**B. Factual and procedural background**

**1.** Soroban is a Delaware limited partnership and investment firm. 1-JA63. Soroban Capital Partners GP LLC is Soroban's general partner and the designated tax matters partner that instituted these proceedings. *Id.* Soroban's limited partners include Eric W. Mandelblatt, Gaurav Kapadia, and Scott Friedman. 1-JA66. Messrs. Mandelblatt, Kapadia, and Friedman were

the sole members of Soroban's general partner. *Id*. Mr. Mandelblatt was Soroban's Managing Partner. 1-JA195. Mr. Kapadia was Co-Managing Partner. *Id.* And Mr. Friedman was Soroban's Head of Trading and Risk Management. 1-JA11.

**2.** Soroban's tax returns for the 2016 and 2017 tax years calculated its partners' net earnings from self-employment at roughly $2 million each year. 1-JA94, 134. Following the SSA's and the IRS's longstanding guidance (including the IRS's instructions to the partnership return Form 1065), Soroban excluded its limited partners' share of Soroban's partnership income from the partners' net earnings from self-employment. Each of Soroban's limited partners is a "partner in a partnership formed under a state limited partnership law, whose personal liability for partnership debts is limited." Tax Ct. Doc. 13, Ex. A at 2; Ex. B at 3.

**3.** In 2018, however, the IRS launched a campaign to narrow the limited partner exception. In the IRS's new view, only passive investors count as limited partners under the 1977 Act's limited partner exception.

The IRS subsequently conducted a TEFRA partnership-level audit of Soroban's 2016 and 2017 tax returns. The IRS issued FPAAs concluding that Soroban's limited partners are not passive investors, so their shares of

Soroban's partnership income constitute earnings from self-employment. 1-JA83, 90. The IRS thus increased the partners' self-employment earnings by nearly $140 million across the two years. *Id.*

**4.** Soroban sought review of the IRS's FPAAs in the Tax Court and filed a motion for partial summary judgment. Soroban argued that a partner's net earnings from self-employment as the IRS construes it is not a partnership item that can be adjusted in TEFRA partnership-level proceedings. Tax. Ct. Doc. 13. Soroban asked the Tax Court to declare the FPAAs were invalid for that reason, and argued that the Tax Court lacked jurisdiction to review the FPAAs on the merits. *Id.* Soroban also argued that if the Tax Court reached the merits, the limited partners' distributive shares of the partnership's income should be excluded from net earnings from self-employment under the limited partner exception's plain text. *Id.* The IRS filed a cross-motion for partial summary judgment, seeking a determination "that an inquiry into the functional roles of Soroban's limited partners is a partnership item that can be determined in these partnership-level proceedings." SA4.

The Tax Court granted the IRS's motion and denied Soroban's. SA18. The court first determined that based on the limited partner exception's text

and legislative history, Congress "intended for the phrase 'limited partners, as such' used in section 1402(a)(13) to refer to passive investors." SA12. The court then found that whether Soroban's partners count as passive investors is a partnership item that can be determined in TEFRA partnership-level proceedings. SA15-16.

After receiving additional evidence, the Tax Court issued a final decision confirming the IRS's adjustments. SA44-45. The court reasoned that Messrs. Mandelblatt, Kapadia, and Friedman aren't passive investors because each contributed services to and helped manage Soroban's business. SA19-42. And because they are not passive investors, the court concluded that they are not limited partners whose partnership income is excluded from net earnings from self-employment under § 1402(a)(13). *Id.*

## STANDARD OF REVIEW

The Court reviews de novo the Tax Court's conclusion that net earnings from self-employment counts as a partnership item under TEFRA. *See Monti*, 223 F.3d at 81-82. The Court also reviews de novo the Tax Court's construction of the limited partner exception, *see Alphonso v. Commissioner*, 708 F.3d 344, 350 (2d Cir. 2013), as well as its application of the statute to the

undisputed facts, *see Diebold Foundation, Inc. v. Commissioner*, 736 F.3d 172, 183 (2d Cir. 2013).

## SUMMARY OF ARGUMENT

**I.** The IRS and Tax Court lacked authority to determine Soroban's partners' net earnings from self-employment in TEFRA partnership-level proceedings.

**A.** TEFRA partnership-level proceedings may be used only to adjust "partnership items." *Woods*, 571 U.S. at 39. Partnership items are defined as items that: (1) Subtitle A of the Tax Code (1) "require[s] to be taken into account for the partnership's taxable year"; and (2) are listed in "regulations prescribed by the Secretary [of the Treasury]" identifying the items "more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3) (2002). Net earnings from self-employment doesn't satisfy either requirement.

**1.** Subtitle A doesn't require a partnership to take into account a partner's net earnings from self-employment for the partnership's taxable year. Sections 702, 703, and 704 define the items a partnership is required to determine. *See* I.R.C. §§ 702, 703, 704. Among other things, those provisions require the partnership to calculate its income and the partners' distributive

shares of that income. But none of the provisions require the partnership to calculate the amount of tax that each partner owes, much less the partners' self-employment tax. Rather, § 1402—the provision that defines net earnings from self-employment—makes clear that the amount of a partner's self-employment tax turns on facts specific to each partner, rather than facts relevant to the partnership as a whole.

It's not surprising that Subtitle A doesn't treat net earnings from self-employment as a partnership item. Partnership items are supposed to be "relevant to the partnership as a whole," *Woods*, 571 U.S. at 39, and generally should not "depend[] on facts specific to" an individual "partner." *Monti*, 223 F.3d at 82. But net earnings from self-employment depends entirely on partner-specific information about the nature of a given partner's income allocations, as well as individualized facts that determine whether any one of § 1402(a)'s many exceptions applies. As Tax Court precedent shows, that is a good indication that net earnings from self-employment isn't the kind of item that can be handled through TEFRA's partnership-level proceedings. *See Estate of Quick v. Commissioner*, 110 T.C. 172, 186-87 (1998).

**2.** Moreover, net earnings from self-employment isn't listed in Treasury's regulation compiling partnership items, *see* 26 C.F.R. § 301.6231(a)(3)–1. That means it isn't one. *Monti*, 223 F.3d at 82.

**B.** The Tax Court's contrary reasoning lacks merit.

**1.** The Tax Court thought that net earnings from self-employment meets the first requirement of TEFRA's partnership-item test because § 1402 is located in Subtitle A of the Tax Code. SA15-16. But the test is whether Subtitle A "require[s]" net earnings from self-employment "to be taken into account for the partnership's taxable year," I.R.C. § 6231(a)(3) (2002), not whether the item simply appears in Subtitle A. Neither § 1402 nor any other provision in Subtitle A requires net earnings from self-employment to be taken into account for the partnership's taxable year.

**2.** The Tax Court concluded that net earnings from self-employment meets the second requirement because it's covered by 26 C.F.R. § 301.6231(a)(3)–1(b), which provides that the "term 'partnership item' includes the accounting practices and the legal and factual determinations that underlie the determination of" a partnership item. But net earnings from self-employment isn't itself a partnership item, and the Tax Court didn't need to calculate net earnings from self-employment to determine any other

partnership item. The Tax Court thus exceeded its jurisdiction by confirming the IRS's unlawful partnership-level adjustments.

**II.** The Tax Court also erred on the merits. Under § 1402(a)(13), each limited partner's distributive share of Soroban's income should have been excluded from the partners' net earnings from self-employment, and thus exempted from Social Security and Medicare taxes.

**A.** The limited partner exception provides that the IRS must exclude "the distributive share of any item of income or loss of a limited partner, as such," from a partnership's net earnings from self-employment, "other than guaranteed payments … to that partner" as "remuneration" "for services actually rendered to or on behalf of the partnership." I.R.C. § 1402(a)(13). Statutory text, longstanding agency guidance, and past congressional action show that the limited partner exception applies to any partner in a limited partnership with limited liability.

**1.** Because "limited partner" is a legal "term[] of art" with a well-established meaning, Congress presumably borrowed that meaning when it enacted the limited partner exception. *See Morissette v. United States*, 342 U.S. 246, 263 (1952). In the late 1970s, both contemporary legal dictionaries and model legislation adopted nationwide defined limited partners as partners

in a limited partnership who enjoyed limited liability—typically capped at their contribution to the partnership. *See, e.g.*, *Limited Partner*, *Black's Law Dictionary* (5th ed. 1979); 1976 ULPA §§ 101(7), 303(a).

**2.** Both the SSA and (before recently) the IRS adopted the same definition in administering the limited partnership exception. Since 1980, the SSA has defined a limited partner as a partner whose "financial liability for the obligations of the partnership is limited to the amount of [his] financial investment in the partnership," with only minor wording changes. 20 C.F.R. § 404.1080(b)(3). And for decades (including the two tax years at issue here), the IRS's instructions defined a limited partner as one "whose potential personal liability for partnership debts is limited to the amount of money or other property that the partner contributed or is required to contribute to the partnership." Tax Ct. Doc. 13, Ex. A at 2; Ex. B at 3.

**3.** Congress has rejected the IRS's past efforts to deviate from statutory text. In 1997, the IRS proposed regulations that would have narrowed the definition of "limited partner" to exclude most partners who participate in the partnership's business. *See* 62 Fed. Reg. 1702, 1703-04 (Jan. 13, 1997). Congress swiftly passed a law blocking the regulation from taking effect

before mid-1998. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935, 111 Stat. 788, 882.

**B.** Soroban's limited partners qualify as limited partners under § 1402(a)(13). Each is a partner in Soroban, a limited partnership. 1-JA71, 73-74. And each enjoys limited liability under the Delaware law governing Soroban's organization. Indeed, the IRS has never argued otherwise.

**C.** The Tax Court's determination that Soroban's limited partners don't qualify for the limited partner exception because they aren't passive investors misconstrues the statute and lacks merit.

**1. a.** Congress would not have understood the term "limited partner" to be limited to passive investors in 1977. By then, legislation enacted nationwide had for decades recognized that a "person may be a general partner"—*i.e.*, the partner that controls the business—"and a limited partner in the same partnership at the same time." 1916 ULPA § 12(1) (1916). Before 1977, courts had also held that limited partners could substantially participate in the business without losing their limited partner status or limited liability. *See, e.g.*, *Frigidaire Sales Corp. v. Union Properties, Inc.*, 562 P.2d 244, 245-46 (Wash. 1977). Congress said nothing in the 1977 Act to depart from that settled understanding.

**b.** Other statutory indicators confirm that Congress didn't adopt the IRS's and Tax Court's passive investor standard. The limited partner exception itself contemplates that limited partners may receive "guaranteed payments … for services actually rendered to or on behalf of the partnership." I.R.C. § 1402(a)(13). A partner drawing a salary for services to the partnership isn't a passive investor, so Congress couldn't have thought that limited partners include only passive investors.

Congress's use in § 1402(a)(13) of the term "guaranteed payments described in section 707(c)" is also significant. Section 707 contains a series of carefully considered rules applying to transactions between partners and partnerships. In particular, § 707(c) defined a narrow subset of transactions between partners and partnerships. I.R.C. § 707(c) (1986). Section 707(a), in contrast, addresses a much broader set of transactions between partners and partnerships. *Id.* § 707(a). But Congress chose to reference only § 707(c) in § 1402(a)(13). The IRS and Tax Court's atextual construction rewrites § 1402(a)(13) to incorporate § 707(a), instead of the narrower provision in § 707(c).

What's more, Congress explicitly adopted a passive investor standard in § 1402(a)(10), which exempts a retired partner's distributions from the

business from self-employment tax if, among other things, "such partner *rendered no services with respect to any trade or business carried on by such partnership*." I.R.C. § 1402(a)(10)(A) (emphasis added). And in § 469(h)(2), Congress directed that "[e]xcept as provided in regulations, no interest in a limited partnership as a limited partner shall be treated as an interest with respect to which a taxpayer materially participates." I.R.C. § 469(h)(2). Put simply, Congress knows how to restrict limited partners to passive investors. Its choice not to do so in § 1402(a)(13) is strong evidence that the Tax Court's passive investor test is wrong.

**c.** The passive investor standard also contradicts longstanding agency guidance. The SSA's internal guidance to its employees explains that the "terms 'silent partner' and 'inactive partner' are sometimes confused with limited partner," but "[t]hey are not the same." SSA, *Program Operation Manual System (POMS),* RS 01802.304, (rev. Sept. 15, 1997), https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802304. And for the tax years at issue here, the IRS's instructions state that "[l]imited partners treat as self-employment earnings only guaranteed payments for services they actually rendered to, or on behalf of, the partnership to the extent that those payments are payment for those services." Tax Ct. Doc. 13, Ex. A at 34; Ex. B at

36. The IRS's longstanding former position is "one more reason yet to question whether its current position represents the best view of the law." *Bittner v. United States*, 598 U.S. 85, 97 (2023).

**2.** The Tax Court's justifications for its passive investor test don't withstand scrutiny.

**a.** The court thought that because § 1402(a)(13) refers to "limited partner[s], as such," "Congress made clear that the limited partner exception applies only to a limited partner who is functioning as a limited partner," meaning that only passive investors count. SA12. But that reasoning assumes its own conclusion—that "limited partner" means "passive investor." It doesn't. By the time Congress enacted the 1977 Act, it was well-settled that limited partners could actively participate in the business. *Infra* pp. 54-56. Read against that backdrop, Congress's reference to "the distributive share of any item of income or loss of a limited partner, as such," I.R.C. § 1402(a)(13), just means that if a partner receives distributions as both a general and a limited partner, only his limited partner distribution is excluded. H.R. Rep. No. 95-702, pt. 1, at 40.

**b.** The Tax Court also reasoned that "limited partner" must have some bespoke federal-law meaning because "'federal tax law, and only

federal tax law, controls the classification of partners and partnerships for federal tax purposes.'" SA34. But so what? The Tax Code routinely borrows state-law concepts and assigns tax consequences to them. *See, e.g.*, *United States v. National Bank of Commerce*, 472 U.S. 713, 722 (1985). There's nothing unusual or nefarious about looking to state law to determine the meaning of legal terms of art in the Tax Code. This Court does so routinely. *See, e.g.*, *Alphonso*, 708 F.3d at 350-52.

**c.** The Tax Court also asserted that legislative history supports its passive investor test. SA10. But the Supreme Court has repeatedly told lower courts not to deviate from a statute's plain meaning based on legislative history. *See, e.g.*, *Martin v. United States*, 605 U.S. 395, 408 (2025). Section 1402(a)(13) makes clear that a limited partner can receive guaranteed payments for services rendered to the partnership. And in any event, the legislative history the Tax Court cited doesn't support the passive investor test. Rather, it recognizes that limited partners can and do "actually perform[]" "services … for the partnership." H.R. Rep. No. 95-702, pt. 1, at 11.

## ARGUMENT

### I. The IRS exceeded its authority and the Tax Court exceeded its jurisdiction because net earnings from self-employment can't be determined in a TEFRA partnership-level proceeding.

The Tax Court exceeded its jurisdiction by upholding the FPAAs. During the 2016 and 2017 tax years, TEFRA allowed the IRS and Tax Court to use partnership-level proceedings only for certain statutorily defined "partnership items." *Monti*, 223 F.3d at 82. TEFRA allowed the IRS to adjust "partnership items" in a partnership-level proceeding, while non-partnership items had to be adjusted "pursuant to … notice of deficiency procedures" specified elsewhere in the Tax Code. *See Callaway*, 231 F.3d at 108; *Monti*, 223 F.3d at 82; *supra* pp. 12-14. The Tax Court's jurisdiction, in turn, is limited to determining "partnership items of the partnership." I.R.C. § 6226(f) (1997). But the limited partners' net earnings from-self employment isn't a partnership item because it doesn't meet either element of TEFRA's partnership-item definition. *See* I.R.C. § 6231(a)(3) (2002). The IRS thus lacked authority to determine Soroban's partners' net earnings from self-employment, *Monti*, 223 F.3d at 82, and the Tax Court likewise lacked jurisdiction to determine that item, and thus to uphold the FPAAs. The Tax Court's contrary reasoning "blur[s]" and "erase[s] … the distinction between

proceedings involving partnership items and those involving nonpartnership items" and is thus "contrary to the system of separate treatment of partnership and nonpartnership issues Congress established by enacting TEFRA." *Id.*

### A. Net earnings from self-employment isn't a partnership item under TEFRA.

To qualify as a partnership item, an issue must be (1) "required to be taken into account for the partnership's taxable year under any provision of subtitle A" of the Tax Code; and (2) listed in "regulations prescribed by the Secretary [of the Treasury]" identifying the items "more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3) (2002). Net earnings from self-employment doesn't satisfy either requirement. It isn't an item that Subtitle A requires partnerships to take into account for their taxable years. And Treasury's TEFRA regulations don't list net earnings from self-employment among the items appropriate for partnership-level proceedings.

#### 1. A partner's net earnings from self-employment isn't "required to be taken into account for the partnership's taxable year."

Statutory text and structure—plus common sense—make clear that a partner's net earnings from self-employment is not "required to be taken into account for the partnership's taxable year under any provision of subtitle A." I.R.C. § 6231(a)(3) (2002).

**a.** Start with text and structure. Sections 702, 703, and 704 define the items a partnership is required to determine under Subtitle A. Among other things, those provisions require the partnership to calculate its income and the partners' distributive shares of that income. But none of those provisions require the partnership to calculate the amount of tax that each partner owes, much less the partners' self-employment tax.

Rather, § 1402—the provision that defines net earnings from self-employment—makes clear that the amount of a partner's self-employment tax is an item that turns on facts specific to each partner, rather than items determined as to the partnership as a whole. For example, § 1402 defines net earnings from self-employment as "the gross income derived by *an individual* from any trade or business carried on by such *individual*, less … deductions … attributable to such trade or business, plus *his* distributive

share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which *he* is a member." I.R.C. § 1402(a) (emphases added). And the statute makes clear that when computing a partner's net earnings from-self employment, the partner must take into account only "the ordinary income or loss of the partnership for any taxable year of the partnership ending within or with *his taxable year*." *Id.* (emphasis added).

**b.** It makes sense that Section 1402 doesn't treat net earnings from self-employment as item the partnership must separately state. Partnership items are supposed to be "relevant to the partnership as a whole." *Woods*, 571 U.S. at 39. Thus, "items that merely affect the tax liability of a specific partner, but not the other partners, are not partnership items." *Russian Recovery Fund Ltd. v. United States*, 81 Fed. Cl. 793, 797 (2008) (citation omitted). When an item "depends on facts specific to" an individual "partner … there is no apparent reason why" it should be dealt with "at the partnership level." *Monti*, 223 F.3d at 82.

Net earnings from self-employment turns entirely on facts specific to the individual partners. This focus on individual facts pervades § 1402. For example:

- Section 1402(a)(1)'s exclusion for rents from real property turns on whether the partner has investment properties, is a real estate dealer, or whether the real property in question is a farm;

- Section 1402(a)(2)'s exclusion for dividends turns on whether the partner has dividends or is a securities dealer;

- Section 1402(a)(5)'s special rules for community-property states turns on whether the partner is married, operates the business with his or her spouse, and lives in a state with a community property regime;

- Section 1402(a)(8)'s special rules for clergy turn on whether the partner is a "duly ordained, commissioned, or licensed minister of a church or a member of a religious order"; and

- Section 1402(a)(10)'s retired partner exception turns on whether the partner is still working and receiving distributions from Treasury regulation-compliant retirement plan.

Moreover, although the IRS is wrong about how the limited partner exception works, *see infra* pp. 53-70, under its view, the limited partner exception would also require individualized examinations for each partner to determine if she is sufficiently similar to a passive investor. The Tax Court has long held that whether a partner is active or passive is "not a partnership item" because it "has no effect on any item that would affect all of the partners' respective returns" or "any item on the [p]artnership's return or on the [p]artnership's books and records." *Estate of Quick*, 110 T.C. at 186-87.

It makes sense that net earnings from self-employment is a partner-specific item. Section 1402 defines how an individual partner pays tax on his income. But partnerships don't pay income tax, I.R.C. § 701, so there is "no apparent reason why" an individual partner's personal self-employment tax should be dealt with "at the partnership level." *Monti*, 223 F.3d at 82.

#### 2. Net earnings from self-employment isn't on Treasury's list of items appropriate for partnership-level proceedings.

Net earnings from self-employment also flunks the partnership-item test because it isn't listed in the "regulations prescribed by the Secretary [of the Treasury]" identifying the items "more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3) (2002). The requirement is simple. If an item is "not on the list" of partnership items prescribed by Treasury, which is published at 26 C.F.R. § 301.6231(a)(3)–1, it isn't a partnership item, period, full stop. *Monti*, 223 F.3d at 82. In *Monti*, for example, this Court held that whether individual partners have the right to request consistent settlement terms isn't a partnership item—and thus isn't subject to TEFRA partnership-level proceedings—because it's not on Treasury's list. *Id.* Similarly, in *Field v. United States*, 328 F.3d 58, 59 (2d Cir. 2003)

(per curiam), this Court held that interest for underpayment of taxes isn't a partnership item because it isn't on the list.

Net earnings from self-employment isn't on the list of partnership items in 26 C.F.R. § 301.6231(a)(3)–1. It thus isn't a partnership item subject to partnership-level TEFRA proceedings.

**B. The Tax Court's contrary reasoning lacks merit.**

The Tax Court's justifications for treating net earnings from self-employment as a partnership item cannot be squared with TEFRA or controlling Treasury regulations.

**1.** The Tax Court reasoned that the partnership-item's first requirement was "easily resolved." SA15, 16. In the court's view, § 1402—the Tax Code provision on net earnings from self-employment—"is found in subtitle A," and "a partnership is required to determine the entity status of its direct partners and 'to report perfunctorily its ordinary income as [net earnings from self-employment] except to the extent that the ordinary income was allocated to a direct partner that was a limited partner.'" SA15-16. Neither rationale works.

To start, TEFRA specifies that an issue counts as a partnership item only if it is "required to be taken into account for the partnership's taxable

year under any provision of subtitle A." I.R.C. § 6231(a)(3) (2002). While § 1402 is located in Subtitle A, it doesn't require net earnings from self-employment to be taken into account for the partner's taxable year. Sections 702 through 704 govern how a partnership calculates its income for any given taxable year, and they do not require partnerships to separately state the amount of their partners' incomes subject to tax. *Supra* pp. 34-37. So the Tax Court's reliance on § 1402 was misplaced.

In the end, the Tax Court identified nothing in Subtitle A requiring partnerships to report net earnings from self employment. The non-precedential memorandum the court relied on, *Olsen-Smith, Ltd. v. Commissioner*, 90 T.C.M. (CCH) 64 (2005), didn't identify any provision of Subtitle A containing that requirement. Nor did the IRS in its briefing, either. That's because no such provision exists. *Supra* pp. 34-37. The Tax Court and IRS can't satisfy TERFA's requirements by imagining fictitious statutes.

**2.** The Tax Court also found that net earnings from self-employment is on Treasury's list of partnership items because it's encompassed by 26 C.F.R. § 301.6231(a)(3)–1(b). SA16. That regulation provides that the "term 'partnership item' includes the accounting practices and the legal and factual determinations that underlie the determination of the amount,

timing, and characterization of items of income, credit, gain, loss, deduction, etc." 26 C.F.R. § 301.6231(a)(3)–1(b).

Section 301.6231(a)(3)–1(b) doesn't support the Tax Court's analysis. That provision just clarifies that the Tax Court's power to adjudicate partnership items in TEFRA partnership-level proceedings includes the lesser power of reviewing "the legal and factual determinations that underlie" those partnership items. *Id.* It doesn't create brand-new partnership items. As Treasury explained when it added the provision, § 301.6231(a)(3)–1(b) clarifies that "items that affect the computation of partnership taxable income"—itself a partnership item, *see* 26 C.F.R. § 301.6231(a)(3)–1(a)(1)(i)—are also partnership items. 51 Fed. Reg. 13212, 13213 (Apr. 18, 1986). Section 301.6231(a)(3)–1(b)'s examples underscore the same point. "The partnership's method of accounting"; "whether an item is currently deductible"; and "whether partnership activities have been engaged in with the intent to make a profit" are all partnership items under § 301.6231(a)(3)–1(b) because they are related to other partnership items—"income" and "deduction[s]." *See* 26 C.F.R. § 301.6231(a)(3)–1(a), (b).

Net earnings from self-employment isn't a partnership item listed elsewhere in § 301.6231(a)(3)–1. *Supra* pp. 37-38. And it isn't encompassed by

any other partnership items because the Tax Code doesn't require partnerships to report it. *Supra* pp. 34-37. The Tax Court violated TEFRA by writing net earnings from self-employment into § 301.6231(a)(3)–1.

* * *

TEFRA doesn't grant the Tax Court the power to determine whether Soroban's partners qualify for the limited partner exception in partnership-level proceedings. The Tax Court should have required the IRS to address that question in deficiency proceedings involving each individual partner. It exceeded its jurisdiction by instead ratifying the IRS's attempt to address the issue through TEFRA partnership-level proceedings.

## II. Soroban's limited partners' distributive shares of its income are excluded from net earnings from self-employment under I.R.C. § 1402(a)(13).

The Tax Court was also wrong on the merits. Section 1402(a)(13) excludes Soroban's limited partners' distributive shares of the partnership's income from self-employment tax. Settled partnership law principles, longstanding agency guidance, and past congressional action confirm that the term "limited partner" in § 1402(a)(13) refers to any partner of a limited partnership with limited liability. Soroban's limited partners fit the bill

because they are partners in a limited partnership and have limited liability under Delaware law.

The Tax Court's contrary conclusion is wrong. The Tax Court thought that only passive investors can count as limited partners, and concluded that Soroban's limited partners aren't passive investors because they play important roles in Soroban's business. But longstanding caselaw, textual indicators in the Tax Code, and agency guidance all make clear that a person can be a limited partner without being a passive investor. The Tax Court's passive investor test finds no support in the statute's text or background legal principles incorporated into the Tax Code.

### A. I.R.C. § 1402(a)(13) applies to any partner in a limited partnership with limited liability.

The limited partner exception provides that the IRS must exclude "the distributive share of any item of income or loss of a limited partner, as such," from a partnership's net earnings from self employment, "other than guaranteed payments … to that partner" as "remuneration" "for services actually rendered to or on behalf of the partnership." I.R.C. § 1402(a)(13). Statutory text, longstanding IRS and SSA guidance, and congressional action show

that the limited partner exception applies to any partner in a limited partnership with limited liability.

#### 1. When § 1402(a)(13) was enacted, the term "limited partner" referred to partners in a limited partnership with limited liability.

A court's "job is to interpret the words" in a statute according to their "meaning at the time Congress enacted the statute." *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration adopted). When Congress "borrows terms of art," like limited partner, courts presume that Congress "kn[e]w[] and adopt[ed] the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette*, 342 U.S. at 263. Courts thus consult "contemporaneous dictionaries" to interpret undefined legal terms, as well as how "other courts and legislatures have used the same language." *Munoz-Gonzalez v. D.L.C. Limousine Service, Inc.*, 904 F.3d 208, 213 (2d Cir. 2018). And here, contemporaneous dictionaries and legislation show that when Congress enacted § 1402(a)(13) in 1977, "limited partner" meant a partner in a limited partnership with limited liability.

**a.** Start with legal dictionaries. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025).

- The 1968 edition of *Black's Law Dictionary* defined limited partners as "special partners, contributing in cash payments a specific sum as capital to the common stock, and who are not liable for the debts of the partnership beyond the fund so contributed," and contrasted them with "general partners," who were "jointly and severally responsible as ordinary partners, and by whom the business is conducted." *Limited Partnership*, *Black's Law Dictionary* (4th rev. ed. 1968).

- The 1979 edition of *Black's Law Dictionary* defined "limited partner" as a "partner whose liability to third party creditors of the partnership is limited to the amount invested by such partner in the partnership." *Limited Partner*, *Black's Law Dictionary* (5th ed. 1979).

- The 1977 edition of *The Law Dictionary* defined limited partners as partners who, "on compliance with the provisions of various state statutes regulating such partnerships, [are] relieved from liability beyond the amount of the capital contributed by them." *Limited Partnership*, *Cochran's Law Dictionary* 184 (5th ed. 1977).

- *Anderson's Dictionary of Law* defined a limited partnership as an "association organized under a statute, with limited liability in some or all of the members." *Limited Partnership*, *Anderson's Law Dictionary* 750 (1913).

In short, legal dictionaries defined limited partners as partners in a limited partnership with limited liability.

**b.** Pre-1977 legislative practice supports the same definition. *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 90 n.12 (1987) (looking to

widely adopted model legislation to glean general principles of partnership law). The 1976 ULPA, which was adopted by "nearly every jurisdiction in this country," *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1501 n.14 (11th Cir. 1996), defined a "limited partnership" as "a partnership formed by two or more persons under the laws of this State and having one or more general partners and one or more limited partners," which were distinguished by the limited partners' lack of liability for the partnership's obligations. 1976 ULPA §§ 101(7), 303(a). The 1976 ULPA was a continuation of the 1916 Uniform Limited Partnership Act, which was itself "adopted in all but one of the fifty states." *Allright Missouri, Inc. v. Billeter*, 829 F.2d 631, 636 (8th Cir. 1987). The 1916 ULPA also defined limited partners as partners "not bound by the obligations of the partnership." 1916 ULPA § 1. So by 1977, legislatures nationwide had recognized for decades that a limited partner is just a partner in a limited partnership with limited liability.

#### 2. Longstanding SSA and IRS guidance confirms that the term "limited partner" carries its ordinary meaning.

Longstanding agency guidance adopted the same definition. An agency's interpretation of a statutory term that was "issued contemporaneously with the statute at issue, and which have remained consistent over

time" is "especially useful" in determining the statute's meaning. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024); *Bittner*, 598 U.S. at 97; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Both the SSA and (until recent years) the IRS interpreted the term "limited partner" to mean partners in a limited partnership with limited liability—strong evidence that the term's ordinary meaning should prevail.

**a.** Begin with the SSA. In the 1977 Act, Congress excluded the "income or loss of a limited partner, as such," from the income that could trigger social security benefits, 42 U.S.C. § 411(a)(12), and then made the conforming amendment to the Tax Code provision at issue here, I.R.C. § 1402(a)(13). *Supra* pp. 15-18. Because the term "limited partner" in both provisions was enacted in the same statute to address the same subject, it must have the same meaning in both provisions. *See United States v. Daugerdas*, 892 F.3d 545, 556 (2d Cir. 2018).

In its regulations and operational guidance, the SSA has consistently defined the "limited partner" as a partner who enjoys limited liability—the same definition embraced by contemporary dictionaries and legislation. *Supra* p. 44. In 1978, the SSA issued proposed regulations defining the term "limited partner" for purposes of the 1977 Act as "one whose financial

liability with respect to the obligations of the partnership is limited to the amount of his or her financial investment in the partnership," 43 Fed. Reg. 25422, 25422 (June 13, 1978). The SSA formally adopted that definition in 1980, and has adhered to it with only minor wording changes to this day. 20 C.F.R. § 404.1080(b)(3).

The SSA's operational guidance embraces the same understanding. The SSA issues a handbook to its employees called the Program Operations Manual System (POMS) Consistent with SSA regulations, POMS defines a "limited partnership" as one "created in accordance with State statutory requirements" that includes "[l]imited liability of limited partners," and does not formally require "management responsibilities of limited partners." SSA, *Program Operation Manual System (POMS)*, RS 01802.302 (rev. Mar. 6, 1991), https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802302. POMS warns that limited partners should not be "confused" with "'silent'" or "'inactive partner[s],'" RS 01802.304, https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802304, and instructs SSA workers to determine if someone is a limited partner by "[r]equest[ing] a copy of the" partnership's state "certificate of registration," RS 01802.302. Put differently, the SSA

recognizes that whether someone is a limited partner turns on whether he enjoys limited liability under state law.

**b.** Until recently, the IRS interpreted "limited partner" in the 1977 Act the same way as the SSA. Beginning in the 1978 tax year, the IRS's instructions for preparing partnership returns defined a limited partner as "one whose potential personal liability for partnership debts is limited to the amount of money or other property that the partner contributed or is required to contribute to the partnership." *See* Appendix of Petitioners-Appellants at APP118, *Denham Capital Management LP v. Commissioner*, No. 25-1349 (1st Cir. Aug. 8, 2025). The IRS adhered to those instructions for decades, including the two tax years at issue here. *See* Tax Ct. Doc. 13, Ex. A at 2; Ex. B at 3. The instructions for the 2016 and 2017 tax years further explained that "[g]enerally, a limited partner's share of partnership income (loss) isn't included in net earnings (loss) from self-employment. Limited partners treat as self-employment earnings only guaranteed payments for services they actually rendered to, or on behalf of, the partnership to the extent that those payments are payment for those services." Tax Ct. Doc. 13, Ex. A at 34; Ex. B at 36.

In short, the IRS recognized for more than 40 years that a "limited partner" is just a partner with state law limited liability, and that limited partners should exclude everything but guaranteed payments like a salary from their net earnings for self-employment. That longstanding agency position is good evidence that § 1402(a)(13) uses "limited partner" in its ordinary, well-settled sense.

### 3. Congress's rejection of the IRS's past efforts to narrow the definition of "limited partner" shows that "limited partner" carries its ordinary meaning.

Congress has also made clear that the IRS shouldn't contort the term "limited partner" to match its policy goals. In 1997, the IRS proposed regulations seeking to narrow the definition of "limited partner" "for purposes of section 1402(a)(13)" to match its position in this case. *See* 62 Fed. Reg. 1702, 1704 (Jan. 13, 1997). The proposed regulation called for a "functional approach" to determine whether a person was a limited partner. *Id.* at 1703. The proposed regulation would have denied limited partner treatment to partners who had (1) "personal liability" for the partnership's debts; (2) "authority" to enter contracts for the partnership; (3) "participate[d] in the partnership's trade or business for more than 500 hours during the partnership's taxable year"; or (4) provided certain specified services for the

partnership. *Id.* at 1703-04. In other words, the IRS was trying to adopt something very close to the passive investor standard it presses here.

Congress immediately blocked the IRS's attempt to exclude partners who participated in the business. Six months after the IRS proposed its regulation, the Senate passed a resolution expressing "concern[] that the proposed change in the treatment of individuals who are limited partners under applicable State law exceeds the regulatory authority of the Treasury Department and would effectively change the law administratively without congressional action." 143 Cong. Rec. 13168 (June 27, 1997). Congress then passed, and President Clinton signed, a law that barred any "temporary or final regulation with respect to the definition of a limited partner under section 1402(a)(13) of the Internal Revenue Code" from "be[ing] issued" "before July 1, 1998." Taxpayer Relief Act of 1997 Pub. L. No. 105-34, § 935, 111 Stat. 788, 882. Chastened by that defeat, the IRS abandoned its proposed regulation and accepted the statute's ordinary meaning for 20 years before it tried to revive its discredited approach in this litigation.

In sum, when the IRS tried to formally adopt the definition of "limited partner" that the Tax Court accepted below, the Senate explained that the IRS's definition "would effectively change the law administratively without

congressional action," 143 Cong. Rec. 13168, and Congress passed a law blocking it. That history is further evidence that Congress intended for the term "limited partner" to carry its ordinary meaning.

* * *

When Congress passed the 1977 Act, a "limited partner" meant a partner in a limited partnership with limited liability. The SSA has always hewed to that definition, and the IRS did the same for more than 40 years. And when the IRS previously tried to expand that definition to match the "functional approach" it advocates here, Congress swiftly intervened and shut the project down. The evidence is clear: a "limited partner" under § 1402(a)(13) is just a partner in a limited partnership who enjoys limited liability under the state law organizing the partnership.

### B. Soroban's limited partners are limited partners covered by I.R.C. § 1402(a)(13).

The undisputed record below shows that Messrs. Mandelblatt, Kapadia, and Friedman were partners in a limited partnership with limited liability. The IRS stipulated that "Soroban is a Delaware limited partnership," and was one for the 2016 and 2017 tax years. 1-JA71, 73. It also

stipulated that Messrs. Mandelblatt, Kapadia, and Friedman were partners in Soroban. 1-JA74.

That leaves just limited liability. Under Delaware law, limited partners are "not liable for the obligations of a limited partnership unless" they are "also a general partner" or they "participate[] in the control of the business." 6 Del. Code Ann. § 17-303(a); *accord* 6 Del. Code Ann. § 17-303(a) (2008) (provision applicable until mid-2017). "A limited partner does not participate in the control of the business" just by acting as "an agent or employee of … the limited partnership or a general partner." 6 Del. Code Ann. § 17-303(b)(1); *accord* 6 Del. Code Ann. § 17-303(b)(1) (2008).

The undisputed record shows that Messrs. Mandelblatt, Kapadia, and Friedman had limited liability under Delaware law. None of them acted as Soroban's general partner, which was Soroban Capital Partners GP LLC. 1-JA63, 183. Soroban's limited partnership agreement prohibited anyone but the general partner from controlling Soroban. 1-JA194. And while Messrs. Mandelblatt, Kapadia, and Friedman each worked in various management capacities for Soroban, that doesn't count as participating in control of the business under Delaware law. 6 Del. Code Ann. § 17-303(b)(1); *accord* 6 Del.

Code Ann. § 17-303(b)(1) (2008). So Messrs. Mandelblatt, Kapadia, and Friedman each has limited liability. The IRS has never argued otherwise.

Because Messrs. Mandelblatt, Kapadia, and Friedman are partners in a limited partnership with limited liability, they are each subject to § 1402(a)(13)'s limited partner exception.

### C. The Tax Court applied the wrong legal standard in determining whether Soroban's limited partners are subject to the limited partner exception.

The Tax Court held that partners can't qualify as limited partners under § 1402(a)(13) unless they are "passive investors" "'who merely invested in a partnership and who were not actively participating in the partnership's business operations.'" SA10, 12. And it concluded that Messrs. Mandelblatt, Kapadia, and Friedman aren't passive investors because they serve in important management roles and provide important services for Soroban's business. SA19-42. But the Tax Court's passive investor standard is wrong. It cannot be squared with the statute's text, and the court's justifications for imposing it lack merit.

### 1. The Tax Court's passive investor standard contravenes § 1402(a)(13).

The Tax Court's passive investor standard is contrary to the statute. When Congress passed the 1977 Act, it was blackletter law that partners could participate in the partnership's business without losing their limited partner status. That concept was part of "the cluster of ideas that were attached to" the term "limited partner" when Congress "borrowed" it for the 1977 Act. *Morissette*, 342 U.S. at 263. Other textual clues confirm that Congress did not understand limited partners as confined to passive investors. And the SSA and (before this litigation) the IRS have consistently cautioned that limited partners shouldn't be conflated with silent or inactive partners.

#### a. In 1977, it was settled law that limited partners could participate in the business and didn't need to be passive investors.

Contemporary legal sources show that Congress would not have understood the term "limited partner" to be cabined to passive investors when it passed the 1977 Act.

***i.*** State law has long recognized that limited partners can and often do participate in the partnership's business. For example, the widely adopted 1916 Uniform Limited Partnership Act recognized that a "person

may be a general partner" —*i.e.*, the partner that controls the business—"and a limited partner in the same partnership at the same time." 1916 ULPA § 12(1). These so-called dual-status partners would receive separate distributions subject to different rules in their capacities as general and limited partners. Similarly, the 1976 Revised Uniform Limited Partnership Act provided that a limited partner would have limited liability "unless [he] is also a general partner or, in addition to the exercise of [his] rights and powers as a limited partner, he takes part in the control of business," in which case he would maintain his limited liability except as "to persons who transact business with the limited partnership with actual knowledge of his participation in control." 1976 ULPA § 303(a) (1976).

Congress was aware of dual-status partners when it passed the 1977 Act. Indeed, it structured the limited partner exception to clarify that "if a person is both a limited partner and a general partner in the same partnership, the distributive share received as a general partner would continue to be covered." H.R. Rep. No. 95-702, pt. 1, at 40 (1977).

***ii.*** Caselaw from before the limited partner exception was enacted also shows that limited partners could, and often did, participate in the business's operations.

- In *Frigidaire Sales Corp.*, for example, the plaintiffs argued that a group of limited partners didn't count as limited partners—and should thus have general liability for the partnership's debts—"because they exercised the day-to-day control and management" over the corporation that served as the partnership's general partner. 562 P.2d at 245-46. The Washington Supreme Court rejected that argument, holding that the defendants' management activities didn't deprive them of their limited partner status. *Id.* at 247.

- Similarly, in *Grainger v. Antoyan*, 313 P.2d 848, 853-54 (Cal. 1957) (en banc), the plaintiffs argued that a limited partner in a car dealership should lose his limited liability because he worked for the dealership as a sales manager, co-signed the dealership's checks, loaned it money, and leased commercial property to it. The California Supreme Court disagreed, holding that none of this "activity" contributing to the business made "him subject to liability" as a general partner. *Id.* at 853.

- And in *Silvola v. Rowlett*, 272 P.2d 287, 290-91 (Colo. 1954) (en banc), the plaintiff argued that a limited partner in an auto repair shop should be subject to general liability because he was employed as the shop's foreman and gave advice to the general partner. The Colorado Supreme Court disagreed, holding that partners do not have to be "silen[t]" to count as a limited partners. *Id.*

Because caselaw recognized that limited partners frequently participated in the business when the 1977 Act was passed, Congress could not have thought the term "limited partner" was limited to passive investors.

#### b. Other textual indicators show that Congress didn't understand limited partners to be limited to passive investors.

Contrary to the IRS's notion that Congress thought that limited partners providing services couldn't in fact be limited partners, Congress explicitly addressed the portion of partnership income that would be subject to self-employment tax when a limited partner provides services. That textual indicator, plus clues elsewhere in the Tax Code, shows that Congress didn't intend for the "limited partner[s]" referenced in § 1402(a)(13) to be limited to passive investors.

***i.*** Consider the carveout in the limited partner exception that contemplates that a limited partner might draw a salary for participating in the business, rather than remaining purely passive. That carveout includes in net earnings from self-employment those "guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services." I.R.C. § 1402(a)(13). The guaranteed payments described in § 707(c) are payments that are "determined without regard to the income of the partnership," like a salary paid "to a partner for services," *id.* § 707(c) (1986), making clear that limited partners,

as a concept, reaches not just passive but also active partners. Under the carveout, Congress chose to tax only the salary portion, and not any share of profits (*i.e.*, an amount that might be akin to a bonus in an employment context).

The Tax Court's passive investor test makes the guaranteed payments carveout irrelevant, contrary to the Supreme Court's warnings against interpreting "a statutory provision so as to render superfluous other provisions in the same enactment.'" *Freytag v. Commissioner*, 501 U.S. 868, 877 (1991) (citation omitted). If the limited partner exception already excludes any partner who participates in the business, there is no need to carve out guaranteed payments like salaries. On the Tax Court's view, those guaranteed payments would never be excluded from self-employment tax because the business activities a partner would perform to earn them would disqualify him from limited partner status.

The Tax Court recognized this problem with its construction, conceding that a partner could get paid for services while keeping his limited partner status as long as "the surrounding circumstances of the partner's economic relationship with the partnership … sufficiently indicate that it is generally one of passive investment." SA34. But that workaround is at best

illusory. If a partner is involved enough in the business to earn the kind of guaranteed payments contemplated by § 707(c), he isn't a passive investor and the guaranteed payments carveout is irrelevant. And there's nothing in the statutory text that suggests that the test would turn on such a fact-intensive inquiry. In the end, the only way to give effect to all of § 1402(a)(13)'s text is to reject the Tax Court's passive investor approach.

Moreover, if it is actually possible for the Tax Court to find that a partner works enough for the partnership to draw a salary while maintaining an "economic relationship with the partnership … that … is generally one of passive investment," SA34, then the passive investor standard is no standard at all. The Tax Code is supposed to provide "certainty and uniformity," *Estate of Borax v. Commissioner*, 349 F.2d 666, 670 (2d Cir. 1965), so that taxpayers can plan their economic affairs. But if some partnership workers can be "passive investors" while others aren't, there is no way to know whether any partner is a "limited partner" without extensive litigation. That can't have been what Congress intended.

***ii.*** Congress's use of the term "guaranteed payments described in section 707(c)" in § 1402(a)(13) is also significant. Section 707 contains a series of carefully considered rules applying to transactions between partners and

partnerships. Section 707(a) provides broad authority for the IRS to recharacterize transactions when a partner engages in a transaction with a partnership other than in his capacity as a partner. I.R.C. § 707(a) (1986). Specifically, § 707(a)(2)(A) provides that allocations and distributions to a partner can be recharacterized as a payment for service if that is what they are in substance. *Id.* § 707(a)(2)(A). But § 707(c) applies to a much narrower subset of transactions between a partner and a partnership, covering only cases where the partner is promised to receive payments for services no matter whether the partnership is profitable. *Id.* § 707(c).

In carving out guaranteed payments under § 707(c) from the limited partner exception, Congress chose to exclude the bonus portion of a service partner's share of partnership profits from self-employment tax. Congress could have referenced the much broader § 707(a), which would have given the IRS the ability to recharacterize income allocations as payments for services if it thought that recharacterization better reflected the substance of the arrangement. But that's not the choice that Congress made.

The Tax Court claimed to apply the canon against surplusage, and to "give effect to every clause and word of [the] statute." SA12. And yet the Tax Court's reasoning would render meaningless Congress's choice to reference

only § 707(c), and not § 707(a) or all of § 707. In reality, the Tax Court inserted a functional analysis determination—which Congress affirmatively rejected—based on its view of "the partner's economic relationship with the partnership." SA34. That test effectively replaces § 707(c) with § 707(a), and thereby fails to give effect to every clause and word in the statute. Because the Tax Code's plain text is clear, it was wrong for the Tax Court and IRS to try to override Congress's policy choice by trying to rewrite § 1402(a)(13) to achieve their view of the more appropriate outcome. *See Gitlitz v. Commissioner*, 531 U.S. 206 (2001).

***iii.*** Other text in § 1402 and elsewhere in the Tax Code confirms that Congress didn't write a passive investor standard into the limited partner exception. For starters, Congress clearly knows how to write a passive investor standard when it wants to. Ten years before Congress enacted the limited partner exception, it passed a retired partner exception that *did* adopt a passive investor standard. *See* Social Security Amendments Act of 1967, Pub. L. No. 90-248, § 118(a), 81 Stat. 821, 841 (1968). The retired partner exception provides that a partner's distributions from the business are exempt from Social Security and Medicare taxes if, among other things, "such partner *rendered no services with respect to any trade or business carried on by such partnership*

(or its successors) during the taxable year of such partnership (or its successors), ending within or with his taxable year, in which such amounts were received." I.R.C. § 1402(a)(10)(A) (emphasis added); *accord* 42 U.S.C. § 411(a)(9).

Congress also knows how to write a statute that presumes that limited partners are passive investors. Section 469 of the Tax Code disallows certain losses and credits from passive activity in which the taxpayer doesn't meaningfully participate. In § 469(h)(2), Congress directed that "[e]xcept as provided in regulations, no interest in a limited partnership as a limited partner shall be treated as an interest with respect to which a taxpayer materially participates." I.R.C. § 469(h)(2).

Unlike in §§ 1402(a)(1) and 469(h)(2), Congress didn't write any language into the limited partner exception limiting it to passive investors, or presuming that limited partners don't materially participate in the business. In fact, it did just the opposite. *Supra* pp. 57-59. The Tax Court should have respected the words Congress wrote, not rubberstamped the IRS's efforts to rewrite them.

### c. The SSA and (until recently) the IRS have not understood limited partners to be passive investors.

The SSA's and IRS's past guidance on the 1977 Act reinforces that limited partners include more than just passive investors. To this day, the SSA's POMS handbook warns that the "terms 'silent partner' and 'inactive partner' are sometimes confused with limited partner," but "[t]hey are not the same." RS 01802.304, https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802304. And for the tax years at issue here, the IRS's instructions on who qualifies for the limited partner exception state that "[l]imited partners treat as self-employment earnings only guaranteed payments for services they actually rendered to, or on behalf of, the partnership to the extent that those payments are payment for those services." Tax Ct. Doc. 13, Ex. A at 34; Ex. B at 36. Even the IRS acknowledged that limited partners include partners who provide services to the business.

To be sure, the IRS now takes the opposite position here. But when "the government has repeatedly issued guidance to the public at odds with the interpretation it now asks [the Court] to adopt … surely that counts as one more reason yet to question whether its current position represents the best view of the law." *Bittner*, 598 U.S. at 97. After all, "when the government

(or any litigant) speaks out of both sides of its mouth, no one should be surprised if its latest utterance isn't the most convincing one." *Id.* at 97 n.5.

### 2. The Tax Court's justifications for its passive investor standard lack merit.

The Tax Court offered three rationales for interpreting the term "limited partner" in § 1402(a)(13) to encompass only passive investors in the partnership. None has merit.

**a.** The Tax Court determined that Congress must have meant to adopt a passive investor standard because it added the words "as such" to § 1402(a)(13). The court reasoned that by "adding 'as such,' Congress made clear that the limited partner exception applies only to a limited partner who is functioning as a limited partner." SA12.

That makes no sense, because the words "as such" don't contain the Tax Court's passive investor test. The phrase "as such" means "in itself," *As Such*, Webster's Third New International Dictionary 2283 (1961), or "in that capacity," *As Such*, 2 The Compact Edition of the Oxford English Dictionary 3137 (1971). It refers back to the closest reasonable antecedent. *See Boechler, P.C. v. Commissioner*, 596 U.S. 199, 205 (2022). So as used in § 1402(a)(13), "limited partner, as such," just means "limited partner, as a limited partner."

As explained, for more than a century, the law has recognized that partner can act as a limited partner without being a passive investor. *Supra* pp. 54-56. So the phrase "limited partner, as such" doesn't stand up the Tax Court's passive investor rule.

It makes sense that Congress inserted the words "as such" into § 1402(a)(13) to mean "limited partner, as a limited partner." Recall that under partnership principles that were widely recognized by at least 1916, a "person may be a general partner"—*i.e.*, the partner that controls the business—"and a limited partner in the same partnership at the same time." 1916 ULPA § 12(1) (1916). In that scenario, a partner can make separate contributions to the business as both a general and a limited partner, and receive separate distributions in both roles to the extent allowed by the partnership agreement. *See, e.g.*, 6 Del. C. § 17-404; J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice* § 20:3 (Oct. 2025 update). Congress added the words "as such" to the limited partner exception to clarify that only a dual-status partner's limited partner distribution would be excluded, while his general partner distribution—typically the money he got for running the business—would remain part of his net earnings from self-employment. As the House Ways and Means Committee's report on the 1977 Act explains,

Congress's intent was to make sure that "if a person is both a limited partner and a general partner in the same partnership, the distributive share received as a general partner would continue to be covered" as net income from self-employment. H.R. Rep. No. 95-702, pt. 1, at 40. The Tax Court didn't need to concoct the passive investor test to give "as such" meaning.

**b.** The Tax Court next reasoned that it could ignore whether Soroban's partners qualify as limited partners under state law because "'federal tax law, and only federal tax law, controls the classification of partners and partnerships for federal tax purposes.'" SA34. It's true that whether Soroban's partners count under the limited partner exception is a question of federal tax law. But the relevant federal tax law—§ 1402(a)(13)—incorporates the term "limited partner," a legal term of art that refers to partners in a state law limited partnership with limited liability. *Supra* pp. 43-45. The court should have applied that definition rather than straining to invent something new.

There is nothing remarkable about looking to state law to interpret legal terms of art in the Tax Code. As the Supreme Court long ago explained, "[s]tate law creates legal interests and rights" and the "federal revenue acts designate what interests or rights, so created, shall be taxed." *Morgan v.*

*Commissioner*, 309 U.S. 78, 80-81 (1940). Thus, for example, in *Burchell v. Helvering*, 115 F.2d 681, 682-83 (2d Cir. 1940), Judge Learned Hand explained that whether the taxpayer's property taxes "accrued" before his death—and could thus be deducted from his income taxes—was "a federal question" because the word "accrued" appeared in a federal revenue statute, but one that turned on state law accrual concepts. Similarly, in *Wesemann v. Commissioner*, 298 F.2d 527, 527 (2d Cir. 1962) (per curiam), this Court looked to New York state law to determine whether the taxpayer was a "head of a household" under the Tax Code. And in *Alphonso*, 708 F.3d at 350-52, this Court looked to New York state law to determine whether ownership in a co-op counted as "property" under the Tax Code. For more examples, see *National Bank of Commerce*, 472 U.S. at 722; *Aquilino v. United States*, 363 U.S. 509, 512-13 (1960); and *Saltzman v. Commissioner*, 131 F.3d 87, 89 (2d Cir. 1997).

Nor is it unusual, as a general matter, for Congress to define federal law by reference to state law concepts. The Armed Career Criminal Act, for example, creates a federal generic definition of "burglary" that borrows from state law concepts, *see Taylor v. United States*, 495 U.S. 575, 598 (1990), and courts evaluate whether specific state law burglary statutes meet the federal generic definition, *see United States v. Stitt*, 586 U.S. 27, 33 (2018). Federal

immigration law uses similar concepts. *E.g.*, *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 395-97 (2017). And the concept goes all the way back to the Constitution. For example, the property protected by the Fifth Amendment Takings Clause is often defined by state law. *See Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023). The same idea applies here. Congress included a generic state law term—"limited partner"—in § 1402(a)(13), and courts must evaluate whether particular partners meet the generic definition under the laws of their state.

**c.** Finally, the Tax Court relied on "'the legislative history of section 1402(a)(13),'" concluding that the statute's "intent 'was to ensure that individuals who merely invested in a partnership and who were not actively participating in the partnership's business operations … would not receive credits towards Social Security coverage.'" SA10. But "'legislative history is not the law'" and courts can't use it to "displace what the law's terms clearly direct." *Martin*, 605 U.S. at 408 (alteration adopted). The term "limited partner" in § 1402(a)(13) isn't ambiguous, and the court shouldn't have used legislative history to depart from the statute's plain meaning.

In any event, the legislative history cuts against the Tax Court's reading. The very next sentence in the House report the court quoted states that

the limited partner extension "would not extend to guaranteed payments …, such as salary and professional fees, received for services actually performed by the limited partner for the partnership." H.R. Rep. No. 95-702, pt. 1, at 11. In other words, Congress acknowledged that limited partners are not just passive investors; they can and do "actually perform[]" "services … for the partnership." *Id.*

The Tax Court's view of policy from legislative history, even taken on its own terms, doesn't support the court's reading, either. The limited partner exception does ultimately ensure that passive investors do "not receive credits towards Social Security coverage." SA10. It just does so in a way that also excludes the distributive shares of other limited partners from self-employment tax. The Tax Court wasn't entitled to override Congress's drafting choices because it thought there was a more precise way to achieve Congress's policy objectives.

* * *

The limited partner exception applies to any partners in a limited partnership that enjoy limited liability. That includes Soroban's limited partners, who indisputably enjoy limited liability under the Delaware law governing Soroban's organization. The Tax Court's contrary conclusion rests on a

passive investor standard that Congress rejected when crafting its statutory text, and contradicts more than a century of blackletter partnership law and longstanding administrative guidance.

## CONCLUSION

The Court should reverse the Tax Court's judgment.

Dated: December 8, 2025

Respectfully submitted,

/s/ *Shay Dvoretzky*

Shay Dvoretzky
*Counsel of Record*
Parker Rider-Longmaid
Armando Gomez
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Kathleen Gregor
Elizabeth Smith
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116

Raza Rasheed
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Avenue of the Stars, Ste. 200N
Los Angeles, CA 90067

*Counsel for Petitioners-Appellants Soroban Capital Partners LP & Soroban Capital Partners GP LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, as calculated by Microsoft Word, it contains 13,954 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I also certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: December 8, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners-Appellants Soroban Capital Partners LP & Soroban Capital Partners GP LLC Tax Matters Partner*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2025, I electronically filed the foregoing brief and following Special Appendix with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: December 8, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners-Appellants Soroban Capital Partners LP & Soroban Capital Partners GP LLC Tax Matters Partner*

[This page intentionally left blank.]

# SPECIAL APPENDIX

## SPECIAL APPENDIX TABLE OF CONTENTS

**Page**

Opinion, November 28, 2023 (Doc. Nos. 35, 33) .......... SA2

Order denying Petitioner's Motions for Summary Judgment and granting Respondent's Motions for Partial Summary Judgment, November 29, 2023 (Doc. Nos. 36, 34) .......... SA18

Memorandum Opinion, May 28, 2025 (Doc. Nos. 59, 56) .......... SA19

Order Denying Motion to Strike and Granting in Part Motion to Reopen Record, May 28, 2025 (Doc. Nos. 60, 57) .......... SA43

Order and Decision, May 28, 2025 (16217-22, Doc. No. 61) .......... SA44

Order and Decision, May 28, 2025 (16218-22, Doc. No. 58) .......... SA45

I.R.C. § 707 (1986) .......... SA46

I.R.C. § 1402(a)[1] .......... SA51

I.R.C. § 6226 (1997) .......... SA63

I.R.C. § 6231 (2002) .......... SA70

26 C.F.R. § 301.6213(a)(3)-1 .......... SA82

[1] The version of I.R.C. § 1402(a) that is in effect today is identical in all material respects to the version that was in effect for the 2016 and 2017 tax years.

# United States Tax Court

161 T.C. No. 12

SOROBAN CAPITAL PARTNERS LP, SOROBAN CAPITAL PARTNERS GP LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

---

Docket Nos. 16217-22, 16218-22. Filed November 28, 2023.

---

PS, a limited partnership subject to the TEFRA audit and litigation procedures, made guaranteed payments and distributed ordinary income to its limited partners. It excluded distributions of ordinary income to its limited partners from its computation of net earnings from self-employment. R determined that the distributions of ordinary income should have been included in PS's computation of net earnings from self-employment.

P, the tax matters partner of PS, filed a Motion for Summary Judgment asking the Court to hold that a limited partner's distributive share of partnership income is excluded from net earnings from self-employment. The parties cross-moved as to whether we have jurisdiction in these partnership-level proceedings to inquire into the functions and roles of PS's limited partners.

*Held*: I.R.C. § 1402(a)(13) contains a limited partner exception that excludes from net earnings from self-employment "the distributive share of any item of income or loss of a limited partner, as such."

**Served 11/28/23**

*Held*, *further*, the limited partner exception of I.R.C. § 1402(a)(13) does not apply to a partner who is limited in name only.

*Held, further*, determining whether a partner is a limited partner in name only requires an inquiry into the functions and roles of the limited partner.

*Held, further*, because net earnings from self-employment is a partnership item, an inquiry into the functions and roles of a limited partner is a factual determination that underlies a partnership item that is properly determined in a TEFRA proceeding. Treas. Reg. § 301.6231(a)(3)-1(b).

*Held, further*, P's Motion for Summary Judgment will be denied; R's Motion for Partial Summary Judgment will be granted.

---

*Elizabeth J. Smith*, *Kathleen S. Gregor*, *Caitlyn M. Leonard*, and *Armando Gomez*, for petitioner.

*Emerald G. Smith*, *Naseem Jehan Khan*, *Michael E. Washburn*, and *Jonathan E. Cornwell*, for respondent.

## OPINION

BUCH, *Judge*: Soroban Capital Partners LP (Soroban) is a limited partnership composed of a general partner and limited partners. For 2016 and 2017 (years in issue), Soroban was subject to the TEFRA[1] unified audit and litigation procedures of sections 6221–6234[2] as then

[1] Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. The TEFRA procedures were repealed and apply only to tax years beginning before January 1, 2018. Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), (g), 129 Stat. 584, 625, 638. Neither party disputes that these cases are TEFRA proceedings.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times,

in effect. On its returns for the years in issue, it reported as net earnings from self-employment its guaranteed payments to its limited partners plus the general partner's share of ordinary business income. The Commissioner adjusted Soroban's net earnings from self-employment by increasing it to include the shares of ordinary business income allocated to the limited partners, taking the position that they were limited partners in name only.

Pending before the Court are two Motions in each of these cases. The first is Soroban Capital Partners GP LLC's (petitioner) Motion for Summary Judgment in which petitioner asks the Court to conclude that the ordinary business income that is allocated to Soroban's limited partners is excluded from its net earnings from self-employment merely by virtue of the partners' being labeled limited partners. That Motion asks in the alternative that we hold that an inquiry into the functional roles of Soroban's limited partners cannot be determined in these partnership-level proceedings. The second motion is the Commissioner's Motion for Partial Summary Judgment, in which he asks us to conclude that an inquiry into the functional roles of Soroban's limited partners is a partnership item that can be determined in these partnership-level proceedings.

Partnerships are required to include in their calculation of net earnings from self-employment the distributive shares of their partners' income. But section 1402(a)(13) excludes from this computation a limited partner's distributive share of income (limited partner exception). Congress intended for this limited partner exception to apply to earnings of an investment nature. To determine whether earnings allocated to limited partners are of an investment nature necessarily requires an inquiry into the functions and roles of the limited partners.

Because the partnership is required to calculate net earnings from self-employment at the partnership level, any adjustment to this calculation must be made in a partnership-level proceeding. Our jurisdiction to make determinations in a partnership-level proceeding depends on whether the item to be determined is a partnership item. A partnership item is any item required to be taken into account by a partnership under subtitle A that is more appropriately determined at the partnership level plus any legal or factual determination underlying such an item. Subtitle A requires partnerships to determine and report

and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

the net earnings from self-employment. Therefore, we have jurisdiction to determine whether Soroban's shares of ordinary business income allocated to its limited partners are excluded from net earnings from self-employment in these partnership-level proceedings.

*Background*

The facts described below are derived from the parties' Motions and pleadings in the record of these cases. Rule 121(b).[3] They are stated solely for purposes of deciding the pending Motions and are not findings of fact for these cases. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

Soroban is an investment firm that is organized as a Delaware limited partnership. It was originally formed as a limited liability company (LLC), but converted to a limited partnership pursuant to Delaware law on January 1, 2015. Soroban is classified as a partnership for federal income tax purposes.

I. *Soroban's Limited Partnership Agreement*

Soroban's Limited Partnership Agreement sets forth the terms of the partnership. It states that Soroban has six partners in total, which includes one general partner and five limited partners. Petitioner is the general partner and tax matters partner. The limited partners are Eric Mandelblatt, Gaurav Kapadia, Scott Friedman, EWM1 LLC, and GKK LLC. However, because both EWM1 and GKK are single-member LLCs wholly owned by Mr. Mandelblatt and Mr. Kapadia, respectively, they are disregarded for federal income tax purposes.[4] Therefore, for federal income tax purposes, Soroban has only three limited partners (Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman).

The Limited Partnership Agreement provides the roles and responsibilities of Soroban's partners. It lists the general partner and its role and authority over the business affairs of the partnership; the limited partners and their roles and interests in the partnership; how the profits and losses are to be allocated; the terms surrounding capital contributions; the voting classes; and the compensation provided to the

[3] The Court's Rules were amended effective March 20, 2023, after the pending Motions were filed. For purposes of these Motions, we apply the Rules as in effect at the time the Motions were filed.

[4] Single member entities are disregarded as entities separate from their owners. Treas. Reg. §§ 301.7701-1(a)(4), 301.7701-3(f)(2).

limited partners in exchange for their services. Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman received guaranteed payments in exchange for providing services to Soroban.

II. *2016 and 2017 Tax Returns*

Soroban filed Forms 1065, U.S. Return of Partnership Income, for the years in issue. On those returns Soroban identified petitioner as the general partner and Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman as limited partners. It reported total net earnings from self-employment of $2,035,395 and $1,901,131 for 2016 and 2017, respectively. These totals represented the guaranteed payments received by Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman for their services to the partnership, and petitioner's share of Soroban's ordinary business income. However, Soroban excluded Mr. Mandelblatt's, Mr. Kapadia's, and Mr. Friedman's shares of Soroban's ordinary business income in its computation of net earnings from self-employment.

On April 25, 2022, the Commissioner issued Notices of Final Partnership Administrative Adjustment for the years in issue, increasing Soroban's net earnings from self-employment and gross nonfarm income. Petitioner, as tax matters partner, filed a timely Petition challenging the Commissioner's determinations.

Petitioner filed a Motion for Summary Judgment, asking the Court to find as a matter of law (1) that section 1402(a)(13) excludes Mr. Mandelblatt's, Mr. Kapadia's, and Mr. Friedman's shares of Soroban's ordinary business income from net earnings from self-employment and thus excludes those earnings from self-employment tax; or in the alternative, (2) that any inquiry into a limited partner's role at Soroban does not concern a partnership item and cannot be resolved in a TEFRA partnership-level proceeding. The Commissioner filed a Motion for Partial Summary Judgment asking the Court to find as a matter of law that an inquiry into a limited partner's role at Soroban does concern a partnership item and can be resolved in these proceedings.

*Discussion*

These cases present the question of whether Soroban's net earnings from self-employment should include its limited partners' distributive shares of ordinary business income. But resolving this question requires us to address two preliminary issues. First, we must determine the scope of the limited partner exception of section

1402(a)(13), which excludes from net earnings from self-employment the distributive share of "a limited partner, as such." If we conclude that this limited partner exception requires an inquiry into a limited partner's role in the partnership, we must determine whether we have jurisdiction to make that inquiry in these partnership-level proceedings.

I. *Summary Judgment Standard*

We may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp.*, 98 T.C. at 520. The moving party bears the burden of showing that there is no genuine dispute as to any material fact. *Sundstrand Corp.*, 98 T.C. at 520. When a motion for summary judgment is properly made and supported, an opposing party may not rest on mere allegations or denials. Rule 121(d). Rather, the party's response, by affidavits or declarations, or as otherwise provided in Rule 121, must set forth specific facts showing there is a genuine factual dispute for trial. Rule 121(d). In deciding whether to grant summary judgment, we view the facts and make inferences in the light most favorable to the nonmoving party. *Sundstrand Corp.*, 98 T.C. at 520.

II. *Self-Employment Tax*

Section 1401(a) imposes a tax on the self-employment income of individuals. *See also* Treas. Reg. § 1.1401-1(a). Self-employment income is defined as "the net earnings from self-employment derived by an individual . . . during any taxable year." I.R.C. § 1402(b); *Howell v. Commissioner*, T.C. Memo. 2012-303, at *9. Section 1402(a) in turn defines net earnings from self-employment as

> the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member.

Partnerships are required to determine and report its "partners' distributive shares of income, gains, deductions, and credit." *Kaplan v. United States*, 133 F.3d 469, 471 (7th Cir. 1998); I.R.C. § 6031; *see also Weiner v. United States*, 389 F.3d 152, 154 (5th Cir. 2004). And under section 702(a)(8), each partner is required to separately take into

account their distributive share of the partnership's "taxable income or loss, exclusive of items requiring separate computation under other paragraphs of [section 702(a)]." Taken together, these Code sections require partners to include their distributive shares of partnership income in net earnings from self-employment. I.R.C. §§ 1402(a), 702(a)(8); *Renkemeyer, Campbell & Weaver, LLP v. Commissioner*, 136 T.C. 137, 146 (2011).

But there are exceptions to this rule. Specifically, section 1402(a)(13) contains a limited partner exception that excludes from net earnings from self-employment

> the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services.

Soroban included the guaranteed payments distributed to Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman in its net earnings from self-employment, but it failed to include their distributive shares of ordinary business income. Disagreeing with this computation, the Commissioner adjusted Soroban's net earnings from self-employment by the amount of the distributive shares allocated to Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman. We must determine whether Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman are "limited partners, as such" as that phrase is used in section 1402(a)(13), and thus whether Soroban properly excluded their shares of ordinary business income from its net earnings from self-employment.

A. *Limited Partner, As Such*

Section 1402(a)(13) does not define the phrase "limited partner, as such." However, legislative history and caselaw provide us with insight on Congress's intended meaning. The limited partner exception under section 1402(a)(13) was enacted in 1977[5] to "exclude from social security coverage, the distributive share of income or loss received by a

[5] This law was originally enacted as section 1402(a)(12). *See* Social Security Amendments of 1977, Pub. L. No. 95-216, § 313(b), 91 Stat. 1509, 1536.

limited partner from the trade or business of a limited partnership."[6] Social Security Amendments of 1977, § 313(b), 91 Stat. at 1536; H.R. Rep. No. 95-702, pt. 1, at 11, *as reprinted in* 1977 U.S.C.C.A.N. at 4168. Essentially, it was enacted to exclude earnings that are of an investment nature. H.R. Rep. No. 95-702, pt. 1, at 11, *as reprinted in* 1977 U.S.C.C.A.N. at 4168.

In 1997 Treasury issued a proposed regulation seeking to define the scope of the limited partner exception. *See* Prop. Treas. Reg. § 1.1402(a)-2, 62 Fed. Reg. 1702 (Jan. 13, 1997). The proposed regulation provided that an individual would not be treated as a limited partner if the individual had personal liability for partnership debts, had authority to contract on behalf of the partnership, or participated in the partnership's trade or business for more than 500 hours during the partnership's taxable year. *Id.* para. (h)(2), 62 Fed. Reg. at 1704.

This proposal received much criticism. That criticism led Congress to issue a moratorium prohibiting Treasury from issuing any temporary or final regulation with respect to the definition of a limited partner under section 1402(a)(13) until July 1, 1998. Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935, 111 Stat. 788, 882. Congress's reasoning behind the moratorium was that "the Senate [was] concerned that the proposed change in the treatment of individuals who are limited partners under applicable State law exceeds the regulatory authority of the Treasury Department and would effectively change the law administratively without congressional action." Revenue Reconciliation Act of 1997, H.R. 2014, 105th Cong., 143 Cong. Rec. S6694, S6774, S6819 (1997).[7]

Since the moratorium, Congress has briefly discussed the definition of limited partner but has not defined it. *See, e.g.*, Staff of

---

[6] Congress enacted this provision out of concern for the use of limited partnership investments to obtain Social Security benefits. Before its enactment, business organizations could solicit investments in limited partnerships as a means for investors to become insured for Social Security benefits. In these situations investors in the limited partnership would perform no services for the partnership and receive Social Security coverage based on investment income. *See* H.R. Rep. No. 95-702, pt. 1, at 40–41 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4155, 4197–98.

[7] The Sense of the Senate Resolution also noted that entities like LLCs and limited liability partnerships (LLPs) were not widely used at the time the limited partner exception was enacted, and it recognized that the proposed regulation attempted to address owners of those entities. H.R. 2014, 105th Cong., 143 Cong. Rec. S6694, S6774, S6819.

J. Comm. on Tax'n, 110th Cong., Present Law and Analysis Relating to Tax Treatment of Partnership Carried Interests and Related Issues, Part I, JCX-62-07, at 35 n.64 (J. Comm. Print 2007) ("[L]imited partner status is determined under State law. Issues have arisen under present law as to the proper [self-employment] tax treatment of individuals who may be limited partners under State law but who participate in the management and operation of the partnership.").[8] Furthermore, Treasury has yet to issue any final or temporary regulation defining "limited partner" under section 1402(a)(13).

In 2011 we were called upon to determine the scope of the limited partner exception. We applied statutory construction principles to determine whether partners in an LLP should be considered limited partners under section 1402(a)(13). *See Renkemeyer*, 136 T.C. 137. In *Renkemeyer*, 136 T.C. at 150, we analyzed the legislative history of section 1402(a)(13) and concluded that its intent "was to ensure that individuals who merely invested in a partnership and who were not actively participating in the partnership's business operations . . . would not receive credits towards Social Security coverage." We further found that "[t]he legislative history . . . does not support a holding that Congress contemplated excluding partners who performed services for a partnership in their capacity as partners (i.e., acting in the manner of self-employed persons), from liability for self-employment taxes." *Renkemeyer*, 136 T.C. at 150. Lastly, we held that the partners in that case were not limited partners for purposes of section 1402(a)(13) because their "distributive shares arose from legal services . . . performed on behalf of the law firm" and not "as a return on the partners' investments." *Renkemeyer*, 136 T.C. at 150.

In *Renkemeyer* we specifically applied a functional analysis test to determine whether the limited partner exception applied. But that case specifically dealt with an LLP and not a limited partnership as present here. While there have been subsequent opinions applying *Renkemeyer* to determine whether taxpayers in passthrough entities are

---

[8] Joint Committee on Taxation reports are not considered legislative history and carry persuasive weight similar to law review articles. *See Gregory v. Commissioner*, 149 T.C. 43, 55 (2017) (noting that the Joint Committee on Taxation's commentary on tax laws after Congress enacts them does "not inform the decisions of the members of Congress who vot[e] in favor of the [law]" and "[t]he Supreme Court has told us such '[p]ost-enactment legislative history . . . is not a legitimate tool of statutory interpretation,'" but instead is as persuasive as law review articles (alterations in original) (first quoting *United States v. Woods*, 571 U.S. 31, 48 (2013); and then quoting *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011))).

limited partners under section 1402(a)(13), we have not addressed whether a limited partner in a state law limited partnership must satisfy a functional analysis test to be entitled to the limited partner exception.[9] *See, e.g.*, *Castigliola v. Commissioner*, T.C. Memo. 2017-62, at *7–14 (finding professional LLC members not limited partners for purposes of section 1402(a)(13)).

B. *Parties Arguments*

Petitioner contends that Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman are state law limited partners and therefore their distributive shares of income are excluded from net earnings from self-employment under section 1402(a)(13). Petitioner argues that because Soroban is a state law limited partnership and its Limited Partnership Agreement identified Mr. Mandelblatt, Mr. Kapadia, and Mr. Friedman as limited partners, section 1402(a)(13) is satisfied.

The Commissioner disagrees, arguing that the distributive shares of income of limited partners in state law limited partnerships are not automatically exempt from self-employment income. He asserts that the Court must apply a functional analysis test, similar to the test outlined in *Renkemeyer* and subsequent cases, to determine whether individuals are limited partners pursuant to section 1402(a)(13).

We agree with the Commissioner. A functional analysis test should be applied when determining whether the limited partner exception under section 1402(a)(13) applies to limited partners in state law limited partnerships.

C. *Whether Soroban's Partners are Limited Partners for Purposes of Section 1402(a)(13)*

Section 1402(a)(13) excludes from net earnings from self-employment "the distributive share of any item of income or loss of a *limited partner, as such*." (Emphasis added.) Neither section 1402(a)(13) nor applicable regulations define the phrase "limited partner, as such." Therefore, we use principles of statutory construction to ascertain Congress's intent.

[9] In *Joseph v. Commissioner*, T.C. Memo. 2020-65, at *60 n.9, we declined to answer whether a de jure limited partner must satisfy *Renkemeyer*'s functional analysis test to be entitled to the limited partner exclusion.

For statutory interpretation, we begin with the text of the statute. *See Ross v. Blake*, 578 U.S. 632, 638 (2016). It is a well-established rule of construction that if a statute does not define a term, the term is to be given its ordinary meaning at the time of enactment. *Perrin v. United States*, 444 U.S. 37, 42 (1979); *Gates v. Commissioner*, 135 T.C. 1, 6 (2010). And the canon against surplusage helps us determine that meaning.

Under the canon against surplusage, we give effect to every clause and word of a statute. *United States v. Menasche*, 348 U.S. 528, 538–39 (1955). "When construing a statute, the Court must interpret it 'so as to avoid rendering any part of the statute meaningless surplusage.'" *Growmark, Inc. & Subs. v. Commissioner*, No. 23797-14, 160 T.C., slip op. at 11 (May 16, 2023) (citing *15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 586 (2016)); *see also Tucker v. Commissioner*, 135 T.C. 114, 154 (2010) ("[W]e decline to read words out of the statute; rather, we attempt to give meaning to every word that Congress enacted . . . ."), *aff'd*, 676 F.3d 1129 (D.C. Cir. 2012).

Turning to the statute in question, we find that the limited partner exception does not apply to a partner who is limited in name only. If Congress had intended that limited partners be automatically excluded, it could have simply said "limited partner." By adding "as such," Congress made clear that the limited partner exception applies only to a limited partner who is functioning as a limited partner.

Petitioner's reliance on legislative history to overcome the plain meaning of the statute is unavailing. To the extent legislative history might be used to shed light on the meaning of the phrase "limited partner, as such," it confirms our conclusion. Congress enacted section 1402(a)(13) to exclude earnings from a mere investment. It intended for the phrase "limited partners, as such" used in section 1402(a)(13) to refer to passive investors.

Petitioner points to H.R. Rep. No. 95-702, pt. 1, at 11, *as reprinted in* 1977 U.S.C.C.A.N. at 4168, as support, noting that it states that section 1402(a)(13) was intended "to exclude for coverage purposes certain earnings which are basically of an investment nature." But Congress's express text makes clear that it was looking to the nature of the earnings. Congress intended section 1402(a)(13) to apply to partners that are passive investors.

Next petitioner cites the Sense of the Senate Resolution for support. Through that resolution, the Senate expressed its view that Treasury's attempt to define limited partner exceeded its authority. But Treasury's proposed regulation had several criteria that might have led to a limited partner's earnings' being subject to self-employment tax, even if the person was a passive investor. One such example is merely being personally liable for partnership debts. Prop. Treas. Reg. § 1.1402(a)-2(h)(2)(i), 62 Fed. Reg. at 1704. The Senate's concern was "that an individual meeting any one of these three criteria will be treated as a general partner." H.R. 2014, 105th Cong., 143 Cong. Rec. S6694, S6774, S6819. The Senate's concern about the criteria set forth in Treasury's proposed regulation does not override the plain text of the statute.

Lastly, petitioner relies on a Joint Committee on Taxation report that states: "A special rule applies for limited partners of a partnership." Staff of J. Comm. on Tax'n, 110th Cong., Present Law and Analysis Relating to Tax Treatment of Partnership Carried Interests and Related Issues, Part I, JCX-62-07, at 35. In a footnote from that sentence, that report explains that "limited partner status is determined under State law." *Id.* at 35 n.64. We find this unpersuasive. The report addresses only the meaning of the words "limited partner" and not the phrase "limited partner, as such." It is those latter words that narrow the scope of the limited partner exception, which the Joint Committee Report does not address. To the extent one might read the Joint Committee on Taxation Report more broadly, it does not constitute legislative history and carries no more weight than a law review article. *Gregory*, 149 T.C. at 55.

Petitioner puts forth myriad other arguments to support its definition of limited partner, but none is persuasive. Petitioner cites section 469 and compares its rules and regulations with section 1402(a)(13), but we do not find the sections analogous. Petitioner cites dicta out of context.[10] Lastly, petitioner points to the 2016 Instructions for Form 1065 at 2 and 2017 Instructions for Form 1065 at 3 as support for its definition. The instructions state: "A limited partner is a partner in a partnership formed under a state limited partnership law, whose

[10] For example, petitioner cites *Duffy* as a case that "recognizes that section 1402(a)(13)'s exception applies to limited partners in a limited partnership." But *Duffy* merely recites the rule of section 1402(a)(13). It makes no determination as to the meaning of "limited partner, as such." *Duffy v. Commissioner*, T.C. Memo. 2020-108, at *50 n.16.

personal liability for partnership debts is limited to the amount of money or other property that the partner contributed or is required to contribute to the partnership." But this definition is provided as part of the "General Instructions" and "Definitions." This is not, and does not purport to be, a definition for purposes of self-employment tax. In discussion of self-employment tax, the instructions state: "Generally, a limited partner's share of partnership income (loss) isn't included in net earnings (loss) from self-employment." 2016 Instructions for Form 1065 at 34; 2017 Instructions for Form 1065 at 36. Use of the qualifier "generally" makes clear that it is not always true that a limited partner's share of partnership income is excluded from net earnings from self-employment.

III. *Partnership Items*

Having concluded that we must examine the functions and roles of the limited partners in the partnership to determine whether their shares of earnings are excluded from net earnings from self-employment, we must address whether that examination must happen in these partnership-level proceedings or await a partner-level proceeding.

A. *Jurisdiction*

Like other federal courts, the Tax Court is a court of limited jurisdiction and can exercise its jurisdiction only to the extent provided by Congress. I.R.C. § 7442. Furthermore, like other courts, we always have jurisdiction to determine whether we have jurisdiction. *See Meserve Drilling Partners, Reg'l Res., Inc. v. Commissioner*, T.C. Memo. 1996-72, 71 T.C.M. (CCH) 2146, 2147, *aff'd*, 152 F.3d 1181 (9th Cir. 1998). The Tax Court has jurisdiction over a TEFRA partnership-level proceeding when the tax matters partner or another eligible partner timely petitions the Court for a readjustment of partnership items. I.R.C. § 6226(a) and (b). And in such a proceeding, we generally have jurisdiction to redetermine partnership items. I.R.C. § 6226(f). Whether we may inquire into the substance of Mr. Mandelblatt's, Mr. Kapadia's, and Mr. Friedman's roles and activities at Soroban for the purpose of determining whether the limited partner exception of section 1402(a)(13) applies turns on the question of whether this determination is a partnership item.

B. *The TEFRA Procedures*

The unified audit and litigation procedures were enacted as part of TEFRA. The TEFRA procedures provide a method for making adjustments at the partnership level. Specifically, section 6221 provides that "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level."

The procedures for determining partnership items and affected items differ. Partnership items are those items that are more properly determined at the partnership level, whereas affected items are items that are affected by partnership items. I.R.C. § 6231(a)(3), (5). Generally, the Commissioner is precluded from assessing liabilities attributable to partnership items until after a partnership-level proceeding. I.R.C. § 6225(a); *Grigoraci v. Commissioner*, T.C. Memo. 2002-202, 84 T.C.M. (CCH) 186, 189. Adjustments to affected items that require a partner-level determination are made in a separate deficiency proceeding after the conclusion of the partnership-level proceeding. I.R.C. § 6230(a); *Grigoraci*, 84 T.C.M. (CCH) at 189; *see also N.C.F. Energy Partners v. Commissioner*, 89 T.C. 741, 744–45 (1987) (finding adjustments to affected items dependent on factual determinations, other than a computation, are to be made in partner-level proceedings).

Section 6231(a)(3) defines a partnership item as "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." Therefore, a partnership item is an item (1) that is required to be taken into account for the partnership's taxable year under subtitle A, and (2) that regulations provide is more appropriately determined at the partnership level. Treasury Regulation § 301.6231(a)(3)-1 provides a list of these items.

The first issue is easily resolved. Section 1402 is found in subtitle A. We have found that subtitle A requires a partnership to separately state "the amount of income that would be [net earnings from self-employment] in the hands of the ultimate recipients if those recipients were in fact individuals." *Olsen-Smith, Ltd. v. Commissioner*, T.C. Memo. 2005-174, 90 T.C.M (CCH) 64, 66; *see* I.R.C. §§ 1401 and 1402. More specifically, a partnership is required to determine the entity

status of its direct partners and "to report perfunctorily its ordinary income as [net earnings from self-employment] except to the extent that the ordinary income was allocated to a direct partner that was a limited partner." *Olsen-Smith*, 90 T.C.M (CCH) at 66. Therefore, the only issue we must consider is whether the disputed issue is an item that the Treasury regulation provides is an item more appropriately determined at the partnership level.

This question is easily resolved. Treasury Regulation § 301.6231(a)(3)-1 identifies items that are partnership items because they are more appropriately determined at the partnership level. Most relevant to the present inquiry is Treasury Regulation § 301.6231(a)(3)-1(b), which provides:

> (b) Factors that affect the determination of partnership items. The term "partnership item" includes the accounting practices and the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc.

A functional inquiry into the roles and activities of Soroban's individual partners as required by section 1402(a)(13) involves factual determinations that are necessary to determine Soroban's aggregate amount of net earnings from self-employment. *See, e.g.*, *Gluck v. Commissioner*, T.C. Memo. 2020-66, at *14–15 (finding whether a partnership owned a building a legal and factual determination pursuant to Treasury Regulation § 301.6231(a)(3)-1(b) when that partnership is required to report its gross rents as income), *aff'd*, No. 21-867, 2022 WL 802766 (2d Cir. Mar. 17, 2022). Accordingly, the functional inquiry into their roles is a partnership item and appropriate for these proceedings.

IV. *Conclusion*

The Court must apply a functional analysis test to determine whether a partner in a state law limited partnership is a "limited partner, as such" for purposes of section 1402(a)(13). For a partnership that is subject to TEFRA, the application of the functional analysis test is a partnership item that we have jurisdiction to determine in a TEFRA proceeding. Accordingly, we will deny petitioner's Motion for Summary Judgment and grant the Commissioner's Motion for Partial Summary Judgment.

To reflect the foregoing,

*An appropriate order will be issued.*

# United States Tax Court

Washington, DC 20217

| | |
|---|---|
| SOROBAN CAPITAL PARTNERS LP,<br>SOROBAN CAPITAL PARTNERS GP LLC,<br>TAX MATTERS PARTNER, ET AL.,<br><br>Petitioner<br><br>v.<br><br>COMMISSIONER OF INTERNAL REVENUE,<br><br>Respondent | Docket No. 16217-22, 16218-22. |

**ORDER**

These cases are consolidated for trial briefing, and opinion. On February 7, 2023, petitioner filed a Motion for Summary Judgment in each of these cases. And on March 2, 2023, the Commissioner filed a Motion for Partial Summary Judgment in each of these cases. On November 28, 2023, the Court issued its opinion at 161 T.C. No. 12, resolving all of these pending motions. In accordance with the Court's opinion, it is

ORDERED that, in Docket No. 16217-22, Petitioner's Motion for Summary Judgment is denied. It is further

ORDERED that, in Docket No. 16217-22, Respondent's Motion for Partial Summary Judgment is granted. It is further

ORDERED that, in Docket No. 16218-22, Petitioner's Motion for Summary Judgment is denied. It is further

ORDERED that, in Docket No. 16218-22, Respondent's Motion for Partial Summary Judgment is granted.

**(Signed) Ronald L. Buch**
**Judge**

**Served 11/29/23**

# United States Tax Court

T.C. Memo. 2025-52

SOROBAN CAPITAL PARTNERS LP, SOROBAN CAPITAL PARTNERS GP LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

---

Docket Nos. 16217-22, 16218-22. Filed May 28, 2025.

---

*Elizabeth J. Smith*, *Kathleen S. Gregor*, *Caitlyn M. Otenti*, and *Armando Gomez*, for petitioner.

*Emerald G. Smith*, *Naseem Jehan Khan*, *Michael E. Washburn*, and *Jonathan E. Cornwell*, for respondent.

## MEMORANDUM OPINION

BUCH, *Judge*: Soroban Capital Partners LP (Soroban) is a limited partnership with a general partner and three limited partners. When calculating net earnings from self-employment for 2016 and 2017 (years in issue), Soroban included guaranteed payments it had made to its limited partners but otherwise excluded their shares of partnership income. The Commissioner issued Notices of Final Partnership Administrative Adjustment (FPAAs) for the years in issue in which he increased Soroban's net earnings from self-employment.

Section 1402(a)(13)[1] excludes "income or loss of a limited partner, as such," when calculating net earnings from self-employment. We

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation

**[*2]** previously held in *Soroban Capital Partners LP v. Commissioner*, 161 T.C. 310 (2023), that in determining the extent to which the limited partner exception of section 1402(a)(13) applies, we apply a functional analysis to determine the extent to which limited partners were acting as such. And in *Denham Capital Management LP v. Commissioner*, T.C. Memo. 2024-114, at *14, we observed: "Our caselaw has continuously reinforced our position that determinations under section 1402(a)(13) require a factual inquiry into how the partnership generated the income in question and the partners' roles and responsibilities in doing so." That factual inquiry is now before us in these cases.

During the years in issue, Soroban earned income from managing investments. Soroban's limited partners played an essential role in generating this income. Soroban acknowledged that the limited partners' unique skills and experience were indispensable to the business. The limited partners exercised managerial control over Soroban and worked full time with Soroban. They contributed little to no capital relative to their shares of income. Functionally, Soroban's limited partners were not acting as limited partners.

## *Background*

The case was submitted for decision without trial pursuant to Rule 122.

### I. *Soroban's Structure*

Soroban is a Delaware limited partnership that was classified as a partnership for federal income tax purposes for the years in issue.[2] At

references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

[2] For the years in issue, Soroban is treated as a partnership subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. In 2015, Congress enacted the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, 129 Stat. 584, which amended the Code by striking the TEFRA provisions and enacting new provisions using many of the same Code section numbers. BBA § 1101(a), (c)(1), 129 Stat. 584, 625. The BBA generally applies for taxable years beginning after December 31, 2017. *See* BBA § 1101(g)(1), 129 Stat. at 638. When referring to sections 6221–6255 in this Memorandum Opinion, we are referring to the TEFRA provisions in effect for the years in issue.

**[*3]** the time of filing the Petitions underlying these cases, Soroban's principal place of business was in New York, New York.

For the years in issue, Soroban identified four partners on its Schedules K–1, Partner's Share of Income, Deductions, Credits, etc. Those partners were Soroban Capital Partners GP LLC (petitioner), EWM1 LLC, GKK LLC, and Scott Friedman.

A. *Soroban's General Partner*

Petitioner is Soroban Capital Partners GP LLC, a Delaware limited liability company and the only general partner of Soroban. As the only general partner of Soroban, petitioner is also the tax matters partner (TMP).[3] For the years in issue, petitioner was classified as a partnership for federal income tax purposes.

Petitioner in turn identified three members on its Schedules K–1. Those members were EWM1 LLC, GKK LLC, and Scott Friedman.

Under the "Limited Liability Company Agreement of Soroban Capital Partners GP LLC," Messrs. Mandelblatt and Kapadia had the power to manage petitioner.

B. *Soroban's Limited and Indirect Partners*

Soroban's limited partners were EWM1 LLC, GKK LLC, and Scott Friedman. EWM1 LLC and GKK LLC were single-member limited liability companies that were wholly owned by Eric Mandelblatt and Guarav Kapadia, respectively. Neither EWM1 LLC nor GKK LLC elected to be treated as an entity separate from its owner, and as a result, they were disregarded for federal income tax purposes. *See* Treas. Reg. §§ 301.7701-1(a)(4), 301.7701-3(b)(1)(ii). Interests held by EWM1 LLC and GKK LLC are treated as being held directly by Messrs. Mandelblatt and Kapadia, respectively.

Petitioner's members, who are indirect partners of Soroban, *see* I.R.C. § 6213(a)(10), likewise were EWM1 LLC, GKK LLC, and Scott Friedman. Thus, taking into account both direct and indirect interests,

[3] Both the 2016 and 2017 Forms 1065, U.S. Return of Partnership Income, purported to designate a limited partner as TMP, but a limited partner may not be designated as TMP if any general partner is eligible to serve as TMP. *See* I.R.C. § 6231(a)(7)(B). Further, the parties stipulated that petitioner is the TMP.

**[*4]** Soroban was wholly owned by three individuals, Messrs. Mandelblatt, Kapadia, and Friedman (Principals).

C. *The Principals' Interests*

On its Form 1065, U.S. Return of Partnership Income, Soroban reported its partners owning the following interests[4] during 2016 and 2017:

| | *2016* | | *2017* | |
|---|---|---|---|---|
| *Partner* | *Profit/Loss* | *Capital* | *Profit/Loss* | *Capital* |
| Petitioner | 1.00% | 2.69% | 1.00% | 0.75% |
| Mr. Mandelblatt | 56.37% | 58.31% | 55.59% | 57.65% |
| Mr. Kapadia | 36.36% | 33.06% | 37.15% | 35.44% |
| Mr. Friedman | 6.26% | 5.94% | 6.26% | 6.16% |
| **Total** | **100%** | **100%** | **100%** | **100%** |

Petitioner also reported similar ownership interests of its members.

| | *2016* | | *2017* | |
|---|---|---|---|---|
| *Partner* | *Profit/Loss* | *Capital* | *Profit/Loss* | *Capital* |
| Mr. Mandelblatt | 56.99% | 56.73% | 56.21% | 55.96% |
| Mr. Kapadia | 36.69% | 36.95% | 37.47% | 37.72% |
| Mr. Friedman | 6.32% | 6.32% | 6.32% | 6.32% |
| **Total** | **100%** | **100%** | **100%** | **100%** |

D. *The Principals' Ordinary Income Allocations*

Soroban allocated ordinary income to each of its partners. That income was allocated as follows for the years in issue:

[4] For brevity, the following tables include the interests held at each year's end. All percentages are rounded to two decimal places; totals are calculated without regard to rounding.

[*5]

| *Soroban's Ordinary Income Allocation* | | |
|---|---|---|
| *Partner* | *2016* | *2017* |
| Petitioner | $785,335 | $645,965 |
| Mr. Mandelblatt | 44,223,468 | 35,861,128 |
| Mr. Kapadia | 28,526,812 | 23,963,504 |
| Mr. Friedman | 4,913,682 | 4,041,670 |
| **Total** | **$78,449,297** | **$64,512,267** |

As for the income allocated by Soroban to petitioner, Soroban reported it as self-employment earnings, and in turn, petitioner allocated the entire amount as ordinary income on the Schedules K–1 it issued to its members. That ordinary income was allocated as follows:

| *Petitioner's Ordinary Income Allocation* | | |
|---|---|---|
| *Member* | *2016* | *2017* |
| Mr. Mandelblatt | $447,552 | $363,084 |
| Mr. Kapadia | 288,150 | 242,056 |
| Mr. Friedman | 49,633 | 40,825 |
| **Total** | **$785,335** | **$645,965** |

Except for insignificant amounts reported as section 179 deductions, petitioner reported all of the income allocated to its members as net earnings from self-employment.

In contrast, when reporting the income allocated to its limited partners, Soroban characterized only the amount of the guaranteed payments as net earnings from self-employment. The guaranteed payments to limited partners (and thus the net earnings from self-employment) reported by Soroban were as follows:

| *Guaranteed Payments/Net Earnings from Self-Employment* | | |
|---|---|---|
| *Limited Partner* | *2016* | *2017* |
| Mr. Mandelblatt | $640,380 | $641,309 |
| Mr. Kapadia | 365,380 | 366,310 |
| Mr. Friedman | 246,624 | 247,552 |
| **Total** | **$1,252,384** | **$1,255,171** |

**[*6]** As for how these amounts were determined, according to Soroban, its partners received as their compensation the "net incentive and management fees earned from the Funds."

II. *Soroban's Operations*

Soroban earned its income from fees it charged its clients for managing investments. Soroban provided investment management services from which it derived all its gross receipts, sales, or other income during the years in issue.

Soroban managed 11 funds: (1) Soroban Master Fund LP (Master Fund), (2) Soroban Fund LLC, (3) Soroban Intermediate Fund LP, (4) Soroban Cayman Fund Ltd., (5) Soroban Opportunities Master Fund LP (Opportunities Fund), (6) Soroban Opportunities Fund LLC, (7) Soroban Opportunities Intermediate Fund LP, (8) Soroban Opportunities Cayman Fund Ltd., (9) Soroban Special Investment Master Fund SPC (Special Fund), (10) Soroban Special Investment Fund LLC, and (11) Soroban Special Investment Fund SPC.

Soroban grouped certain funds together. The Master Fund and the Opportunities Fund were grouped into "master-intermediate-feeder" sets of related funds. Soroban Fund LLC, Soroban Cayman Fund Ltd., and Soroban Intermediate Fund LP collected money from investors and then invested the assets, directly or indirectly, in the Master Fund. Additionally, Soroban Opportunities Fund LLC, Soroban Opportunities Cayman Fund Ltd., and Soroban Opportunities Intermediate Fund LP collected money from investors and invested these assets, directly or indirectly, in the Opportunities Fund. The Special Fund operated a "master-feeder" structure where the Soroban Special Investment Fund LLC and the Soroban Special Investment Cayman Fund LP, collected money from investors and then invested these assets in the Special Fund.

The funds compensated Soroban according to the value of the fund assets as well as their performance. The funds paid Soroban quarterly investment management fees in amounts equal to 0 to 1.5% of the values of the funds. Some funds also paid an affiliate of Soroban annual performance-based compensation, ranging from 17% to 35% of the capital appreciation of the fund assets. Any management fees based on the value of the fund assets were charged at the master fund level. Soroban could waive these fees at its discretion.

**[*7]** For the years in issue, Soroban's gross income represented amounts paid by the Master Fund and the Opportunities Fund. In 2016, the Master Fund and the Opportunities Fund paid Soroban $88,509,662 and $27,910,903, respectively, totaling $116,420,565. In 2017, the Master Fund and the Opportunities Fund paid Soroban $93,078,116 and $37,916,496, respectively, totaling $130,994,612. The other funds did not pay Soroban fees in the years in issue.

The funds accounted for their payments to Soroban as expenses for management services. The Investment Management agreement between Soroban and the Master Fund, as well as that between Soroban and the Opportunities Fund, provides: "As consideration for the services rendered pursuant to this Agreement, the Investment Manager [Soroban] shall be entitled to receive the Management Fees described in the Offering Memoranda." The Master Fund and Opportunities Fund characterized the amounts they paid to Soroban as "Expenses" on their "Statement of Operations" for 2016.

Soroban advertised these arrangements to its potential clients. Soroban solicited potential investors for the Master Fund and the Opportunities Fund with descriptions of the features of the respective funds in Private Placement Memoranda. These Private Placement Memoranda described the fees paid by the investors to Soroban as "Management Fees."

A. *Roles of the Principals in Investment Management*

Messrs. Mandelblatt, Kapadia, and Friedman managed both the investments and the operations of Soroban and the funds it managed.

In the years in issue, Mr. Mandelblatt was Soroban's managing partner and chief investment officer (CIO). During those years, his duties included managing the investing of the funds' portfolios on Soroban's behalf. Soroban described Mr. Mandelblatt as responsible for "portfolio management," "research," and "risk management." Mr. Mandelblatt had "final discretion on all portfolio-related matters."

In the years in issue, Mr. Kapadia was Soroban's comanaging partner. His duties included managing the investing of the funds' portfolios on Soroban's behalf. Soroban described him as responsible for "portfolio management," "research," and "risk management."

In the years in issue, Mr. Friedman was Soroban's head of trading and risk management. Mr. Friedman's duties included executing

**[*8]** Messrs. Mandelblatt's and Kapadia's investing decisions. Soroban described him as responsible for "risk management" and "trade execution."

1. *Investment Advice*

All three Principals were responsible for daily "risk management oversight." To accomplish this, they used daily reports to monitor profit and loss exposures and to adjust the portfolios to stay within risk guidelines.

The Principals managed risk by monitoring and hedging transactions. Mr. Mandelblatt and Mr. Kapadia routinely "perform[ed] an extensive review of all analytical work including company fundamentals, industry analysis and market technicals [sic] in an effort to determine the risk associated with each trade and [would] determine the sizing, timing and hedging of each trade prior to entering into a trade." The Principals "hedge[d] the portfolio to control any unintended exposures" from stress testing. The Principals "perform[ed] a daily review of risk concentration in the portfolio."

The Principals managed trade orders. Soroban explained to its investors that Mr. Mandelblatt and Mr. Kapadia were responsible for authorizing trade orders, but that Mr. Mandelblatt had final veto power. Orders were provided to traders throughout the day by Mr. Mandelblatt or Mr. Kapadia. Mr. Friedman and others could execute trades and were always available to do so.

2. *Managing Investment Personnel*

Messrs. Mandelblatt and Kapadia led the investment process. Soroban had an investment team during the years in issue, which consisted of the Principals plus research analysts and traders who reported to them.

B. *Roles of the Principals in Soroban's Operation*

1. *Serving on Committees*

All three Principals served on all of the committees that oversaw the operations of Soroban. In 2016, Soroban had four committees that oversaw operations: Brokerage, Trade Allocation, Valuation, and Management. Each of the Principals served on all four of those committees. In 2017, Soroban added an additional committee for

**[*9]** Cybersecurity. The Cybersecurity Committee was the only committee on which the three Principals did not all serve.

The Brokerage Committee was Soroban's policy-making body with respect to the management of brokerage activities. During the years in issue, the Brokerage Committee reviewed a schedule of Soroban's executing brokers and the commissions paid to (and services received from) such brokers and revised the list of approved brokers on the basis of its assessment of various factors. The Brokerage Committee was to meet at least annually and generally quarterly. The Brokerage Committee approved and ratified all counterparties with whom Soroban traded.

The Trade Allocation Committee was responsible for ensuring that Soroban acted in accordance with Soroban's trade allocation policies and procedures, and it determined under which circumstances deviations from those policies were warranted. Their activities included aggregating investments for clients and allocating investments among clients. The Trade Allocation Committee generally met quarterly.

The Management Committee discussed and considered material issues affecting the firm.

The Valuation Committee was responsible for ensuring that Soroban complied with its valuation policies and procedures and that any good faith estimates of investments' fair value were made using reasonable and appropriate methods. The Valuation Committee was to meet quarterly.

2. *Control Over Hiring Decisions*

In general, Soroban's daily business operations were handled by employees other than the Principals. These employees included Vito Tanzi, chief operating officer (COO) and chief financial officer (CFO); Steven Johnson, head of investor relations; and Steven Niditch, general counsel and chief compliance officer. Soroban's daily business operations were "functions that did not involve managing its advised investment funds' investments, exposures and risks." Twelve to fourteen people assisted Messrs. Tanzi, Johnson, and Niditch in these roles.

The Principals nonetheless exercised control over the daily business operations, including hiring and firing. Messrs. Tanzi, Johnson, and Niditch reported to Messrs. Mandelblatt and Kapadia. Soroban's practice was for all partners and employees to interview all

**[*10]** hiring candidates. The Principals were involved in decisions to fire, promote, terminate, and evaluate Soroban's employees in 2016 and 2017. Thus, although daily business operations were handled by employees other than the Principals, those employees were subject to the hiring and firing decisions of the Principals.

3. *Ability to Bind the Partnership*

In the years in issue, Mr. Mandelblatt could execute agreements, contracts, or other documents binding Soroban in his capacity as Managing Partner of Soroban's general partner. Mr. Mandelblatt could sign OTC derivative master agreements and confirmations and modifications to such agreements.

Other employees could also bind the partnership. Messrs. Tanzi and Niditch (subordinates to Mr. Mandelblatt) could execute agreements, contracts, and other documents in their respective capacities as COO/CFO and general counsel/chief compliance officer.

Soroban's limited partnership agreement provided that only petitioner, as the general partner of Soroban, would be able to bind or manage Soroban. In turn, the partners of petitioner were the three Principals. Mr. Mandelblatt and Mr. Kapadia were petitioner's managing and comanaging partner, respectively. Mr. Kapadia, as comanaging partner, could act on behalf of petitioner with respect to all aspects of the business, subject only to Mr. Mandelblatt's ultimate authority. Mr. Kapadia would use "reasonable efforts" to consult with Mr. Mandelblatt on matters falling outside of day-to-day activities. Mr. Mandelblatt could overrule Mr. Kapadia.

C. *Principals' Time Commitment*

All three Principals treated Soroban as their full-time jobs. While Soroban did not create or maintain formal records or timesheets documenting the hours worked by the Principals, it estimated that the Principals worked between 2,300 and 2,500 hours per year during the years in issue.

The Principals were required to devote their full attention to the business. Messrs. Mandelblatt and Kapadia were required under the terms of Soroban's limited partnership agreement to devote their "full time" to Soroban's investment management business and were generally prohibited from pursuing other investment-related business opportunities.

**[*11]** The Principals devoted their full attention to the business. In documents prepared for investors, Soroban explained that Messrs. Mandelblatt, Kapadia, and Friedman devoted 100% of their time to Soroban and the funds it manages.

D. *Principals' Capital Contributions and Partnership Distributions*

Only Mr. Mandelblatt contributed assets to Soroban. He contributed $3,539,117 to Soroban in 2010, $800,000 in 2011, and $15,000 in 2013, bringing his total contributions to $4,354,117. The last contribution was not in cash. Mr. Mandelblatt paid an expense on Soroban's behalf in 2011, and Soroban adjusted its balance sheet to reflect this amount in 2013. Approximately 29% of these amounts were used for organizational and startup expenses; the remainder was used for operating expenses.

These cash contributions are the only cash capital contributions Soroban received from the Principals from its formation through December 31, 2017.

Apart from cash, the Principals contributed their know-how, investment track records, and relationships with potential investors to the success of Soroban.

E. *Soroban's Advertising and Client Communications*

Soroban advertised the unique skills and talents of the Principals. Soroban advertised to potential investors that the company was managed by the Principals. In the organizational chart displayed in advertisement materials, Mr. Mandelblatt and Mr. Kapadia were on top of the organization, with Mr. Kapadia reporting to Mr. Mandelblatt. In these charts, Mr. Friedman was shown leading a department with two employees.

1. *Advertising Materials*

The advertising materials enticed investors with access to the Principals' unique talents. Soroban's Private Placement Memoranda for prospective investors included the Principals' professional biographies. Similarly, Soroban's presentation for prospective investors included the Principals' professional biographies. Soroban's presentations to prospective investors included timelines of each Principal's career.

**[*12]** Messrs. Mandelblatt, Kapadia, and Friedman were referred to as the "founding partners" of Soroban. Similarly, Messrs. Mandelblatt and Kapadia are each referred to as "Founder" in the "Limited Partnership Agreement of Soroban Capital Partners LP," dated January 1, 2015.

Soroban advertised that "[t]he founding partners have worked together for over a decade and have demonstrated investment success managing teams and capital across asset classes, sectors, geographies and market cycles." Soroban explained that it invests in areas in which Mr. Mandelblatt and Mr. Kapadia "have experience." Soroban explained that it generates ideas by seeking to "leverage its extensive investing experience and network of information and relationships."

Soroban specifically advertised each of the Principals individually. Soroban's advertisements described Mr. Kapadia, as Soroban's comanaging partner. Soroban advertised his experience as a partner at TPG-Axon Capital Management, LP (TPG-Axon), starting in 2004; his experience investing in Europe, Asia, and Latin America across a wide variety of industries; his experience as a strategy consultant; and his graduation with honors from the Wharton School of Business.

Soroban's advertisement described Mr. Friedman as Soroban's head of trading and risk management. Soroban advertised that Mr. Friedman had experience as head trader at TPG-Axon starting in 2006; that he was an analyst in trading for Goldman, Sachs & Co. (Goldman Sachs); and that he graduated with honors from the University of Florida.

Soroban's advertising materials described Mr. Mandelblatt as Soroban's CIO. The materials also showed his experience as a partner at TPG-Axon in 2005; that from 1998 to 2005 he worked at Goldman Sachs; and that he graduated with honors from the University of Florida.

Soroban's advertisements explained that Mr. Mandelblatt's participation in Soroban was critical to the Fund's success. Soroban cautioned that "[t]he success of the Fund will depend, in large part, upon the skill and expertise of the management of Soroban. In the event of the death, disability, or departure of any principals or other key members of Soroban, the business and the performance of the Fund may be adversely affected."

**[*13]** 2. *Private Placement Memorandum and Due Diligence Questionnaire*

Soroban provided prospective investors with a Private Placement Memorandum, a due diligence questionnaire, and related governing agreements of the relevant funds. In them, Soroban acknowledged that Mr. Mandelblatt was essential to the operation of the business. Soroban explained to its investors that Mr. Mandelblatt generally managed the funds, but in his absence Mr. Kapadia and Mr. Friedman would manage them. If Mr. Mandelblatt died, was permanently incapacitated, or otherwise permanently ceased to be responsible for overseeing the investment of the assets of the fund, a "Key-Man Event" would occur. If a Key-Man Event were to occur, the fund would provide notice to investors within ten days of when Soroban discovered the event. At that point, investors had the option to provide written notice of their intention to withdraw all or a portion of their investment with the fund.

Soroban likewise acknowledged that the Principals were essential to the operation of the business. Soroban explained to its investors that, if all three Principals were unavailable, the funds would liquidate. Materials provided to investors explain that in the event Mr. Mandelblatt were incapacitated, Messrs. Kapadia and Friedman would manage the funds. However, in the event all three Principals were "temporarily or permanently absent from overseeing the investment of the assets of the Funds, the Analysts and COO/CFO would manage the liquidation of the Funds." But for the three Principals, Soroban would not exist.

III. *Procedural History*

A. *Respondent's FPAA*

On April 25, 2022, the Commissioner timely issued to petitioner two FPAAs, one each for the years ending December 31, 2016, and December 31, 2017. In these FPAAs, the Commissioner proposed recharacterizing the ordinary income allocated to Soroban's limited partners as net earnings from self-employment. Thus, the Commissioner proposed increasing Soroban's 2016 and 2017 net earnings from self-employment by $77,663,962 and $63,866,302, respectively.

**[*14]** B. *Tax Court Proceedings*

With its principal place of business in New York, Soroban filed Petitions with this Court. Shortly thereafter, the parties filed a Motion to Consolidate the two cases. Petitioner filed a Motion for Summary Judgment, asking us to find that section 1402(a)(13) excludes limited partners' distributive shares of income from net earnings from self-employment and thus self-employment tax (SECA) applies only to the Principals' guaranteed payments. For this purpose, petitioner argued that characterization as a limited partner for state law purposes was controlling. The Commissioner objected and filed a Cross-Motion for Partial Summary Judgment. The Commissioner argued that section 1402(a)(13) requires a functional inquiry into the roles of the partners to determine whether they are bona fide limited partners. The parties also disputed whether the Court has jurisdiction in this partnership-level proceeding over any functional inquiry into the partners' roles.

We granted the Commissioner's Motion and denied petitioner's Motion. *Soroban*, 161 T.C. 310. In the Opinion, we held that the section 1402(a)(13) requires a functional inquiry into the roles and responsibilities of the partners, and that such an inquiry concerns a partnership item for the purposes of a TEFRA proceeding. *Soroban*, 161 T.C. at 324. The parties subsequently filed a joint Motion to Submit this Case Pursuant to Rule 122, which we granted.

After the parties filed simultaneous opening and answering briefs, petitioner filed a Motion to Reopen the Record to enter petitioner's Forms 1065 for years before and after those in issue. Petitioner included in its Simultaneous Opening Brief a proposed finding of fact that included tax return information from 2010 through 2023. Information from years 2010 through 2015 and 2018 through 2023 did not appear in the parties' stipulations.

The Commissioner filed a Motion to Strike with respect to the new information. We ordered petitioner to respond. We recharacterized petitioner's response as a Motion to Reopen the Record. The Commissioner filed a response to the Motion to Reopen the Record, explaining that allowing the information would deny the Commissioner the opportunity for cross-examination.

**[*15]** *Discussion*

I. *Jurisdiction over FPAA*

The Commissioner's adjustments in an FPAA are generally presumed correct. Rule 142(a). A party challenging an FPAA has the burden of proving that the Commissioner's adjustments are in error. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *see also Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996) ("[The taxpayer] bears the burden of proving that [the Commissioner's] determinations in the FPAA are erroneous."); *Clovis I v. Commissioner*, 88 T.C. 980, 982 (1987) (finding that an FPAA is the functional equivalent of a Notice of Deficiency).

The burden shifts if the taxpayer provides sufficient evidence and meets certain other requirements. Section 7491 specifies that if "a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed," then the Commissioner shall bear that burden "with respect to such issue." I.R.C. § 7491(a)(1). In the case of a partnership, however, this rule applies only if the partnership meets specific net worth requirements. I.R.C. § 7491(a)(2)(C). Petitioner has not established that those requirements have been met. We decide cases on the relative weight of the evidence. *Knudsen v. Commissioner*, 131 T.C. 185, 188 (2008), *supplementing* T.C. Memo. 2007-340. Shifts in the burden have significance only in those rare instances of an evidentiary tie. *Id.* Discerning no tie, we can decide the issues on the preponderance of the evidence. *See Bordelon v. Commissioner*, T.C. Memo. 2020-26, at *11.

II. *Tax on Net Earnings from Self-Employment*

Section 1401 imposes a tax on the self-employment income of every individual. I.R.C. § 1401(a) and (b). Section 1402(b) defines "self-employment income" as "the net earnings from self-employment derived by an individual (other than a nonresident alien . . . ) during any taxable year." *See also* Treas. Reg. § 1.1401-1(c) ("[S]elf-employment income consists of the net earnings derived by an individual (other than a nonresident alien) from a trade or business carried on by him as sole proprietor or by a partnership of which he is a member . . . .").

Section 1402(a) defines net earnings from self-employment as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions" attributable to the business, as well as the individual's "distributive share" of income or loss

**[*16]** from a partnership. But an exception to this rule excludes distributions received by limited partners in a partnership. Specifically, section 1402(a)(13) excludes "the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments" from net earnings from self-employment.

In his FPAA, the Commissioner proposed increasing the amount of Soroban's income that should be characterized as net earnings from self-employment. Specifically, the Commissioner alleges that Messrs. Mandelblatt, Kapadia, and Friedman were not limited partners for the purpose of section 1402(a)(13). Resolving these cases requires us to determine whether Soroban's partners qualify as limited partners for the purposes of this exception.

We previously decided that section 1402(a)(13) requires a functional analysis. In *Soroban*, 161 T.C. at 324, we found that the Court has jurisdiction to determine whether a state law limited partner should be characterized as a limited partner for federal SECA tax purposes. Further, we held that determining whether a partner should be characterized as a limited partner requires a functional analysis into the roles and responsibilities of the partner. *Id.*

In applying our previous holding, we remain mindful that "federal tax law, and only federal tax law, controls the classification of 'partners' and 'partnerships' for federal tax purposes." *Azimzadeh v. Commissioner*, T.C. Memo. 2013-169, at *5 (first citing Treas. Reg. § 301.7701-1(a)(1); and then citing *Commissioner v. Tower*, 327 U.S. 280, 288, 290 (1946)). Therefore, we now turn to a functional analysis.

III. *Application of Functional Analysis*

We recently applied a functional analysis in a factually analogous case. *See generally Denham*, T.C. Memo. 2024-114. The test is designed to be a comprehensive inquiry into whether the Principals "were '*generally* akin' to passive investors." *See id.* at *14 (quoting *Renkemeyer, Campbell & Weaver, LLP v. Commissioner*, 136 T.C. 137, 147–48 (2011)). Under this test, to exclude a partner's distributive share of partnership income from net earnings from self-employment, the surrounding circumstances of the partner's economic relationship with the partnership must sufficiently indicate that it is generally one of passive investment. *Denham*, T.C. Memo. 2024-114, at *14.

Following our opinions in *Renkemeyer* and *Denham*, we analyze the Principals' roles and responsibilities. As a preliminary matter,

**[*17]** petitioner bears the burden of establishing that the Principals' distributive shares represented income of an investment nature. *See Howell v. Commissioner*, T.C. Memo. 2012-303, at *16–17; *see also* Rule 142(a). In analyzing the Principals' roles and responsibilities, we review the sources of Soroban's income for the years in issue, the Principals' roles in generating that income, and the relationship between the Principals' distributive shares and any capital contributions they made to the partnership. *See Renkemeyer*, 136. T.C. at 150.

We applied this test in *Denham*. We looked at the extent to which the partners' time, skills, and judgment were essential to the partnership's income. *Denham*, T.C. Memo. 2024-114, at *15. We evaluated what roles they played in the business, i.e., whether they served as employees, sat on committees, possessed the authority to bind the partnership, or took part in personnel decisions. *Id.* at *16–17. We considered the time they devoted to the business. *Id.* at *16. We looked to how the partnership advertised itself to the public, and whether it advertised any specific skills or expertise of the partners. *Id.* at *17. And we examined the capital contributed by the partners. *Id.* at *15–16.

A. *The Principals' Role in Generating Income*

Soroban generated income from fees it charged its clients for managing investments. The Principals' time, skills, and judgment were essential to these services. The funds were managed by Mr. Mandelblatt. In the event of his temporary absence, Messrs. Kapadia and Friedman would manage the funds. The Principals were responsible for managing risk. They managed trade offers, over which Mr. Mandelblatt had final authority. All three Principals oversaw and participated in the investment process. This work all contributed to the generation of Soroban's income. The fees were substantial, generating approximately $247 million in revenue for Soroban across the years in issue.

B. *The Principals' Role in Management*

Each of the Principals participated in the management of Soroban. All three Principals served on the Brokerage, Trade Allocation, Management, and Valuation Committees. Through the management committee, Messrs. Mandelblatt, Kapadia, and Friedman made decisions related to hiring, firing, promoting, and evaluating employees. When not acting by committee, the Principals exercised authority delegated to them by petitioner to negotiate and execute any agreement

**[*18]** or document to conduct Soroban's business. The Principals were crucial and active parts of Soroban's business.

Petitioner argues that this work was not done by the Principals alone and that it would be inappropriate to attribute the generation of Soroban's income solely to the Principals. The record makes clear that Soroban employed people other than the Principals to carry out the operations of the business. But the Principals maintained control over the operations of the business, exercising authority over the core functions of Soroban's business.

C. *The Principals' Time Devoted to the Business*

The Principals devoted significant time to the business. In materials prepared for the investors, Soroban represented that "100% of [the Principals'] time [was] devoted to the management and investment activities of [Soroban] and the funds it manages." Indeed, while no formal time records were maintained, Soroban estimated that the Principals worked 2,300 to 2,500 hours annually during the years in issue. The Principals devoted their full-time efforts to actively pursuing the business of Soroban.

D. *Marketing the Principals' Role in the Business*

The expertise of the Principals was a selling point for potential investors. In presentations prepared for investors, Soroban advertised the unique skill and experience of the Principals. The skill and experience of Mr. Mandelblatt was so crucial that if he became incapacitated, it would be a key-man event triggering rights notice to investors and the right to withdraw funds on short notice. In addition, if no Principal were available to manage the funds, the funds would liquidate. The Principals were publicly held out as essential to the operation of Soroban.

E. *The Principals' Capital Contributions*

The Principals' insignificant capital contributions show that their distributive shares of income were not returns on investment. When the size of a partner's investment is relatively small in comparison to the fees the partnership charges for services it provides, the small investment is not sufficient to classify the partner's distributive share as a return on investment. *See Renkemeyer*, 136 T.C. at 150. Messrs. Kapadia and Friedman did not contribute capital to Soroban. Their distributive share was not a return on an investment of capital.

**[*19]** Although Mr. Mandelblatt contributed capital, his contributions are disproportionate to the distributions he received. Here, *Denham* is instructive. In these cases as in *Denham*, only one partner contributed capital. The sole contributing partner in *Denham*, Mr. Porter, contributed roughly $8 million, and the partnership generated roughly $130 million in revenue during the years in issue. *Denham*, T.C. Memo. 2024-114, at *3, *15–16. Mr. Porter's cumulative distributive share was roughly $16 million over the two years in issue. Mr. Mandelblatt contributed far less capital and received a far greater distributive share. Mr. Mandelblatt contributed $4 million, and Soroban generated roughly $247 million of income during the years in issue. Mr. Mandelblatt's cumulative distributive share was $80 million over the two years in issue. The disproportionate income generated does not indicate a return on an investment of capital.

F. *Petitioner's Additional Factors*

Petitioner proposed its own list of factors for a functional analysis test. The proposed test has nine factors: (1) whether the limited partner was treated as a limited partner under applicable state law; (2) whether the limited partner engaged in any conduct that would result in the limited partner's losing his status as a limited partner under state law; (3) whether the limited partner also held an interest in the partnership as a general partner; (4) whether the limited partner had a capital investment in the partnership; (5) whether the limited partner received separate compensation for any services provided to the partnership; (6) whether the earnings of the partnership were solely attributable to services provided by the limited partners; (7) whether the amount of earnings allocated to each limited partner was determined by reference to the services provided by that limited partner to the partnership; (8) whether the terms of the limited partnership agreement authorized the limited partners, in their capacity as limited partners, to exercise managerial authority or bind the partnership in contracts and in other ways; and (9) whether any persons, other than the limited partners, exercised managerial authority, or held the authority to bind the partnership in contracts and in other ways.

To be clear, the test of whether a partner functions as a general partner or a limited partner for federal tax purposes is not dictated by any set number of factors. Rather, it is a facts and circumstances test that takes into account all relevant facts and circumstances. Those suggested by petitioner are of varying degrees of relevance. We note, however, that many rely to some extent on the label placed on a partner

**[*20]** for state law purposes. Labels are perhaps least relevant because they may be inconsistent with the economic reality of a partner's relationship with the entity. A partner labeled a limited partner who works for the business full time, whose work is essential to generating the business's income, who is held out to the public as essential to the business, and who contributes little or no capital, is not functioning as a limited partner regardless of the label placed on that partner.

Petitioner relies on the fiction that the Principals did not serve Soroban in their individual capacities as limited partners. Instead, petitioner argues, they acted with authority delegated to them by the general partner, which they in turn had the authority to manage. This type of legal fiction is precisely why application of federal tax law to the economic arrangement of the parties controls, and not mere state law classifications. Soroban relies on Messrs. Mandelblatt, Kapadia, and Friedman to function. Their unique skills and expertise help the business to manage large investment funds, which, in turn, generate income for the business. They participate in the management of the company through committees. If the Principals were unable to participate in the business, clients would have a right to a return of their investments and the funds would liquidate. Thus, the Principals' roles in the business are not those of passive investors.

IV. *Reopening the Record*

Petitioner requests that we reopen the record to allow the Court to consider tax returns for years not before the Court. In its Simultaneous Opening Brief, petitioner referenced its net income, capital contributions, and partners' capital accounts for 2010 through 2023. The figures reference Form 1065 for each year. The record as initially stipulated did not include the Forms 1065 for years 2010 through 2015 or 2018 through 2023.

Petitioner argues that the Forms 1065 are material to issues presented in these cases. Petitioner further argues that they are responsive to the Commissioner's argument that Mr. Mandelblatt's distributive share cannot be a return on investment because only Mr. Mandelblatt contributed capital to the partnership. The Forms 1065 show that the partners contributed substantial capital to the partnership in 2019, 2020, and 2021 (beyond what Mr. Mandelblatt contributed in 2010, 2011, and 2013). Thus, petitioner argues that distributions are returns on investment. This is a material issue, petitioner asserts, because "[w]hether the Limited Partners are entitled

**[*21]** to a return on investment is a fundamental point of disagreement between the parties."

The Commissioner objects to the introduction of this material into evidence. Principally, the Commissioner argues that, without an opportunity to examine the information and interview witnesses, the Commissioner is prejudiced by the introduction of this information.

Reopening the record for the submission of additional evidence lies within the discretion of the Court. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 331 (1971); *Butler v. Commissioner*, 114 T.C. 276, 286–87 (2000), *abrogated on other grounds by Porter v. Commissioner*, 132 T.C. 203 (2009). A court will not grant a motion to reopen the record unless, among other requirements, the additional evidence is not merely cumulative or impeaching but is material to the issues involved, and the evidence probably would change the outcome of the case. *Coleman v. Commissioner*, T.C. Memo. 1989-248, 57 T.C.M. (CCH) 493, 495, *aff'd sub nom. Meisel v. Commissioner*, 991 F.2d 795 (6th Cir. 1993) (unpublished table decision).

We balance the moving party's diligence against the possible prejudice to the nonmoving party. *Degourville v. Commissioner*, T.C. Memo. 2022-93, at *12. Specifically, we consider whether reopening the record after trial would prejudice the nonmoving party by foreclosing their cross-examination of the evidence. *Estate of Freedman v. Commissioner*, T.C. Memo. 2007-61, 93 T.C.M. (CCH) 1007, 1013. To this point, petitioner has made itself available to the Commissioner for additional questions on the evidence presented.

For purposes of deciding whether to allow the additional evidence, we will focus on the question of whether the evidence would change the outcome of the cases. Petitioner included a table purporting to show the Principals' capital investments over time. That table and the tax returns providing the information supporting it are offered in support of petitioner's statement that the Principals' "capital investments in Soroban have fluctuated over time based on the performance of the firm and that in certain years they were required to make substantial additional capital investments to fund losses incurred by the firm."

We begin by noting that nothing in petitioner's table or supporting documents addresses the functional roles of the partners, which is the inquiry required by *Denham*. The data, however, sheds light on the question of whether the Principals' interests and

**[*22]** distributions were of an investment nature. *See Renkemeyer*, 136 T.C. at 150.

Petitioner offered the following table:

| *Tax Year* | *Net Income (Loss) per Books per Form 1065, Schedule M–2* | *Capital Contributed per Form 1065, Schedule M–2* | *Year-End Balance of Partners' Capital Accounts per Form 1065, Schedule M–2* |
|---|---|---|---|
| 2010 | ($1,989,670) | $3,539,117 | $1,549,447 |
| 2011 | 9,734,178 | 800,000 | 9,208,625 |
| 2012 | 23,229,139 | -0- | 13,227,857 |
| 2013 | 42,869,824 | 15,000 | 42,526,865 |
| 2014 | 38,833,719 | -0- | 40,266,182 |
| 2015 | 46,673,068 | -0- | 24,060,150 |
| 2016 | 78,073,783 | -0- | 46,485,205 |
| 2017 | 64,717,245 | -0- | 85,472,327 |
| 2018 | (31,034,618) | -0- | 50,367,302 |
| 2019 | (102,557,321) | 91,514,062 | 13,531,775 |
| 2020 | (11,026,784) | 9,003,703 | 11,458,694 |
| 2021 | (33,628,556) | 48,457,500 | 26,237,638 |
| 2022 | 22,786,779 | -0- | 48,974,417 |
| 2023 | 11,854,375 | -0- | 22,083,544 |

And the tax returns offered in support of this table confirm the data presented. What that data shows, however, is not a return typically associated with the passive investment of a limited partner. The following table shows the Principals' combined distributive shares of ordinary income as a percentage of their contributed capital and capital accounts.

| **[*23]** *Tax Year* | *Cumulative Ordinary Income (Loss) of Principals* | *Capital Contributed per Form 1065, Sch. M–2* | *Yearend Balance of Partners' Capital Accounts per Form 1065, Sch. M–2* | *Income as a % of Capital Contributions* | *Income as a % of Capital Account* |
|---|---|---|---|---|---|
| 2010 | ($1,951,768) | $3,539,117 | $1,549,447 | −55.15% | −125.97% |
| 2011 | 9,837,284 | 800,000 | 9,208,625 | 1229.66% | 106.83% |
| 2012 | 23,331,698 | -0- | 13,227,857 | N/A | 176.38% |
| 2013 | 43,506,155 | 15,000 | 42,526,865 | 290041.03% | 102.30% |
| 2014 | 39,002,025 | -0- | 40,266,182 | N/A | 96.86% |
| 2015 | 46,687,847 | -0- | 24,060,150 | N/A | 194.05% |
| 2016 | 77,663,962 | -0- | 46,485,205 | N/A | 167.07% |
| 2017 | 63,866,302 | -0- | 85,472,327 | N/A | 74.72% |
| 2018 | (31,264,049) | -0- | 50,367,302 | N/A | -62.07% |
| 2019 | (102,146,314) | 91,514,062 | 13,531,775 | −111.62% | −754.86% |
| 2020 | (11,341,091) | 9,003,703 | 11,458,694 | −125.96% | −98.97% |
| 2021 | (33,152,011) | 48,457,500 | 26,237,638 | −68.41% | −126.35% |
| 2022 | 22,196,616 | -0- | 48,974,417 | N/A | 45.32% |
| 2023 | 10,509,517 | -0- | 1,549,447 | N/A | 53.68% |

To the extent petitioner's additional evidence is relevant, it only reinforces our conclusions. The Principals' shares of ordinary income bear no relationship to their capital contributed or their capital accounts. "Thus it is clear that the partners' distributive shares of the . . . firm's income did not arise as a return on the partners' investment and were not 'earnings which are basically of an investment nature.'" *Renkemeyer*, 136 T.C. at 150 (quoting H.R. Rep. No. 95-702, pt. 1, at 11 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4155, 4168).

Some of the competing principles on whether to reopen the record are in equipoise. That the additional evidence would not prejudice the Commissioner would favor the admission of the evidence. But the reason it would not prejudice the Commissioner is that it would not be likely to change the outcome, which would favor exclusion of the evidence.

The proffered evidence carries with it an additional issue: We cannot receive it in its entirety without reopening the record for yet further information. The Schedules K–1 accompanying the Forms 1065

**[*24]** show ownership changes beginning in 2020, with one of the Principals apparently departing and a new entity, owned by Mr. Mandelblatt, joining in 2021. The Schedules K–1 show a further ownership change in 2023, as well. Moreover, information for years after the years in issue is of limited probative value. We have no evidence as to what precipitated any changes that occurred in years after the years in issue. And information from those years does not shed light on the capital investments during the years in issue. For the sake of completeness of the record, we will exercise our discretion to supplement the record and grant petitioner's Motion insofar as we will supplement the record to include Soroban's Forms 1065 for 2010 through 2015.

*Conclusion*

Soroban's limited partners were limited partners in name only. They were essential to generating the business's income, they oversaw day-to-day management, they worked for the business full time, and they were held out to the public as essential to the business. Their capital accounts make clear that their earnings were not of an investment nature. They are not limited partners within the meaning of section 1402(a)(13), and their earnings constitute net earnings from self-employment for the years in issue.

To reflect the foregoing

*Decisions will be entered for respondent.*

# United States Tax Court

Washington, DC 20217

SOROBAN CAPITAL PARTNERS LP,
SOROBAN CAPITAL PARTNERS GP LLC,
TAX MATTERS PARTNER, ET AL.,

Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent

Docket Nos. 16217-22, 16218-22.

## ORDER

On October 11, 2024, the Commissioner filed a Motion to Strike Portions of Petitioner's Simultaneous Opening Brief that attempt to add evidence to the stipulated record and that present arguments based on that added evidence. And on October 16, 2024, petitioner filed a Motion to Reopen the Record for the limited purpose of introducing additional tax returns that support the information presented in Petitioner's Simultaneous Opening Brief. For the reasons stated in the Court's opinion at T.C. Memo. 2025-52 issued May 28, 2025, it is

ORDERED that the Commissioner's Motion to Strike filed October 11, 2024, is denied. It is further

ORDERED that petitioner's Motion to Reopen the Record filed October 16, 2024, is granted in part.

**(Signed) Ronald L. Buch**
**Judge**

**Served 05/28/25**

# United States Tax Court

Washington, DC 20217

SOROBAN CAPITAL PARTNERS LP,
SOROBAN CAPITAL PARTNERS GP
LLC, TAX MATTERS PARTNER,

Petitioner

v.

COMMISSIONER OF INTERNAL
REVENUE,

Respondent

Docket No. 16217-22.

## ORDER AND DECISION

Pursuant to the determination of the Court as set forth in its Opinion (T.C. Memo. 2025-52) issued May 28, 2025, it is

ORDERED and DECIDED that the following statements show the adjustments to partnership items of Soroban Capital Partners LP for taxable year ending December 31, 2016:

| ***Tax Period Ending December 31, 2016*** | | |
|---|---|---|
| *Partnership Item* | *As Reported* | *As Determined* |
| Net Earnings (Loss) From Self-Employment | $2,035,395.00 | $79,699,357.00 |
| Gross Nonfarm Income | $2,416,590.00 | $80,080,552.00 |

**(Signed) Ronald L. Buch**
**Judge**

**Entered and Served 05/28/25**

# United States Tax Court

Washington, DC 20217

SOROBAN CAPITAL PARTNERS LP, SOROBAN CAPITAL PARTNERS GP LLC, TAX MATTERS PARTNER,

Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent

Docket No. 16218-22.

**ORDER AND DECISION**

Pursuant to the determination of the Court as set forth in its Opinion (T.C. Memo. 2025-52) issued May 28, 2025, it is

ORDERED and DECIDED that the following statements show the adjustments to partnership items of Soroban Capital Partners LP for taxable year ending December 31, 2017:

| ***Tax Period Ending December 31, 2017*** | | |
|---|---|---|
| *Partnership Item* | *As Reported* | *As Determined* |
| Net Earnings (Loss) From Self-Employment | $1,901.131.00 | $65,767,433.00 |
| Gross Nonfarm Income | $2,565,117.00 | $66,431,419.00 |

**(Signed) Ronald L. Buch**
**Judge**

**Entered and Served 05/28/25**

**I.R.C. § 707. Transactions between partner and partnership**

**(a) Partner not acting in capacity as partner**

**(1) In general**

If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.

**(2) Treatment of payments to partners for property or services**

Under regulations prescribed by the Secretary—

**(A) Treatment of certain services and transfers of property**

If—

(i) a partner performs services for a partnership or transfers property to a partnership,

(ii) there is a related direct or indirect allocation and distribution to such partner, and

(iii) the performance of such services (or such transfer) and the allocation and distribution, when viewed together, are properly characterized as a transaction

occurring between the partnership and a partner acting other than in his capacity as a member of the partnership,

such allocation and distribution shall be treated as a transaction described in paragraph (1).

**(B) Treatment of certain property transfers**

If—

(i) there is a direct or indirect transfer of money or other property by a partner to a partnership,

(ii) there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner), and

(iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property,

**(b) Certain sales or exchanges of property with respect to controlled partnerships**

**(1) Losses disallowed**

No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between—

(A) a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or

(B) two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests.

In the case of a subsequent sale or exchange by a transferee described in this paragraph, section 267(d) shall be applicable as if the loss were disallowed under section 267(a)(1). For purposes of section 267(a)(2), partnerships described in subparagraph (B) of this paragraph shall be treated as persons specified in section 267(b).

**(2) Gains treated as ordinary income**

In the case of a sale or exchange, directly or indirectly, of property, which in the hands of the transferee, is property other than a capital asset as defined in section 1221—

(A) between a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or profits interest, in such partnership, or

(B) between two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests,

any gain recognized shall be considered as ordinary income.

**(3) Ownership of a capital or profits interest**

For purposes of paragraphs (1) and (2) of this subsection, the ownership of a capital or profits interest in a partnership shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) other than paragraph (3) of such section.

**(c) Guaranteed payments**

To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject

to section 263, for purposes of section 162(a) (relating to trade or business expenses).

**I.R.C. § 1402. Definitions**

**(a) Net earnings from self-employment**

The term ''net earnings from self-employment'' means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary income or loss—

(1) there shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares, and including payments under section 1233(a)(2) of the Food Security Act of 1985 (16 U.S.C. 3833(a)(2)) to individuals receiving benefits under section 202 or 223 of the Social Security Act) together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer; except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) such

income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including livestock, bees, poultry, and fur-bearing animals and wildlife) on such land, and that there shall be material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) in the production or the management of the production of such agricultural or horticultural commodities, and (B) there is material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) with respect to any such agricultural or horticultural commodity;

(2) there shall be excluded dividends on any share of stock, and interest on any bond, debenture, note, or certificate, or other evidence of indebtedness, issued with interest coupons or in registered form by any corporation (including one issued by a government or political subdivision thereof), unless such dividends and interest are received in the course of a trade or business as a dealer in stocks or securities;

(3) there shall be excluded any gain or loss—

(A) which is considered as gain or loss from the sale or exchange of a capital asset,

(B) from the cutting of timber, or the disposal of timber, coal, or iron ore, if section 631 applies to such gain or loss, or

(C) from the sale, exchange, involuntary conversion, or other disposition of property if such property is neither—

(i) stock in trade or other property of a kind which would properly be includible in inventory if on hand at the close of the taxable year, nor

(ii) property held primarily for sale to customers in the ordinary course of the trade or business;

(4) the deduction for net operating losses provided in section 172 shall not be allowed;

(5) if—

(A) any of the income derived from a trade or business (other than a trade or business carried on by a partnership) is community income under community property laws applicable to such income, the gross income and deductions attributable to

such trade or business shall be treated as the gross income and deductions of the spouse carrying on such trade or business or, if such trade or business is jointly operated, treated as the gross income and deductions of each spouse on the basis of their respective distributive share of the gross income and deductions; and

(B) any portion of a partner's distributive share of the ordinary income or loss from a trade or business carried on by a partnership is community income or loss under the community property laws applicable to such share, all of such distributive share shall be included in computing the net earnings from self-employment of such partner, and no part of such share shall be taken into account in computing the net earnings from self-employment of the spouse of such partner;

(6) a resident of Puerto Rico shall compute his net earnings from self-employment in the same manner as a citizen of the United States but without regard to section 933;

(7) the deduction for personal exemptions provided in section 151 shall not be allowed;

(8) an individual who is a duly ordained, commissioned, or licensed minister of a church or a member of a religious order shall compute his net earnings from self-employment derived from the performance of service described in subsection (c)(4) without regard to section 107 (relating to rental value of parsonages), section 119 (relating to meals and lodging furnished for the convenience of the employer), and section 911 (relating to citizens or residents of the United States living abroad), but shall not include in such net earnings from self-employment the rental value of any parsonage or any parsonage allowance (whether or not excludable under section 107) provided after the individual retires, or any other retirement benefit received by such individual from a church plan (as defined in section 414(e)) after the individual retires;

(9) the exclusion from gross income provided by section 931 shall not apply;

(10) there shall be excluded amounts received by a partner pursuant to a written plan of the partnership, which meets such requirements as are prescribed by the Secretary, and which provides for payments on account of retirement, on a periodic basis, to

partners generally or to a class or classes of partners, such payments to continue at least until such partner's death, if—

(A) such partner rendered no services with respect to any trade or business carried on by such partnership (or its successors) during the taxable year of such partnership (or its successors), ending within or with his taxable year, in which such amounts were received, and

(B) no obligation exists (as of the close of the partnership's taxable year referred to in subparagraph (A)) from the other partners to such partner except with respect to retirement payments under such plan, and

(C) such partner's share, if any, of the capital of the partnership has been paid to him in full before the close of the partnership's taxable year referred to in subparagraph (A);

(11) the exclusion from gross income provided by section 911(a)(1) shall not apply;

(12) in lieu of the deduction provided by section 164(f) (relating to deduction for one-half of self-employment taxes), there shall be allowed a deduction equal to the product of—

(A) the taxpayer's net earnings from selfemployment for the taxable year (determined without regard to this paragraph), and

(B) one-half of the sum of the rates imposed by subsections (a) and (b) of section 1401 for such year (determined without regard to the rate imposed under paragraph (2) of section 1401(b));

(13) there shall be excluded the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services;

(14) in the case of church employee income, the special rules of subsection (j)(1) shall apply;

(15) in the case of a member of an Indian tribe, the special rules of section 7873 (relating to income derived by Indians from exercise of fishing rights) shall apply;

(16) the deduction provided by section 199 1 shall not be allowed; and

(17) notwithstanding the preceding provisions of this subsection, each spouse's share of income or loss from a qualified joint venture shall be taken into account as provided in section 761(f) in determining net earnings from self-employment of such spouse.

If the taxable year of a partner is different from that of the partnership, the distributive share which he is required to include in computing his net earnings from self-employment shall be based on the ordinary income or loss of the partnership for any taxable year of the partnership ending within or with his taxable year. In the case of any trade or business which is carried on by an individual or by a partnership and in which, if such trade or business were carried on exclusively by employees, the major portion of the services would constitute agricultural labor as defined in section 3121(g)—

(i) in the case of an individual, if the gross income derived by him from such trade or business is not more than the upper limit, the net earnings from self-employment derived by him from such trade

or business may, at his option, be deemed to be 662⁄3 percent of such gross income; or

(ii) in the case of an individual, if the gross income derived by him from such trade or business is more than the upper limit and the net earnings from self-employment derived by him from such trade or business (computed under this subsection without regard to this sentence) are less than the lower limit, the net earnings from self-employment derived by him from such trade or business may, at his option, be deemed to be the lower limit; and

(iii) in the case of a member of a partnership, if his distributive share of the gross income of the partnership derived from such trade or business (after such gross income has been reduced by the sum of all payments to which section 707(c) applies) is not more than the upper limit, his distributive share of income described in section 702(a)(8) derived from such trade or business may, at his option, be deemed to be an amount equal to 662⁄3 percent of his distributive share of such gross income (after such gross income has been so reduced); or

(iv) in the case of a member of a partnership, if his distributive share of the gross income of the partnership derived from such trade or business (after such gross income has been reduced by the sum of all payments to which section 707(c) applies) is more than the upper limit and his distributive share (whether or not distributed) of income described in section 702(a)(8) derived from such trade or business (computed under this subsection without regard to this sentence) is less than the lower limit, his distributive share of income described in section 702(a)(8) derived from such trade or business may, at his option, be deemed to be the lower limit.

For purposes of the preceding sentence, gross income means—

(v) in the case of any such trade or business in which the income is computed under a cash receipts and disbursements method, the gross receipts from such trade or business reduced by the cost or other basis of property which was purchased and sold in carrying on such trade or business, adjusted (after such reduction) in accordance with the provisions of paragraphs (1) through (7) and paragraph (9) of this subsection; and

(vi) in the case of any such trade or business in which the income is computed under an accrual method, the gross income from such trade or business, adjusted in accordance with the provisions of paragraphs (1) through (7) and paragraph (9) of this subsection;

and, for purposes of such sentence, if an individual (including a member of a partnership) derives gross income from more than one such trade or business, such gross income (including his distributive share of the gross income of any partnership derived from any such trade or business) shall be deemed to have been derived from one trade or business.

The preceding sentence and clauses (i) through (iv) of the second preceding sentence shall also apply in the case of any trade or business (other than a trade or business specified in such second preceding sentence) which is carried on by an individual who is self-employed on a regular basis as defined in subsection (h), or by a partnership of which an individual is a member on a regular basis as defined in subsection (h), but only if such individual's net earnings from self-employment as determined without regard to this sentence in the taxable year are less than the lower limit and less than 66 2⁄3 percent of the sum (in such taxable year) of such individual's gross income derived from all trades or businesses carried on by him

and his distributive share of the income or loss from all trades or businesses carried on by all the partnerships of which he is a member; except that this sentence shall not apply to more than 5 taxable years in the case of any individual, and in no case in which an individual elects to determine the amount of his net earnings from self-employment for a taxable year under the provisions of the two preceding sentences with respect to a trade or business to which the second preceding sentence applies and with respect to a trade or business to which this sentence applies shall such net earnings for such year exceed the lower limit.

**I.R.C. § 6226 (1997). Judicial review of final partnership administrative adjustments**

**(a) Petition by tax matters partner**

Within 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for a readjustment of the partnership items for such taxable year with—

(1) the Tax Court,

(2) the district court of the United States for the district in which the partnership's principal place of business is located, or

(3) the Court of Federal Claims.

**(b) Petition by partner other than tax matters partner**

**(1) In general**

If the tax matters partner does not file a readjustment petition under subsection (a) with respect to any final partnership administrative adjustment, any notice partner (and any 5-percent group) may, within 60 days after the close of the 90-day period set forth in subsection (a), file a petition for a readjustment of the partnership items for

the taxable year involved with any of the courts described in subsection (a).

**(2) Priority of the Tax Court action**

If more than 1 action is brought under paragraph (1) with respect to any partnership for any partnership taxable year, the first such action brought in the Tax Court shall go forward.

**(3) Priority outside the Tax Court**

If more than 1 action is brought under paragraph (1) with respect to any partnership for any taxable year but no such action is brought in the Tax Court, the first such action brought shall go forward.

**(4) Dismissal of other actions**

If an action is brought under paragraph (1) in addition to the action which goes forward under paragraph (2) or (3), such action shall be dismissed.

**(5) Treatment of premature petitions**

If—

(A) a petition for a readjustment of partnership items for the taxable year involved is filed by a notice partner (or a 5-

percent group) during the 90-day period described in subsection (a), and

(B) no action is brought under paragraph (1) during the 60-day period described therein with respect to such taxable year which is not dismissed,

such petition shall be treated for purposes of paragraph (1) as filed on the last day of such 60-day period.

**(6) Tax matters partner may intervene**

The tax matters partner may intervene in any action brought under this subsection.

**(c) Partners treated as parties**

If an action is brought under subsection (a) or (b) with respect to a partnership for any partnership taxable year—

(1) each person who was a partner in such partnership at any time during such year shall be treated as a party to such action, and

(2) the court having jurisdiction of such action shall allow each such person to participate in the action.

**(d) Partner must have interest in outcome**

**(1) In order to be party to action**

Subsection (c) shall not apply to a partner after the day on which—

(A) the partnership items of such partner for the partnership taxable year became nonpartnership items by reason of 1 or more of the events described in subsection (b) of section 6231, or

(B) the period within which any tax attributable to such partnership items may be assessed against that partner expired.

Notwithstanding subparagraph (B), any person treated under subsection (c) as a party to an action shall be permitted to participate in such action (or file a readjustment petition under subsection (b) or paragraph (2) of this subsection) solely for the purpose of asserting that the period of limitations for assessing any tax attributable to partnership items has expired with respect to such person, and the court having jurisdiction of such action shall have jurisdiction to consider such assertion.

**(2) To file petition**

No partner may file a readjustment petition under subsection (b) unless such partner would (after the application of paragraph (1) of this subsection) be treated as a party to the proceeding.

**(e) Jurisdictional requirement for bringing action in district court or Court of Federal Claims**

**(1) In general**

A readjustment petition under this section may be filed in a district court of the United States or the Court of Federal Claims only if the partner filing the petition deposits with the Secretary, on or before the day the petition is filed, the amount by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the final partnership administrative adjustment. In the case of a petition filed by a 5-percent group, the requirement of the preceding sentence shall apply to each member of the group. The court may by order provide that the jurisdictional requirements of this paragraph are satisfied where there has been a good faith attempt to satisfy such

requirements and any shortfall in the amount required to be deposited is timely corrected.

**(2) Refund on request**

If an action brought in a district court of the United States or in the Court of Federal Claims is dismissed by reason of the priority of a Tax Court action under paragraph (2) of subsection (b), the Secretary shall, at the request of the partner who made the deposit, refund the amount deposited under paragraph (1).

**(3) Interest payable**

Any amount deposited under paragraph (1), while deposited, shall not be treated as a payment of tax for purposes of this title (other than chapter 67).

**(f) Scope of judicial review**

A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

**(g) Determination of court reviewable**

Any determination by a court under this section shall have the force and effect of a decision of the Tax Court or a final judgment or decree of the district court or the Court of Federal Claims, as the case may be, and shall be reviewable as such. With respect to the partnership, only the tax matters partner, a notice partner, or a 5-percent group may seek review of a determination by a court under this section.

**(h) Effect of decision dismissing action**

If an action brought under this section is dismissed (other than under paragraph (4) of subsection (b)), the decision of the court dismissing the action shall be considered as its decision that the notice of final partnership administrative adjustment is correct, and an appropriate order shall be entered in the records of the court.

**I.R.C. § 6231 (2002). Definitions and special rules**

**(a) Definitions**

For purposes of this subchapter—

**(1) Partnership**

**(A) In general**

Except as provided in subparagraph (B), the term ''partnership'' means any partnership required to file a return under section 6031(a).

**(B) Exception for small partnerships**

**(i) In general**

The term ''partnership'' shall not include any partnership having 10 or fewer partners each of whom is an individual (other than a nonresident alien), a C corporation, or an estate of a deceased partner. For purposes of the preceding sentence, a husband and wife (and their estates) shall be treated as 1 partner.

**(ii) Election to have subchapter apply**

A partnership (within the meaning of subparagraph (A)) may for any taxable year elect to have clause (i) not

apply. Such election shall apply for such taxable year and all subsequent taxable years unless revoked with the consent of the Secretary.

**(2) Partner**

The term "partner" means—

(A) a partner in the partnership, and

(B) any other person whose income tax liability under subtitle A is determined in whole or in part by taking into account directly or indirectly partnership items of the partnership.

**(3) Partnership item**

The term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

**(4) Nonpartnership item**

The term "nonpartnership item" means an item which is (or is treated as) not a partnership item.

**(5) Affected item**

The term "affected item" means any item to the extent such item is affected by a partnership item.

**(6) Computational adjustment**

The term ''computational adjustment'' means the change in the tax liability of a partner which properly reflects the treatment under this subchapter of a partnership item. All adjustments required to apply the results of a proceeding with respect to a partnership under this subchapter to an indirect partner shall be treated as computational adjustments.

**(7) Tax matters partner**

The tax matters partner of any partnership is—

(A) the general partner designated as the tax matters partner as provided in regulations, or

(B) if there is no general partner who has been so designated, the general partner having the largest profits interest in the partnership at the close of the taxable year

involved (or, where there is more than 1 such partner, the 1 of such partners whose name would appear first in an alphabetical listing).

If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner. The Secretary shall, within 30 days of selecting a tax matters partner under the preceding sentence, notify all partners required to receive notice under section 6223(a) of the name and address of the person selected.

**(8) Notice partner**

The term "notice partner" means a partner who, at the time in question, would be entitled to notice under subsection (a) of section 6223 (determined without regard to subsections (b)(2) and (e)(1)(B) thereof).

**(9) Pass-thru partner**

The term "pass-thru partner" means a partnership, estate, trust, S corporation, nominee, or other similar person through whom other

persons hold an interest in the partnership with respect to which proceedings under this subchapter are conducted.

**(10) Indirect partner**

The term "indirect partner" means a person holding an interest in a partnership through 1 or more pass-thru partners.

**(11) 5-percent group**

A 5-percent group is a group of partners who for the partnership taxable year involved had profits interests which aggregated 5 percent or more.

**(12) Husband and wife**

Except to the extent otherwise provided in regulations, a husband and wife who have a joint interest in a partnership shall be treated as 1 person.

**(b) Items cease to be partnership items in certain cases**

**(1) In general**

For purposes of this subchapter, the partnership items of a partner for a partnership taxable year shall become nonpartnership items as of the date—

(A) the Secretary mails to such partner a notice that such items shall be treated as nonpartnership items,

(B) the partner files suit under section 6228(b) after the Secretary fails to allow an administrative adjustment request with respect to any of such items,

(C) the Secretary or the Attorney General (or his delegate) enters into a settlement agreement with the partner with respect to such items, or

(D) such change occurs under subsection (e) of section 6223 (relating to effect of Secretary's failure to provide notice) or under subsection (c) of this section.

**(2) Circumstances in which notice is permitted**

The Secretary may mail the notice referred to in subparagraph (A) of paragraph (1) to a partner with respect to partnership items for a partnership taxable year only if—

(A) such partner—

(i) has complied with subparagraph (B) of section 6222(b)(1) (relating to notification of inconsistent treatment) with respect to one or more of such items, and

(ii) has not, as of the date on which the Secretary mails the notice, filed a request for administrative adjustments which would make the partner's treatment of the item or items with respect to which the partner complied with subparagraph (B) of section 6222(b)(1) consistent with the treatment of such item or items on the partnership return, or

(B)(i) such partner has filed a request under section 6227(d) for administrative adjustment of one or more of such items, and

(ii) the adjustments requested would not make such partner's treatment of such items consistent with the treatment of such items on the partnership return.

**(3) Notice must be mailed before beginning of partnership proceeding**

Any notice to a partner under subparagraph (A) of paragraph (1) with respect to partnership items for a partnership taxable year shall be mailed before the day on which the Secretary mails to the tax

matters partner a notice of the beginning of an administrative proceeding at the partnership level with respect to such items.

**(c) Regulations with respect to certain special enforcement areas**

**(1) Applicability of subsection**

This subsection applies in the case of—

(A) assessments under section 6851 (relating to termination assessments of income tax) or section 6861 (relating to jeopardy assessments of income, estate, gift, and certain excise taxes),

(B) criminal investigations,

(C) indirect methods of proof of income,

(D) foreign partnerships, and

(E) other areas that the Secretary determines by regulation to present special enforcement considerations.

**(2) Items may be treated as nonpartnership items**

To the extent that the Secretary determines and provides by regulations that to treat items as partnership items will interfere with the effective and efficient enforcement of this title in any case

described in paragraph (1), such items shall be treated as nonpartnership items for purposes of this subchapter.

**(3) Special rules**

The Secretary may prescribe by regulation such special rules as the Secretary determines to be necessary to achieve the purposes of this subchapter in any case described in paragraph (1).

**(d) Time for determining partner's profits interest in partnership**

**(1) In general**

For purposes of section 6223(b) (relating to special rules for partnerships with more than 100 partners) and paragraph (11) of subsection (a) (relating to 5-percent group), the interest of a partner in the profits of a partnership for a partnership taxable year shall be determined—

(A) in the case of a partner whose entire interest in the partnership is disposed of during such partnership taxable year, as of the moment immediately before such disposition, or

(B) in the case of any other partner, as of the close of the partnership taxable year.

**(2) Indirect partners**

The Secretary shall prescribe regulations consistent with the principles of paragraph (1) to be applied in the case of indirect partners.

**(e) Effect of judicial decisions in certain proceedings**

**(1) Determinations at partner level**

No judicial determination with respect to the income tax liability of any partner not conducted under this subchapter shall be a bar to any adjustment in such partner's income tax liability resulting from—

(A) a proceeding with respect to partnership items under this subchapter, or

(B) a proceeding with respect to items which become nonpartnership items—

(i) by reason of 1 or more of the events described in subsection (b), and

(ii) after the appropriate time for including such items in any other proceeding with respect to nonpartnership items.

**(2) Proceedings under section 6228(a)**

No judicial determination in any proceeding under subsection (a) of section 6228 with respect to any partnership item shall be a bar to any adjustment in any other partnership item.

**(f) Special rule for deductions, losses, and credits of foreign partnerships**

Except to the extent otherwise provided in regulations, in the case of any partnership the tax matters partner of which resides outside the United States or the books of which are maintained outside the United States, no deduction, loss, or credit shall be allowable to any partner unless section 6031 is complied with for the partnership's taxable year in which such deduction, loss, or credit arose at such time as the Secretary prescribes by regulations.

**(g) Partnership return to be determinative of whether subchapter applies**

**(1) Determination that subchapter applies**

If, on the basis of a partnership return for a taxable year, the Secretary reasonably determines that this subchapter applies to such partnership for such year but such determination is erroneous, then the provisions of this subchapter are hereby extended to such partnership (and its items) for such taxable year and to partners of such partnership.

**(2) Determination that subchapter does not apply**

If, on the basis of a partnership return for a taxable year, the Secretary reasonably determines that this subchapter does not apply to such partnership for such year but such determination is erroneous, then the provisions of this subchapter shall not apply to such partnership (and its items) for such taxable year or to partners of such partnership.

**26 C.F.R. § 301.6231(a)(3)–1 Partnership items.**

(a) *In general.* For purposes of subtitle F of the Internal Revenue Code of 1954, the following items which are required to be taken into account for the taxable year of a partnership under subtitle A of the Code are more appropriately determined at the partnership level than at the partner level and, therefore, are partnership items:

(1) The partnership aggregate and each partner's share of each of the following:

(i) Items of income, gain loss, deduction, or credit of the partnership;

(ii) Expenditures by the partnership not deductible in computing its taxable income (for example, charitable contributions);

(iii) Items of the partnership which may be tax preference items under section 57(a) for any partner;

(iv) Income of the partnership exempt from tax;

(v) Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year); and

(vi) Other amounts determinable at the partnership level with respect to partnership assets, investments, transactions and operations necessary to enable the partnership or the partners to determine—

(A) The investment credit determined under section 46(a);

(B) Recapture under section 47 of the investment credit;

(C) Amounts at risk in any activity to which section 465 applies;

(D) The depletion allowance under section 613A with respect to oil and gas wells; and

(E) The application of section 751 (a) and (b);

(2) Guaranteed payments;

(3) Optional adjustments to the basis of partnership property pursuant to an election under section 754 (including necessary preliminary determinations, such as the determination of a transferee partner's basis in a partnership interest); and

(4) Items relating to the following transactions, to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for

purposes of the partnership books and records or for purposes of furnishing information to a partner:

(i) Contributions to the partnership;

(ii) Distributions from the partnership; and

(iii) Transactions to which section 707(a) applies (including the application of section 707(b)).

(b) *Factors that affect the determination of partnership items.* The term ''partnership item'' includes the accounting practices and the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc. Examples of these determinations are: The partnership's method of accounting, taxable year, and inventory method; whether an election was made by the partnership; whether partnership property is a capital asset, section 1231 property, or inventory; whether an item is currently deductible or must be capitalized; whether partnership activities have been engaged in with the intent to make a profit for purposes of section 183; and whether the partnership qualifies for the research and development credit under section 30.

(c) *Illustrations*—(1) *In general.* This paragraph (c) illustrates the provisions of paragraph (a)(4) of this section. The determinations illustrated in this paragraph (c) that the partnership is required to make are not exhaustive; there may be additional determinations that the partnership is required to make which relate to a transaction listed in paragraph (a)(4) of this section. The critical element is that the partnership needs to make a determination with respect to a matter for the purposes stated; failure by the partnership actually to make a determination (for example, because it does not maintain proper books and records) does not prevent an item from being a partnership item.

(2) *Contributions.* For purposes of its books and records, or for purposes of furnishing information to a partner, the partnership needs to determine:

(i) The character of the amount received from a partner (for example, whether it is a contribution, a loan, or a repayment of a loan);

(ii) The amount of money contributed by a partner;

(iii) The applicability of the investment company rules of section 721(b) with respect to a contribution; and

(iv) The basis to the partnership of contributed property (including necessary preliminary determinations, such as the partner's basis in the contributed property).

To the extent that a determination of an item relating to a contribution can be made from these and similar determinations that the partnership is required to make, therefore, that item is a partnership item. To the extent that that determination requires other information, however, that item is not a partnership item. For example, it may be necessary to determine whether contribution of the property causes recapture by the contributing partner of the investment credit under section 47 in certain circumstances in which that determination is irrelevant to the partnership.

(3) *Distributions.* For purposes of its books and records, or for purposes of furnishing information to a partner, the partnership needs to determine:

(i) The character of the amount transferred to a partner (for example, whether it is a distribution, a loan, or a repayment of a loan);

(ii) The amount of money distributed to a partner;

(iii) The adjusted basis to the partnership of distributed property; and

(iv) The character of partnership property (for example, whether an item is inventory or a capital asset).

To the extent that a determination of an item relating to a distribution can be made from these and similar determinations that the partnership is required to make, therefore, that item is a partnership item. To the extent that that determination requires other information, however, that item is not a partnership item. Such other information would include those factors used in determining the partner's basis for the partnership interest that are not themselves partnership items, such as the amount that the partner paid to acquire the partnership interest from a transferor partner if that transfer was not covered by an election under section 754.

(4) *Transactions to which section 707 (a) applies.* For purposes of its books and records, the partnership needs to determine:

(i) The amount transferred from the partnership to a partner or from a partner to the partnership in any transaction to which section 707(a) applies;

(ii) The character of such an amount (for example, whether or not it is a loan; in the case of amounts paid over time for the purchase of an asset, what portion is interest); and

(iii) The percentage of the capital interests and profits interests in the partnership owned by each partner.

To the extent that a determination of an item relating to a transaction to which section 707(a) applies can be made from these and similar determinations that the partnership is required to make, therefore, that item is a partnership item. To the extent that that determination requires other information, however, that item is not a partnership item. An example of such other information is the cost to the partner of goods sold to the partnership.

(d) *Effective date.* This section shall apply with respect to partnership taxable years beginning after September 3, 1982. This section shall also apply with respect to any partnership taxable year ending after September 3, 1982, if with respect to that year there is an agreement entered into pursuant to section 407(a)(3) of the Tax Equity and Fiscal Responsibility Act of 1982.