25-2079 (L)
*Soroban Capital Partners LP v. Commissioner of Internal Revenue*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2025

(Argued: June 25, 2026 Decided: September 17, 2026)

Docket Nos. 25-2079 (L), 25-2250 (CON)

---

SOROBAN CAPITAL PARTNERS LP,
SOROBAN CAPITAL PARTNERS GP LLC TAX MATTERS PARTNER,

*Petitioners-Appellants*,

*- against -*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

---

ON APPEAL FROM THE UNITED STATES TAX COURT

---

Before:

CALABRESI, CHIN, and MERRIAM, *Circuit Judges*.

---

Appeals from orders and decisions of the United States Tax Court (Buch, *J.*) upholding adjustments made by the Internal Revenue Service to the taxable income of an investment firm. Under the Internal Revenue Code, "self-employment income" is subject to "self-employment tax," but "self-employment income" does not include the distributive shares of "limited partners." I.R.C. § 1402(a)(13). In reporting its taxable income for the 2016 and 2017 tax years, the firm did not include the distributive shares of its three principals, claiming they were "limited partners." The Commissioner of Internal Revenue issued notices of adjustment, increasing the firm's taxable income for 2016 and 2017 to account for the three principals' distributive shares and reasoning that they were not limited partners because they exercised managerial control over the firm. The firm, through its "tax matters partner," challenged the adjustments before the Tax Court, which ruled in favor of the Commissioner. Petitioners-appellants now appeal, arguing that the Tax Court lacked jurisdiction to decide the adjustments and that the principals are "limited partners" whose distributive shares are not subject to self-employment tax. We hold that the Tax Court had jurisdiction over these proceedings and that the principals are not "limited partners" under

§ 1402(a)(13). Accordingly, their distributive shares are subject to the self-employment tax.

AFFIRMED.

---

SHAY DVORETZKY (Parker Rider-Longmaid, Armando Gomez, Kathleen Gregor, Elizabeth Smith, Raza Rasheed, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C., Boston, MA, and Los Angeles, CA, *for Petitioners-Appellants.*

NORAH E. BRINGER, Attorney (Ellen Page DelSole, Attorney, *on the brief*), Tax Litigation Branch, *for* Brett A. Shumate, Assistant Attorney General, Joshua Wu, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., *for Respondent-Appellee.*

Ryan P. McCormick, The Real Estate Roundtable, Inc., Washington, D.C.; David M.J. Rein, David C. Spitzer, Isaac J. Wheeler, Mark A. Popovsky, David N. Whalen, Zachary R. Ingber, Sullivan & Cromwell LLP, New York, NY, *for Amicus Curiae* The Real Estate Roundtable, Inc., *in support of Petitioners-Appellants*.

Richard A. Husseini, P.C., David W. Foster, P.C., JoAnne Nagjee, Kirkland & Ellis LLP, Houston, TX, Washington, D.C., and Chicago, IL, *for Amicus Curiae* Managed Funds Association, *in support of Petitioners-Appellants*.

Julie Ciamporcero Avetta, Thalia Tsakirgis Spinrad, Tax Law Center at NYU Law, New York, NY, *for Amicus Curiae* Tax Law Center at NYU Law, *in support of Respondent-Appellee*.

---

CHIN, *Circuit Judge*:

Under the Internal Revenue Code (the "Code"), a partner's distributive share of a partnership's income generally qualifies as "self-employment income" subject to "self-employment tax" (which funds Social Security and Medicare). I.R.C. § 1401(a)-(b). The distributive shares of "limited partners," however, are not considered self-employment income and therefore are not subject to the self-employment tax. I.R.C. § 1402(a)(13).

In this case, the three principals of petitioner-appellant Soroban Capital Partners LP ("Soroban") received approximately $141.5 million in distributive shares from Soroban in the 2016 and 2017 tax years. Soroban did not include the $141.5 million as self-employment income because, in its view, the three principals were "limited partners." Respondent-appellee Commissioner of Internal Revenue (the "Commissioner") disagreed, finding after an audit that, because the three principals worked full-time managing and running Soroban, they could not be limited partners. The Commissioner therefore issued notices of

adjustment to Soroban advising that the Internal Revenue Service (the "IRS") was adjusting Soroban's taxable income to include the principals' $141.5 million in distributive shares.

Soroban, through its "tax matters partner," defendant-appellant Soroban Capital Partners GP LLC (the "GP"), filed petitions in the Tax Court challenging the proposed adjustments.[1] First, Soroban argued that its principals were limited partners under § 1402(a)(13) of the Code and that therefore their distributive shares were not subject to self-employment tax. Second, Soroban argued that the IRS had issued the adjustments under the wrong procedures and that, accordingly, the Tax Court lacked jurisdiction to review the adjustments. The Tax Court (Buch, *J.*) rejected Soroban's arguments in both respects. Soroban now appeals.

We hold that the Tax Court had jurisdiction over these proceedings and that the principals are not "limited partners" within the meaning of § 1402(a)(13) of the Code. In 1977, when Congress enacted § 1402(a)(13), the ordinary meaning of "limited partner" was a partner who had limited liability for

---

[1] Under the Tax Equality and Fiscal Responsibility Act of 1982 ("TEFRA"), a partnership's tax matters partner was a "general partner designated as the tax matters partner." I.R.C. § 6231(a)(7) (repealed 2015). The tax matters partner represented the partnership during IRS tax audits and related proceedings. *See id.* § 6231(b)(3).

partnership debts and who did not partake in running the business. Because the principals exerted managerial control over Soroban, they do not qualify as limited partners under § 1402(a)(13), and their distributive shares are thus subject to the self-employment tax. Accordingly, we AFFIRM the Tax Court's decisions.

## *BACKGROUND*

We begin with an overview of the statutory and regulatory regime as relevant to the main issue before us: the self-employment tax's application to the distributive shares of a "limited partner." *See* I.R.C. § 1402(a)(13). We then summarize the factual and procedural history underlying this appeal.

### I. *Statutory and Regulatory Background*

We first provide an overview of the statutory and regulatory regime, including how the self-employment tax works and procedures governing the taxation of partnership income.

#### A. *The Code's Self-Employment Tax*

Subtitle A of the Code contains the provisions that govern federal income taxes. Within Subtitle A, § 1401 imposes a tax on every individual's "self-employment income." I.R.C. § 1401(a)-(b). These self-employment income taxes are then used to fund our Medicare and Social Security systems. While

taxpayers do not pay Social Security taxes on earnings above a certain amount, there is no analogous cap on Medicare contributions. *See* Internal Revenue Serv., U.S. Dep't of the Treasury, *Pub. No. 15, (Circular E), Employer's Tax Guide* 29 (2026). The Social Security tax amounts to 12.4%, and the Medicare tax equals 2.9%, for a total self-employment tax rate of 15.3% (subject to any cap). I.R.C. § 1401(a)-(b).

The Code defines self-employment income as "the *net earnings from self-employment* derived by an individual . . . during any taxable year." *Id.* § 1402(b) (emphasis added). In turn, the Code defines "net earnings from self-employment" ("NESE") as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions" attributable to the business, "*plus [the individual's] distributive share* . . . of income or loss . . . from any trade or business carried on by a partnership of which he is a member." *Id.* § 1402(a) (emphasis added).[2] Putting these provisions together, then, self-employment income generally includes -- and the self-employment tax

---

[2] A "distributive share" is a partner's assigned share of the partnership's "income, gain, loss, deduction, or credit." I.R.C. § 704(a)-(b). A partner's distributive share is therefore based, in part, on how much profit the partnership generates, rather than on any services the partner contributes to the partnership.

generally applies to -- the distributive shares partners receive from their partnerships. *Id.*

Section 1402(a)(13), however, provides an exception to this general definition of NESE. That provision, which is the crux of this appeal, states:

> [T]here shall be excluded the distributive share of any item of income or loss of a *limited partner, as such,* other than guaranteed payments . . . to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services.

I.R.C. § 1402(a)(13) (emphasis added).[3] Thus, NESE does not include -- and, consequently, the self-employment tax does not apply to -- the distributive shares of "limited partner[s], as such," other than guaranteed payments. *Id.* This case turns on the meaning of "limited partner," as used in § 1402(a)(13).

### B. *Partnership Taxation and Related Proceedings*

The Tax Court's jurisdiction to decide the adjustments at issue turns on whether the IRS used the proper procedures to adjust the NESE Soroban reported on its partnership tax returns. We therefore briefly explain how

---

[3] A "guaranteed payment" is compensation paid to a partner "for services or the use of capital" provided to the partnership and -- unlike a distributive share -- is determined "without regard to the income of the partnership." I.R.C. § 707(c).

partnership income is taxed and outline the procedures used to adjust partnership taxable income.

**1. Taxation of Partnership Income**

Partnerships do not pay federal taxes on their income. I.R.C. § 701. Instead, the responsibility for paying federal taxes on partnership income passes through to the partnership's partners. *See id.* §§ 701-703.

To aid the IRS in determining partners' pass-through tax liability, each "partnership must report its tax items on an information return" called a Form 1065. *United States v. Woods*, 571 U.S. 31, 38 (2013) (citing I.R.C. § 6031(a)). The partnership's Form 1065 is used to calculate the partnership's taxable income for the year -- and thus the pass-through tax liability of the partnership's *partners* for the year. *Addington v. Comm'r*, 205 F.3d 54, 59-60 (2d Cir. 2000). Then, using the information reported on the partnership information return, "partners must report their distributive shares of the partnership's tax items on their own individual returns." *Woods*, 571 U.S. at 38 (citing I.R.C. §§ 702, 704). Accordingly, each partner, when computing their income tax liability, "is individually required to take into account [their] distributive share of the partnership's tax items." *Callaway v. Comm'r*, 231 F.3d 106, 107 (2d Cir. 2000); *see also* I.R.C. §§ 701;

Treas. Reg. § 1.702-1(a). Individual partners must report their distributive shares "in a manner which is consistent with" the partnership's information return. I.R.C. § 6222(a); *id.* § 702(b); Treas. Reg. § 1.702-1(b).

**2. TEFRA**

Passed in 1982, "TEFRA provide[d] for unified partnership audit and litigation procedures for making adjustments to partnership taxable income." *Addington*, 205 F.3d at 59. Although the law was repealed in 2015, Congress specified that the law would continue to apply through the 2017 tax year. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101, 129 Stat. 584, 625 (2015). Thus, TEFRA applied to Soroban during the 2016 and 2017 tax years, the years at issue in this case.[4]

Congress enacted TEFRA to eliminate the need for the IRS to correct errors on a partnership's information return through individual, partner-by-partner "deficiency proceedings," *Woods*, 571 U.S. at 38-39, an arrangement that "resulted in duplication of administrative and judicial resources and sometimes . . . inconsistent results as between partners," *Callaway*, 231 F.3d at 107.

---

[4] When citing to I.R.C. §§ 6221-55, we refer to the TEFRA provisions applicable to the 2016 and 2017 tax years.

Therefore, Title IV of TEFRA "establish[ed] a single unified procedure for determining the tax treatment of all *partnership items* at the *partnership level*, rather than separately at the partner level." *Id.* at 108 (emphases added). By so doing, TEFRA sought "to ensure that, in general, partnership items are adjusted *once* at the partnership level," through "centralized audit procedures." *Id.* at 111, 108 (emphasis added). As discussed below, TEFRA provided a definition of "partnership item." *See* I.R.C. § 6231(a)(3) (repealed 2015). *See infra* Sections I.B-C of Discussion.

To accomplish these goals, TEFRA established a two-step procedure. First, the statute required that "the tax treatment of any partnership item . . . be determined at the partnership level." I.R.C. § 6221 (repealed 2015). Then, "the tax treatment of nonpartnership items [was] determined at the level of the individual partner's return." *Callaway*, 231 F.3d at 108. Thus, generally, the IRS could "adjust partnership items *only* at the partnership level," *id.* at 109 (emphasis added), and adjustments to nonpartnership items could *not* be raised during this first stage, *see id.* at 108; *Woods*, 571 U.S. at 39. Therefore, whether an item was a partnership item or a non-partnership item was the "threshold question for the application of the TEFRA procedures." *Callaway*, 231 F.3d at 108.

It is the first stage of TEFRA's two-stage process for addressing partnership-related tax matters that is relevant here. At this first stage, the IRS was required to "initiate proceedings at the partnership level to adjust 'partnership items,' those relevant to the partnership as a whole." *Woods*, 571 U.S. at 39 (quoting I.R.C. § 6221). If the IRS disagreed with a partnership's reporting of partnership items, it initiated an audit; then, if the IRS determined that it must adjust a partnership item listed in a partnership return, it would send the partners a Notice of Final Partnership Administrative Adjustment ("FPAA"), informing the partners of any adjustments. *Callaway*, 231 F.3d at 109. The partners could seek judicial review of those adjustments. *Id.* To do so, the partnership's designated tax matters partner could contest the FPAA by filing a petition for readjustment in, as relevant here, the Tax Court. *See* I.R.C. § 6226(a) (repealed 2015).[5] The Tax Court is a court of limited jurisdiction that, under TEFRA, had jurisdiction over TEFRA partnership-level proceedings to determine or redetermine partnership items. *Woods*, 571 U.S. at 38-39; I.R.C. § 7442.

[5] All partners are also "treated as parties to the suit [if] they have an ongoing interest in the outcome of the proceedings." *Callaway*, 231 F.3d at 109.

Once the FPAA adjustments became final, the IRS could initiate the second stage of TEFRA.[6] At this second stage, the IRS determined whether its partnership-level adjustments to partnership items also required individual partner-level adjustments to "affected items," that is, "any item to the extent such item is affected by a partnership item" but is not itself a partnership item. I.R.C. § 6231(a)(5) (repealed 2015); *Woods*, 571 U.S. at 39.

## II. *Factual Background*

The facts in this case are undisputed; the parties submitted the case to the Tax Court on a fully stipulated record. On appeal, Soroban does not challenge the Tax Court's factual findings.

### A. *Soroban, Its General Partner, and Its Principals*

Soroban is a Delaware limited partnership. It serves as the investment manager to a group of hedge funds and earns management and incentive fees for its services. In 2016 and 2017, Soroban earned some $247 million in income from providing its investment management services.

---

[6] The FPAA adjustments became final after judicial resolution or once they went unchallenged for 150 days. *See* I.R.C. § 6225(a) (repealed 2015).

Soroban's sole general partner is the GP, a separate Delaware limited liability company ("LLC") that is classified as a partnership for federal income tax purposes. Under Soroban's Limited Partnership Agreement, only the GP can manage, operate, and control Soroban. The GP is Soroban's designated tax matters partner and instituted the proceedings below.

Soroban's principals -- Eric W. Mandelblatt, Gaurav Kapadia, and Scott Friedman (the "Principals") -- are Soroban's three founding members and are limited partners of Soroban as well as members of the GP.[7] During the years in issue, Mandelblatt was Soroban's Managing Partner and Chief Investment Officer; Kapadia was its Co-Managing Partner; and Friedman was its Head of Trading and Risk Management. Mandelblatt and Kapadia had the authority to manage the GP, with Kapadia's authority subject only to Mandelblatt's.

In 2016 and 2017, the Principals worked full time in Soroban's business -- approximately 2,300 to 2,500 hours per year. The Principals "managed the portfolio investments and exposures of Soroban's advised

[7] Two of the three Principals hold their partnership interests in Soroban through LLCs of which they are the sole owner. We refer to the Principals as holding those interests directly, as the parties do. *See* Treas. Reg. §§ 301.7701-2(c)(2)(i), 301.7701-3(b)(1)(ii) (each stating that, generally, a non-corporation business entity with a single owner is "disregarded as an entity separate from its owner").

investment funds," Joint App'x at 1176, and -- along with the research analysts and traders who reported to them -- comprised Soroban's investment team. In short, the Principals "played an essential role in generating [Soroban's] income." *Soroban Cap. Partners LP v. Comm'r ("Soroban II")*, T.C.M. (RIA) 2025-52, 2025 WL 1517432, at *1 (T.C. May 28, 2025).

In addition to being money-makers for Soroban, the Principals "exercised managerial control over Soroban" and its business operations. *Id.* In 2016, all three Principals sat on all four of Soroban's governing committees -- the Brokerage, Trade Allocation, Valuation, and Management Committees. In 2017, the Principals sat on the same four committees, meaning they sat on all but one of Soroban's governing committees for that tax year.[8] The Principals also all played roles in Soroban's decisions to hire, fire, promote, terminate, and evaluate Soroban's employees. Moreover, Soroban's senior management team, which ran Soroban's daily business operations, reported directly to Mandelblatt and Kapadia.

[8] Soroban established a Cybersecurity Committee in 2017; the Principals did not serve on that Committee, but "its members were selected by the Management Committee." Joint App'x at 1187.

Meanwhile, in contrast to providing these extensive services, the Principals contributed relatively little capital to Soroban from its founding through December 31, 2017. During that time, Mandelblatt contributed only about $4.3 million in capital to Soroban, and Kapadia and Friedman contributed nothing.

**B. *Soroban's Allocations and Its 2016 and 2017 Information Returns***

For their services to Soroban, the Principals received guaranteed payments. Their guaranteed payments in 2016 and 2017 totaled approximately $2.5 million**.**

For those same years, Soroban allocated roughly 1% of its ordinary income to the GP and the remaining 99% to the Principals as limited partners.[9] Thus, for the 2016 and 2017 tax years combined, the Principals' distributive shares totaled roughly $141.5 million -- an amount over 55 times higher than what they received in guaranteed payments for their services to Soroban.

---

[9] Almost all forms of income, including wages (but excluding capital gains), are classified as ordinary income. *See Ordinary Income, Black's Law Dictionary* (12th ed. 2024).

On its Forms 1065 for 2016 and 2017, Soroban reported NESE of $2,035,395 and $1,901,131, respectively -- roughly the sum of the Principals' guaranteed payments plus the GP's distributive share of ordinary income. The Principals paid the self-employment Medicare and Social Security taxes on these amounts. Invoking § 1402(a)(13), however, Soroban excluded the Principals' distributive shares from its NESE total. Thus, the Principals did not pay self-employment tax on their distributive shares. The excluded shares -- roughly $141.5 million across the two years -- are the subject of the IRS adjustments.

## III. *Procedural History*

### A. *Notices of FPAAs and Soroban's Petitions for Readjustment*

On April 25, 2022, the Commissioner issued FPAAs to Soroban for the 2016 and 2017 tax years after conducting an audit and concluding that the Principals were not limited partners eligible for the limited-partner exception to the self-employment tax. The FPAAs thus recharacterized the Principals' distributive shares as NESE subject to self-employment taxes. By including the Principals' distributive shares of $141.5 million across both years, the FPAAs raised Soroban's NESE by $77,663,962 for 2016 and $63,866,302 for 2017.

On July 21, 2022, the GP, as Soroban's tax matters partner under TEFRA, filed petitions in the Tax Court seeking review of the FPAAs for both the 2016 and 2017 tax years. The petitions requested that the Tax Court conclude no adjustments should be made to the NESE amounts Soroban had reported on its 2016 and 2017 Forms 1065. The petitions also asked the Tax Court to determine that TEFRA partnership-level proceedings were inappropriate for the adjustments at issue. Shortly after filing the petitions, the parties filed a joint motion to consolidate the two cases, and the Tax Court granted the motion on November 7, 2022.

### B. *Summary Judgment,* **Soroban I,** *and* **Soroban II**

Soroban moved for summary judgment on February 7, 2023, and on March 2, 2023, the Commissioner cross-moved for partial summary judgment on the jurisdictional question. Soroban asked the Tax Court to conclude that, under § 1402(a)(13), the Principals' distributive shares should be excluded from NESE because the Principals were limited partners in name and thus qualified for the limited-partner exception. In the alternative, Soroban requested that the Tax Court determine that the FPAAs exceeded the Commissioner's TEFRA authority -- and thus the Tax Court's jurisdiction to decide the adjustments -- because any

inquiry into the Principals' functional roles was not a partnership item resolvable in partnership-level proceedings. The Commissioner's cross-motion requested that the Tax Court conclude that an inquiry into the Principals' functional roles was a partnership item that *could* be determined in partnership-level proceedings.

On November 28, 2023, the Tax Court denied Soroban's motion and granted the Commissioner's. *Soroban Cap. Partners LP v. Comm'r* ("*Soroban I*"), 161 T.C. 310 (2023). The Tax Court concluded that the § 1402(a)(13) "exception does not apply to a partner who is limited in name only." *Id.* at 320. The Tax Court held that, instead, a "functional analysis" determines whether a partner is a limited partner whose distributive shares are exempt from the self-employment tax, such that § 1402(a)(13) "applies only to a limited partner who is functioning as a limited partner." *Id.* at 325, 320. The Tax Court also rejected Soroban's jurisdictional argument. *Id.* at 325.

Following *Soroban I*, the parties submitted the consolidated cases for decision on a stipulated record. On May 28, 2025, the Tax Court issued a decision applying *Soroban I*'s functional analysis and concluding that the Principals were "limited partners in name only" who did not qualify as "limited

partners" under § 1402(a)(13). *Soroban II*, T.C.M. 2025-52, at *14. Emphasizing the Principals' operational control over Soroban, the Tax Court found that "[b]ut for the three Principals, Soroban would not exist." *Id.* at *8. Thus, the Tax Court concluded that the Principals' distributive shares constituted NESE subject to the self-employment tax and accordingly sustained the IRS's adjustments in full, entering orders and decisions for the Commissioner as to both tax years. *Id.* at *14. Soroban filed a timely notice of appeal on August 25, 2025.

## *DISCUSSION*

Facing tax liability on tens of millions of dollars in income per year, Soroban challenges the Tax Court's decisions on both jurisdictional and merits grounds. We first discuss the Tax Court's jurisdiction over these proceedings under TEFRA. We then turn to the definition of "limited partner" within the meaning of § 1402(a)(13). We conclude by discussing whether the Principals are limited partners within the meaning of § 1402(a)(13) and -- consequently -- whether their distributive shares are subject to the self-employment tax.

### I. *Jurisdiction*

As both parties agree, the threshold jurisdictional question turns on whether NESE qualifies as a partnership item subject to TEFRA partnership-level

proceedings and, relatedly, to determination by the Tax Court on review. *See Woods*, 571 U.S. at 39 (explaining that the Tax Court's jurisdiction under TEFRA was limited to determining or redetermining *partnership* items). Whether an item is a partnership item is a question of statutory interpretation that we review *de novo*. *See Monti v. United States*, 223 F.3d 76, 81 (2d Cir. 2000); *Alphonso v. Comm'r*, 708 F.3d 344, 350 (2d Cir. 2013). We also review the question of the Tax Court's jurisdiction *de novo*. *Maier v. Comm'r*, 360 F.3d 361, 363 (2d Cir. 2004).

**A. *Applicable Law***

TEFRA defined a partnership item as

> any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for the purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

I.R.C. § 6231(a)(3) (repealed 2015). Thus, a partnership item is an item that (1) is "required to be taken into account" for the partnership's taxable year pursuant to Subtitle A (which covers income taxes) and (2) the Treasury Regulations provide is "more appropriately determined" at the partnership level. *Id.* Treasury Regulation § 301.6231(a)(3)-1 provides a non-exhaustive list of partnership items.

### B. *Application*

Soroban argues that the IRS exceeded its authority by using TEFRA partnership-level proceedings to adjust a non-partnership item, *i.e.*, NESE, and that the Tax Court therefore exceeded its jurisdiction in upholding the FPAAs, because the Tax Court only had jurisdiction over TEFRA partnership-level proceedings to determine "*partnership items*." I.R.C. § 6226(f) (repealed 2015) (emphasis added).

We first discuss whether NESE is an item "required to be taken into account" for the partnership's taxable year under Subtitle A. I.R.C. § 6231(a)(3) (repealed 2015). We then analyze whether the Treasury Regulations provide that NESE is an item "more appropriately determined" at the partnership level than at the partner level. I.R.C. § 6231(a)(3) (repealed 2015). We conclude that NESE meets both prongs of the "partnership item" test and is therefore a partnership item that the IRS appropriately adjusted in TEFRA partnership-level proceedings and that the Tax Court appropriately determined upon review.

#### 1. "Required To Be Taken into Account" Under Subtitle A

NESE is an item "required to be taken into account" for the partnership's taxable year under Subtitle A of the Code. I.R.C. § 6231(a)(3)

(repealed 2015). Indeed, both partnerships and partners must take NESE into account.

According to § 703, which falls under Subtitle A of the Code, a partnership "shall" compute its taxable income -- also called ordinary business income -- "in the same manner as in the case of an individual." *Id.* § 703(a). Computing the partnership's taxable income thus requires the partnership to take into account the self-employment income the partnership generates, as individuals' self-employment income is subject to the self-employment tax under Subtitle A. *Id.* § 1401(a)-(b). And because the partnership must take into account self-employment income when computing its taxable income, it necessarily must also account for NESE. *Id.* § 1402(b) (provision in Subtitle A) (defining "self-employment income" as "the [NESE] derived by an individual . . . during any taxable year"). The upshot is that, under Subtitle A, the partnership must "take into account" NESE. Indeed, a provision in Subtitle F of the Code provides that partnerships must state certain information on their partnership tax returns "for the purpose of carrying out the provisions of subtitle A." *Id.* § 6031(a). "Net earnings (loss) from self-employment" is one of these items. Joint App'x at 134, line 14a.

Under the same provisions, each *partner* must also determine their own taxable income by accounting for NESE. Consequently, NESE is an item "required to be taken into account" under Subtitle A, because the partnership must account for it in computing its taxable income and because partners must also consider it in calculating their taxable income. I.R.C. § 6231(a)(3) (repealed 2015).

Soroban concedes -- as it must -- that NESE appears and is defined in Subtitle A and that §§ 702, 703, and 704 of Subtitle A require partnerships to calculate their income (as well as their partners' distributive shares of that income) -- which includes NESE. Soroban nevertheless contends that NESE "simply appears" in Subtitle A and that Subtitle A does not require partnerships to take NESE into account. Appellants' Br. at 24. It reasons that partnerships are not required to calculate the amount of income *tax* or self-employment *tax* each partner owes on their self-employment income, and §§ 702, 703, and 704 do not require partnerships to separately "state" each partner's taxable income or "report" NESE. *Id.* at 39.

These arguments miss the mark. Simply because Soroban need not explicitly state each individual partner's share of the partnership's total NESE, or

parse out the taxes each partner owes on their share of NESE, does not mean that Soroban is not required to *account for NESE* under Subtitle A at all. What matters for our purposes is whether the partnership must take NESE into account as taxable income -- not whether Soroban must also ascertain the taxes each partner owes on that taxable income. After all, TEFRA partnership-level proceedings offer a vehicle to determine the "treatment" of tax items -- not partners' tax *liability* on those items. *Callaway*, 231 F.3d at 108.

At bottom, when Soroban calculates its total taxable income, under Subtitle A it must account for NESE, including the NESE it eventually distributes to its partners; and partners, too, must account for NESE when calculating their own taxable income. Thus, NESE is required to be taken into account for the partnership's taxable year under Subtitle A, satisfying the first prong of the partnership-item definition. *See* I.R.C. § 6231(a)(3) (repealed 2015).

**2. Treasury Regulation § 301.6231(a)(3)-1**

Next, under the Treasury Regulations, NESE is an item "more appropriately determined" at the partnership level than at the partner level, thus satisfying the second prong of the partnership-item definition. I.R.C. § 6231(a)(3) (repealed 2015).

Treasury Regulation § 301.6231(a)(3)-1 provides a non-exhaustive list of items that are "more appropriately determined at the partnership level than at the partner level and [that], therefore, are partnership items." Treas. Reg. § 301.6231(a)(3)-1(a). The list includes: "[t]he partnership aggregate and each partner's share of . . . [i]tems of income, gain[,] loss, deduction, or credit of the partnership," *id.* § 301.6231(a)(3)-1(a)(1)(i); "[t]he partnership aggregate and each partner's share of . . . [i]ncome of the partnership exempt from tax," *id.* § 301.6231(a)(3)-1(a)(1)(iv); guaranteed payments, *id.* § 301.6231(a)(3)-1(a)(2); and "[i]tems relating to . . . [d]istributions from the partnership" "to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, [or] the character of an amount . . . for purposes of the partnership books and records or for purposes of furnishing information to a partner," *id.* § 301.6231(a)(3)-1(a)(4)(ii). Additionally, partnership items include "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." *Id.* § 301.6231(a)(3)-1(b). Items not specifically listed in the Treasury Regulation may also qualify as partnership items. *See Chimblo v. Comm'r*, 177 F.3d 119, 125 (2d Cir. 1999) (determining that

the statute of limitations for assessing tax attributable to partnership items is a partnership item despite not being listed as one).

NESE is an item "more appropriately determined at the partnership level" under the Treasury Regulations because, first, whether partnership income qualifies as NESE is a "legal and factual determination[]" that affects whether the income is "characteriz[ed]" as both self-employment income and taxable income. Treas. Reg. § 301.6231(a)(3)-1(b). For the same reasons, the determination of whether income qualifies as NESE affects the "amount" of an item of income: taxable income. *Id.* Thus, because a partnership's aggregate NESE affects the characterization and amount of an item of income, NESE is an item "more appropriately determined" at the partnership level under Treasury Regulation § 301.6231(a)(3)-1(b).

Second, considering the partnership items that Treasury Regulation § 301.6231(a)(3)-1 expressly identifies, common sense tells us that NESE -- although not specifically mentioned in the regulation -- is an item "more appropriately determined" at the partnership level. I.R.C. § 6231(a)(3) (repealed 2015). The regulation lists income, "items relating to" distributive shares, and guaranteed payments as partnership items. *See* Treas. Reg. § 301.6231(a)(3)-

1(a)(1)-(2). These partnership items -- income, distributive shares, and guaranteed payments -- are the very components that make up NESE. *See* I.R.C. § 1402(a)(13). Accordingly, if all the components of NESE are partnership items, NESE, too, should logically be considered a partnership item.

Classifying NESE as a partnership item that should be evaluated at the partnership level makes good practical sense, too. After all, the calculation impacts all partners. Were NESE determinations relegated to partner-level proceedings, therefore, the same inquiry would need to be made multiple times, in contravention of TEFRA's purpose. *See Callaway*, 231 F.3d at 111, 108 (explaining that the purpose of TEFRA "is to ensure that, in general, partnership items are adjusted *once* at the partnership level" through "centralized audit procedures" (emphasis added)).

Soroban objects that NESE is not explicitly listed in Treasury Regulation § 301.6231(a)(3)-1(a) and that Treasury Regulation § 301.6231(a)(3)-1(b) cannot support NESE's status as a partnership item because it merely "clarifies that items that affect the computation of partnership taxable income . . . are also partnership items." Appellants' Br. at 40 (citation modified). As already noted, however, Treasury Regulation § 301.6231(a)(3)-1 provides a

*non-exclusive* list of partnership items. *See Chimblo*, 177 F.3d at 125. Furthermore, contrary to Soroban's suggestion, whether income is characterized as NESE *does* affect the computation of partnership taxable income, because NESE is an element of a partnership's total taxable income. Indeed, the FPAAs at issue adjusted Soroban's taxable income by recharacterizing the Principals' distributive shares as NESE. Soroban's contentions therefore fail.

* * *

Accordingly, NESE is a partnership item subject to TEFRA proceedings, and the Tax Court had jurisdiction to determine Soroban's NESE.

## II. *Meaning of "Limited Partner" Under I.R.C. § 1402(a)(13)*

This case's merits question turns on the definition of "limited partner," as set forth in § 1402(a)(13). The meaning of "limited partner" in § 1402(a)(13) is a question of statutory construction that this Court reviews *de novo*. *See Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 183 (2d Cir. 2013).

Soroban argues that the term refers to any partner of a limited partnership with limited liability. Conversely, the Commissioner advocates for a functional analysis and contends that "limited partner" means a partner who not

only has limited liability but who also "do[es] not control a business and [is] generally akin to [a] passive investor[]." Appellee's Br. at 16.

We hold that "limited partner," as used in § 1402(a)(13), means a partner who, in addition to having limited liability, does not run, manage, or control the partnership's business.[10] We arrive at this conclusion based on three sources that provide guidance as to the meaning of the term as used here: (1) the text of the statute and its ordinary meaning in 1977, when § 1402(a)(13) was enacted; (2) the statute's surrounding text and structure; and (3) the statute's legislative history and historical context.

### A. *The Text*

We begin, as always, with the text. *See Van Buren v. United States*, 593 U.S. 374, 381 (2021). We first discuss the meaning of the term "limited partner" and then analyze other textual indicators in § 1402(a)(13).

#### 1. The Words "Limited Partner" in § 1402(a)(13)

Because the Code does not define the term "limited partner," we apply the usual methods of statutory interpretation. "It is a fundamental canon

[10] We note that while limited liability and lack of managerial control are the main characteristics of a "limited partner," there may be other limitations which may vary state by state.

of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *Watson v. Republican Nat'l Comm.*, 609 U.S. --, 146 S. Ct. 2165, 2172 (June 29, 2026) (citation modified); *see also Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020) ("Without a statutory definition, we turn to the phrase's plain meaning at the time of enactment."). We therefore consider contemporaneous dictionary and treatise definitions of "limited partner," as well as contemporaneous state statutes regarding limited partnerships, to discern the term's ordinary meaning at the time of § 1402(a)(13)'s enactment.

*i. Contemporaneous Dictionary and Treatise Definitions*

In 1977, the ordinary meaning of "limited partner" was a partner who "contribute[s] capital and share[s] in the profits" but who "*take[s] no part in running [the] business* and incur[s] no liability . . . beyond contribution." *Limited Partnership*, *Black's Law Dictionary* (5th ed. 1979) (emphasis added); *accord Special Partner*, *Webster's Third New International Dictionary* 2186 (1976) ("[A] partner who may share in the profits . . . , who contributes property to the capital thereof but must not exercise control over or be active in partnership affairs, and whose liability for partnership debts . . . is limited to his capital and interest in the firm

assets -- called also *limited partner*, distinguished from *general partner*."); *Limited Partner*, *id.* at 1313 (cross-referencing "special partner" and defining "limited partner" as "a partner whose liability to creditors of the partnership is usu[ally] limited to the amount of capital he has contributed to the partnership *providing he has not held himself out to the public as a general partner* and has complied with other requirements of law" (emphasis added)). In contrast, a "general partner" was a partner "by whom the business is conducted" and who is "jointly and severally responsible" for the partnership's obligations. *Limited Partnership*, *Black's Law Dictionary* (5th ed. 1979); *see also Partner, Full or General Partner*, *id.* ("A partner who participates fully in the profits, losses and management of the partnership and who is personally liable for its debts."). Thus, a limited partner was understood in 1977 to have two features: limited liability and lack of managerial control over the partnership.[11]

---

[11] *See also*, *e.g.*, 2 Benjamin Vaughan Abbott, *Special Partner, or Partnership*, *Dictionary of Terms and Phrases Used in American or English Jurisprudence* 491 (1879) ("[S]pecial partner usually means the partner who . . . puts in a definite capital, *assumes no part (or only such as the statute permits) in the business management*, and is liable only to loss of the capital contributed. . . . [T]he partnership thus formed is commonly called limited partnership . . . ." (emphasis added)); *Limited Partnership*, *id.* at 49-50 ("A form of partnership . . . in which the firm consists of one or more general partners, jointly and severally responsible as ordinary partners, and by whom the business is conducted; and

Soroban contends that contemporaneous dictionaries, such as Black's Law Dictionary, simply defined "limited partner" as a partner in a limited partnership with limited liability. But while many contemporaneous dictionaries may have focused on the limited liability aspect when defining "limited *partner*" (also known as "special partner"), when defining "limited *partnership*," those same dictionaries indicated that limited partners -- unlike general partners -- lacked management authority. *Compare, e.g.*, *Special Partner*, *Black's Law Dictionary* (4th ed. 1968) ("A member of a limited partnership who furnishes certain funds to the common stock, and whose liability extends no further than the fund furnished. A partner whose responsibility is restricted to the amount of his investment."), *with Limited Partnership*, *id.* ("A partnership consisting of one or more *general partners*, jointly and severally responsible as ordinary partners, *and by whom the business is conducted*, and one or more special partners . . . ." (emphases added)).[12]

---

one or more special partners, contributing in cash payments a specific sum as capital to the common stock, and who are not liable for the debts of the partnership beyond the fund so contributed. *These special partners must refrain from dealing in the business*, except in matters permitted by statute . . . ." (emphasis added)).

12 *See also* 1 Alexander M. Burrill, *Limited Partnership*, *A Law Dictionary and Glossary* 160 (2d ed. 1867) ("A partnership consisting of one or more general partners . . . by whom the business is conducted, and one or more special partners, contributing in cash payments a specific sum as capital . . . and who are not liable for the debts of the

Certain dictionaries alternatively incorporated this feature of the limited partner not by emphasizing the general versus limited partner's role but by referencing the Uniform Limited Partnership Act, which -- as discussed below -- described limited partners as lacking control over business operations. *Compare, e.g.*, *Limited Partnership*, *Cochran's The Law Dictionary* (5th ed. 1977) ("A partnership . . . formed by two or more persons *under the provisions of the Uniform Limited Partnership Act*, having as members one or more general partners and one or more limited partners. The limited partners, as such, are not bound by the obligations of the partnership." (emphasis added)), *and Special Partner*, *id.* ("[A] member of a limited partnership . . . whose liability is limited to the amount contributed by him to the business of the firm, and *who does not have the powers of a general partner*." (emphasis added)), *with* Uniform Limited Partnership Act § 7 (1916) (providing that a limited partner "shall not become liable as a general partner unless . . . he takes part in the control of the business"). Thus,

---

partnership beyond the fund."); 2 Stewart Rapalje & Robert L. Lawrence, *Partner, Particular, Limited, or Special*, *A Dictionary of American and English Law* 932 (1888) ("In America, a limited partnership is one consisting of one or more general partners, jointly and severally responsible as ordinary partners, and by whom the business is conducted, and one or more special partners, who contribute in cash a special sum as capital to the common stock, and who are not liable for the debts of the partnership beyond the fund so contributed.").

contemporaneous dictionaries overwhelmingly described limited partners as having *both* limited liability *and* a lack of control over the partnership.

The leading treatises of the time also confirmed that "limited partners, in return for immunity, must refrain from any participation in the management or control of the business." Harold Gill Reuschlein & William A. Gregory, *Handbook on the Law of Agency and Partnership* § 264 (1979).[13] Accordingly, we conclude based on these sources that an essential feature of the limited partner in 1977 was a lack of participation in running the partnership's business.

[13] *Accord* Judson A. Crane, *Handbook on the Law of Partnership and Other Unincorporated Associations* 112-13 (2d ed. 1952) ("A limited partnership . . . consists of general partners, who manage the business and have the same liability as in an ordinary partnership, and of limited or special partners, who take no part in management, share profits, but do not share losses beyond their capital investment."); *id.* at 114 ("The general partners conduct the business and are personally liable to creditors. The special or limited partners do not participate in management and are not personally liable to creditors."); Alan R. Bromberg, *Crane and Bromberg on Partnership* 147 (1968) ("Limited partners are exempt from personal liability on condition that they do not participate in management. There is no express bar to their participation, but the threat of personal liability is a strong deterrent."); *see also* Sheldon I. Banoff, *Tax Distinctions Between General and Limited Partners*, 35 Tax L. Rev. 1, 77 (1979) ("For purposes of the definition of self-employment income, the better view of [a limited partner] who becomes liable as a general partner [by taking part in the control of the business] . . . is that he be deemed to be a general partner.").

*ii. Contemporaneous State Laws*

Furthermore, state laws in existence at the time of the enactment of § 1402(a)(13) buttress this understanding of a limited partner.

We begin with the Uniform Limited Partnership Act. The 1916 Uniform Limited Partnership Act ("ULPA") was a model statute approved in 1916 by the National Conference of Commissioners on Uniform State Laws. Sheldon I. Banoff, *Tax Distinctions Between General and Limited Partners*, 35 Tax L. Rev. 1, 3 & n.1 (1979). By 1979, it had been adopted and enacted in every state except for Louisiana. *Id.*; Robert A. Kessler, *The New Uniform Limited Partnership Act: A Critique*, 48 Fordham L. Rev. 159, 159 (1979). By 1979, ULPA's 1976 successor, the Revised Uniform Limited Partnership Act ("RULPA"), had replaced it in a handful of states. *See* Kessler, *supra*, at 159. Given ULPA and RULPA's widespread adoption, Congress legislated against the backdrop of ULPA and RULPA's partnership rules when it used the term "limited partner" in § 1402(a)(13). *See Tanvir v. Tanzin*, 894 F.3d 449, 463 (2d Cir. 2018), *aff'd,* 592 U.S. 43 (2020) (relying on "the venerable canon of construction that Congress is presumed to legislate with familiarity of the legal backdrop for its legislation"

(quoting *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 115 (2d Cir. 2017))).

ULPA and RULPA premised the limited-partner role on both limited liability and the absence of managerial control. Indeed, § 7 of ULPA provided that a limited partner "shall not become liable as a general partner unless . . . he takes part in the control of the business." ULPA § 7 (1916); *see also* RULPA § 303(a) (1976) ("[A] limited partner is not liable for the obligations of a limited partnership unless [the partner] . . . takes part in the control of the business."). Moreover, ULPA clarified that "[t]he contributions of a limited partner may be cash or other property, but not services." ULPA § 4 (1916). Thus, in 1977, the majority of states allowed partners to maintain their limited liability only to the extent that they did not exercise managerial control over the partnership. *Id.* In essence, a limited partner surrendered their limited liability -- and therefore functionally transformed into a general partner for liability purposes -- by engaging in control of the partnership. *See* Banoff, *supra*, at 77 ("For purposes of the definition of self-employment income, the better view of one who becomes liable as a general partner under section 7 of the U.L.P.A. [by taking part in the control of the business] is that he be deemed to be a general

partner."). A hallmark of limited partners at the time of § 1402(a)(13)'s passage, then, was lack of management authority.

Soroban contends that, at least under Delaware's version of RULPA § 303(a), 6 Del. Code Ann. § 17-303(a), a partner who exercises managerial control may lose their limited liability but does not lose their formal "limited partner" status. Soroban therefore insists that a limited partner is defined only by limited liability. We are unpersuaded.

Soroban's view ignores the fact that, as discussed above, one of the two critical features distinguishing the typical limited partner from the typical general partner in 1977 was managerial authority. "[T]ax law deals in economic realities, not legal abstractions." *Comm'r v. Sw. Exploration Co.*, 350 U.S. 308, 315 (1956); *accord PPL Corp. v. Comm'r*, 569 U.S. 329, 340 (2013). Thus, regardless of whether in some cases a limited partner could formally be *called* a "limited partner" even while running the business, a partner partaking in control was no longer *acting* as a traditional limited partner in reality and, indeed, became liable "as a general partner." ULPA § 7 (1916); *see also* Banoff, *supra*, at 77.

Soroban also points out that some states allowed limited partners to participate in control of the business and maintain limited liability, or otherwise

did not premise the definition of "limited partner" on the absence of managerial control -- and therefore Congress could not have had that feature in mind when it passed § 1402(a)(13). Not so. As we have established, the "ordinary meaning" of limited partner in 1977 was a partner with both limited liability and limited involvement in managing the business. *Watson*, 146 S. Ct. at 2172 (citation modified). Were we to adopt Soroban's position that a term's meaning may only be "ordinary" if it is universally and identically adopted across all 50 states, we doubt that *any* word could have such an "ordinary" meaning.

Finally, Soroban's proposed definition of a limited partner -- a partner in a state-law limited partnership with limited liability -- would force courts to analyze whether a partner qualifies as a limited partner by simply looking to the partner's formal title under state law. Such a definition contravenes the principle that, in federal tax matters, "[s]tate law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Burnet v. Harmel*, 287 U.S. 103, 110 (1932). Thus, we reject Soroban's claims that lack of control was not an essential feature of the limited partner in 1977 for federal tax purposes.

**2. The Phrase "As Such" in § 1402(a)(13)**

The phrase "as such," which directly follows "limited partner," also supports our interpretation of § 1402(a)(13)'s limited partner exception. *See* I.R.C. § 1402(a)(13) ("[T]here shall be excluded the distributive share . . . of a limited partner, as such, other than guaranteed payments . . . ."). The phrase "as such" means "in that capacity." *As Such*, 2 *The Compact Edition of the Oxford English Dictionary* 3137 (1971). It therefore limits the tax exclusion to income a partner earns *in their capacity as a limited partner* -- that is, income attributable to the partner's investment in the partnership, not to their management of the business. A partner who runs the partnership earns their distributive share of the partnership's profits, in effect, from managing the business, such that this income is not earned in their capacity as a "limited partner." Thus, we agree with the Tax Court that the words "as such" indicate that § 1402(a)(13) only extends to limited partners who act within the bounds of a typical limited partner, by investing in but not managing the partnership. *See Soroban I*, 161 T.C. at 320. A "limited partner" who is a limited partner in name only is not a "limited partner, *as such*."

**3. The "Guaranteed Payments" Carveout in § 1402(a)(13)**

Furthermore, § 1402(a)(13) includes in the definition of self-employment income a limited partner's "guaranteed payments described in section 707(c) . . . for services actually rendered." I.R.C. § 1402(a)(13). This carveout from the limited-partner exception fortifies our interpretation of a "limited partner" as one who does not manage the business, because the carveout aligns with the paradigm that income from working (as opposed to investing) is subject to the self-employment tax.

Soroban observes that this carveout to the limited partner exception indicates that Congress anticipated that limited partners could render services to the partnership. Therefore, Soroban concludes, a limited partner could be active in the partnership -- and therefore could exercise managerial control over it. Soroban's reasoning is unavailing. We do not disagree that a limited partner in 1977 could provide *some* services to the partnership. But that fact does not cast doubt on our conclusion that limited partners nevertheless could not *exercise managerial control* over the partnership, because merely providing services does not necessarily equate to running the business. Accordingly, the inclusion of guaranteed payments in the definition of "self-employment income" shows that

in 1977, Congress omitted from the term "limited partner" any partner with management authority over the partnership.

### B. *The Surrounding Statutory Text and Structure*

The interpretation of a federal statute may also "depend[] upon reading the whole statutory text." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). In this case, the surrounding statutory text and structure of § 1402 confirm that § 1402(a)(13) exempts from the definition of "self-employment income" only income from passive investment -- not income earned from actively running a business.

Section 1402(a) defines NESE and then identifies a number of categories of income to be excluded from NESE, including: income from real-estate rentals (unless received "in the course of a trade or business as a real estate dealer"), stock dividends and interest on bonds (unless received "in the course of a trade or business as a dealer in stocks or securities"), and the sale or exchange of a capital asset or property (unless the property is inventory or "held primarily for sale to customers in the ordinary course of the trade or business"). I.R.C. § 1402(a)(1)-(3). Payments to a retired partner are also excluded from the

definition of NESE if the partner "rendered no services" to the business. *Id.* § 1402(a)(10).

This additional statutory text makes clear the distinct treatment of income from investment and income from employment -- that is, from work. Items such as real estate rental income, stock dividends and interest on bonds, and gains from the sale or exchange of capital assets or property are excluded -- but only if they are not the product of a trade or business in those areas. Section 1402 excludes from NESE any income that is the result of passive investment and not income from active involvement in running a business. The limited partner exception in § 1402(a)(13) should be interpreted in accordance with this general "regulatory scheme." *Mellouli v. Lynch*, 575 U.S. 798, 809 (2014).

**C. *The Historical Context and Legislative History***

Finally, the legislative context and history bolster our conclusion that "limited partner" in § 1402(a)(13) encompasses a partner who does not run the business or exercise managerial control over it. *See Dolan*, 546 U.S. at 486 ("Interpretation of a word or phrase depends upon reading the whole statutory text, *considering the purpose and context of the statute*, and consulting any precedents or authorities that inform the analysis." (emphasis added)).

To begin, the historical context surrounding § 1402(a)(13)'s enactment supports our reading of the words "limited partner." When the IRS collects the self-employment tax from partners, the Social Security Administration (the "SSA") credits those payments. *See* 42 U.S.C. § 412. Thus, in return for paying the self-employment tax, partners receive future Social Security benefits. *See id.* This setup creates a "comprehensive national insurance system that provides benefits for retired *workers*, disabled *workers*, unemployed *workers*, and their families." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 48 (2011) (emphases added). Indeed, part of Social Security's purpose is to ensure "the decent support of elderly *workmen* who have ceased to labor." *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 364 (1946) (emphasis added).

Before 1977, *all* partners' partnership income qualified as self-employment income subject to the self-employment tax. *See* Patricia E. Dilley, *Breaking the Glass Slipper*, 54 Tax Law. 65, 85 (2000). Accordingly, all partnership income also triggered eligibility for Social Security benefits. By 1977, however, a trend had emerged in which some taxpayers obtained Social Security benefits, not by actually working, but by passively investing small amounts of money in limited partnerships. H.R. Rep. No. 95-702, pt. 1, at 40-41 (1977). The

partnership would pay these passive investors small distributions as a return on their investments, the passive investors would pay small amounts of the self-employment tax on those distributions, and the passive investors would in turn earn Social Security credits for those tax payments. *Id.* Thus, these limited partners -- who did not manage the partnership and were not active in it -- were claiming Social Security benefits, which were meant to support workers, through mere passive investment. *Id.*

In response to this dilemma, Congress enacted the Social Security Amendments of 1977 to prevent certain "limited partner" income, earned through passive investment, from triggering Social Security benefits. *See* Karen C. Burke, *The Original Meaning of "Limited Partner,"* 104 Taxes 17, 18 (2026). To accomplish this goal, the amendments changed the Social Security Act so that the distributive shares of limited partners (that is, partners who functioned as passive investors) no longer counted toward Social Security benefits. *See* Dilley, *supra*, at 85. Specifically, Congress amended the Social Security Act's definition of NESE to exclude limited partners' distributive shares, other than guaranteed payments earned from services actually rendered to the partnership. *See* 42 U.S.C. § 411(a)(12). Accordingly, because limited partners' distributive shares no

longer qualified as NESE, they also no longer counted as self-employment income eligible to trigger Social Security benefits, thereby addressing the problem Congress had identified. Congress mirrored these textual changes in the Code by amending I.R.C. § 1402(a)(13)'s definition of NESE to exclude limited partners' distributive shares from the self-employment tax on self-employment income. *See* I.R.C. § 1402(a)(13). This context indicates that, in 1977, Congress viewed "limited partners" as partners who generally acted as passive investors and who did not partake in management of the partnership.

Of course, the amended definition of NESE later gave rise to another loophole, which is the crux of this appeal. Namely, after 1977, some partners began to exploit the new definition of NESE by labeling themselves as limited partners and -- in contrast to the passive investors who prompted the Social Security Amendments of 1977 -- managing the partnership in exchange for *large* distributions, which they claimed were not subject to the self-employment tax on account of their "limited-partner" status. *See* Burke, *supra*, at 22. But the statute's context and legislative history reveal that this position, popularized after the passage of § 1402(a)(13), does not accord with the meaning of "limited partner" that Congress had in mind in 1977.

Consistent with our understanding of "limited partner," the House Report accompanying the Social Security Amendments of 1977 described the type of income excluded from NESE -- and therefore "excluded from social security coverage" -- as earnings that are "basically of an investment nature." H.R. Rep. No. 95-702, pt. 1, at 11 (1977); *see also id.* at 40-41. The Report tied the provision to a specific issue Congress wanted to curb: passive investors' use of small limited-partnership interests to obtain Social Security credits despite "perform[ing] no services" for those credits, a tactic "inconsistent with the basic principle . . . that benefits are designed to partially replace lost earnings from *work*." *Id.* at 41 (emphasis added); *see also* Banoff, *supra*, at 77 & n.287.[14] This context and legislative history further reinforce our conclusion that "limited partner" in § 1402(a)(13) refers to partners who both retain limited liability and who do not manage the partnership.

---

[14] Moreover, in 2008, the staff of a joint commission of Congress again explained that, in 1977, limited-partner status "worked as a proxy" for "those partners who did not have significant labor income" from the partnership, as "many States' laws prohibited limited partners from participating in management." Staff of J. Comm. on Tax'n, JCX-48-08, at 63 (2008).

## D. *Soroban's Other Contrary Arguments Fail*

Soroban raises a host of arguments aimed at undercutting the understanding of a limited partner as one who does not run the business. All are unpersuasive. We first dispense with Soroban's structural arguments and then dispose of its legislative history arguments.

### 1. Textual and Structural Arguments

#### *i. Congressional Silence*

Soroban asserts that, if Congress had wanted to define "limited partner" to mean a passive investor who exercised no control over the partnership, it would have done so explicitly. As explained above, however, in 1977, the term "limited partner" was itself understood to mean a partner who did not manage the partnership and thus generally functioned as a passive investor. Modifying "limited partner" with "passive" would therefore have been redundant. Because we do not require Congress to repeat itself several times over before we give its words effect, we reject Soroban's argument.

Soroban also highlights §§ 1402(a)(10) and 469(h)(2) of the Code to argue that Congress "knows how to restrict limited partners to passive investors" but deliberately chose not to in § 1402(a)(13). Appellants' Br. at 28-29; *see also id.*

at 62. Section 1402(a)(10) excludes from the definition of NESE any "amounts received by a partner" for "payments on account of retirement" if "such partner rendered no services" to the partnership "during the taxable year . . . in which such amounts were received." I.R.C. § 1402(a)(10). Meanwhile, § 469(h)(2) states that "[e]xcept as provided in regulations, no interest in a limited partnership as a limited partner shall be treated as an interest with respect to which a taxpayer materially participates." *Id.* § 469(h)(2). We again reject Soroban's arguments. As already discussed, Congress did indeed know how to cabin limited partners to those who did not control the business: by employing the 1977 ordinary meaning of the term "limited partner." Congress did so here. As neither of these provisions redefines "limited partner" for the purposes of the Code, we interpret the term in accordance with its ordinary meaning in 1977.

*ii. Section 1402(a)(13)'s Reference to § 707(c)*

Soroban also urges us to attach special significance to the fact that § 1402(a)(13) excludes from the tax exemption only guaranteed payments described in § 707(c). Soroban makes much of the fact that, in contrast, § 1402(a)(13) does not reference § 707(a)(2)(A), which allows the IRS to recharacterize a partner's distributions as "transaction[s] . . . between the

partnership and one who is not a partner" when a partner, *inter alia*, "performs services for a partnership." I.R.C. § 707(a)(1)-(2). In Soroban's view, had Congress similarly meant for the IRS to be able to recharacterize limited-partner distributions as payments for service -- and therefore NESE -- under § 1402(a)(13), it would have referenced § 707(a)(2)(A).

As the Commissioner points out, only § 707(c), not § 707(a), describes guaranteed payments. *See* I.R.C. § 707. It would therefore make no sense for § 1402(a)(13) to reference "guaranteed payments described in" § 707(a). Moreover, Soroban's argument wrongly assumes that the Commissioner's reading of § 1402(a)(13) entails *re*characterization of certain distributions as self-employment income. To the contrary, the distributions of partners who control the business are not characterized as limited-partner distributions *in the first place* under § 1402(a)(13) -- so it is not necessary to *re*characterize such distributions as *not* limited-partner distributions. Section 707(a) therefore does not help Soroban. Accordingly, nothing in the guaranteed payments carveout undermines our conclusion that a "limited partner" means a partner who, in addition to having limited liability, does not manage the business.

### 2. Agency Guidance and Legislative History Arguments

Finally, we address Soroban's arguments regarding agency materials and a 1997 congressional moratorium on IRS regulations.

#### *i. Agency Regulation, Guidance, and Instructions*

Soroban argues that an SSA regulation, SSA guidance, and the IRS's Form 1065 instructions all show that a "limited partner" is simply a partner in a state law limited partnership with limited liability. We disagree.

First, we acknowledge that the SSA's 1978 Social Security Act regulation regarding the term "limited partner" is probative of the term's meaning within § 1402(a)(13) of the Code. Indeed, the 1977 Social Security Amendments amended the definition of NESE in the Code and in the Social Security Act in identical ways, namely, by excluding the distributive shares of "limited partners" from NESE. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."). And it is true that the 1978 SSA regulation partially defined a limited partner as "one whose liability with respect to the obligations of the partnership is limited to the amount of his or her financial

investment in the partnership." 43 Fed. Reg. 25422, 25422 (June 13, 1978) (codified at 20 C.F.R. § 404.1050(a)(2)(i) (1978)). But that regulation also notes that "[g]enerally, [a limited partner] will not have performed services in the operation of, or participated in the control of, the business carried on by the partnership for the taxable year involved." *Id.* The regulation therefore subverts, rather than supports, Soroban's argument.

Similarly, Soroban points to the SSA's operational guidance for employees -- the Program Operations Manual System ("POMS") -- as support for its definition of limited partner. *See* Social Security Administration, RS.01802.302 Limited Partnerships, *Program Operations Manual System (POMS)* (Mar. 6, 1991), https://secure.ssa.gov/apps10/poms.nsf/lnx/0301802302 [https://perma.cc/422N-L7PP]. Putting aside that this guidance is merely for employees and was not published until 1991, nearly fifteen years after § 1402(a)(13) was enacted, the POMS again serves only to undermine Soroban's claim. As Soroban itself notes, the POMS defines a limited partnership as one that features both "limited liability of limited partners" and "[n]o management responsibilities of limited partners." *Id.*

Finally, as for the IRS's Form 1065 instructions for the 1978, 2016, and 2017 tax years, Soroban argues that these documents defined a limited partner in terms of limited liability only, rather than in terms of restricted management authority. But even assuming Soroban's view of the form instructions is correct, we have previously explained that "IRS publications, though aimed at explaining existing law to taxpayers, do not have the force of law." *United States v. Josephberg*, 562 F.3d 478, 498 (2d Cir. 2009) (citation modified). Rather, "[t]he authoritative sources of Federal tax law are the statutes, regulations, and judicial decisions." *Id.* (citation modified). Similarly, while IRS form instructions may be probative of a term's meaning, they are not binding law, especially to the extent they conflict with statutes or regulations. Here, ordinary statutory interpretation principles make clear that, for § 1402(a)(13) purposes, a limited partner may not participate in the partnership's business. An incomplete definition of "limited partner" in the IRS's Form 1065 instructions cannot overcome that conclusion.

Thus, Soroban's invocations of the SSA regulation, SSA guidance, and IRS Form 1065 instructions fall flat.

*ii. 1997 Congressional Moratorium*

Finally, Soroban contends that a 1997 congressional moratorium on proposed IRS regulations indicates that the term "limited partner" in § 1402(a)(13) cannot incorporate a functional definition akin to the one we adopt here. We disagree.

In 1997, the IRS proposed a regulation that would have defined the term "limited partner" and excluded from that definition any individual that "[h]as personal liability" for the partnership's debts and obligations, "[h]as authority . . . to contract on behalf of the partnership," or "[p]articipates in the partnership's trade or business for more than 500 hours during the partnership's taxable year." 62 Fed. Reg. 1702, 1704 (Jan. 13, 1997). After the IRS proposed this regulation, Congress passed, and President Clinton signed, a law preventing the issuance of any "temporary or final regulation with respect to the definition of a limited partner under section 1402(a)(13) of the Internal Revenue Code" until July 1, 1998. Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 935, 111 Stat. 788, 882 (1997).

We are not persuaded that the moratorium indicates Congress's wholesale rejection of a functional definition of "limited partner" under

§ 1402(a)(13). First, the legislative history to which Soroban points occurred twenty years after Congress enacted § 1402(a)(13) -- significantly lessening its salience for the ordinary meaning of "limited partner" in 1977. Second, the proposed regulation set forth very specific boundaries on limited partners. *See* 62 Fed. Reg. at 1704. These bright-line rules differ significantly from the functional approach we discern today, which simply focuses on whether a limited partner has limited liability and controls the partnership -- a test that depends more on the totality of the circumstances than on a strict numbers game, unlike the proposed 1997 regulation. Finally, and relatedly, by imposing a freeze on any regulations that would define or redefine "limited partner," Congress chose to leave § 1402(a)(13) untouched -- thereby preserving the definition of "limited partner" as it was commonly understood in 1977, when § 1402(a)(13) was passed. *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (explaining that "several equally tenable inferences may be drawn" from Congressional inaction and thus courts should be wary of relying on such evidence in statutory interpretation). Accordingly, we reject Soroban's argument that the 1997 congressional moratorium bars the definition

of "limited partner" that we now adopt, which is consistent with the widespread understanding of the term in 1977.

* * *

In 1977, the ordinary meaning of "limited partner" had two features. First, a limited partner's liability for partnership obligations was limited to the amount of their contributions to the partnership; second, a limited partner did not take part in running the business. The text, surrounding text, statutory structure, historical context, and legislative history of § 1402(a)(13) support this understanding. Accordingly, we hold that, for the purposes of § 1402(a)(13), a "limited partner" is one who has limited liability and who does not run, manage, or otherwise exert control or managerial authority over the partnership.

We note that a panel of the Fifth Circuit also recently addressed the meaning of "limited partner" for purposes of § 1402(a)(13) in *K Alain L.L.L.P. v. Commissioner of Internal Revenue*, 184 F.4th 766 (5th Cir. 2026). There, the court held that a limited partner is "a partner who plays no significant role in managing or running a business." *Id*. at 767.[15]

---

[15] Judge Graves dissented, concluding that "the text and structure of 26 U.S.C.

The Fifth Circuit did not expound on what it considers to be a non-significant role, but to the extent *K Alain* holds that a limited partner may provide *some* services to the partnership, we do not disagree. Nor does the Commissioner. *See* Appellee's Br. at 62 ("It is not the Commissioner's position -- and the Tax Court's interpretation of § 1402(a)(13) does not mean -- that providing *any* services to . . . or having *any* participation in . . . a partnership renders the individual not a limited partner."). So long as the activities in question do not constitute controlling, managing, or running the business, a partner may play a role in the partnership and still qualify as "limited" under § 1402(a)(13).[16]

---

§ 1402(a)(13) are clear that its tax exemption for limited partners applies only to those functioning as passive investors." *Id*. at 772. We also note that a similar case is currently pending before the First Circuit, which heard oral argument on February 8, 2026. *See Denham Cap. Mgmt. LP v. Commissioner of Internal Revenue*, No. 25-1349 (1st Cir. Feb. 8, 2026). In *Denham*, the First Circuit is considering both the jurisdictional issue and the merits issue we address here.

[16] The Fifth Circuit explicitly rejected the Tax Court's decision in this case, which it described as holding that "the term 'limited partner' could refer only to 'passive investors.'" *K Alain*, 185 F.4th at 771 (citing *Soroban*, 161 T.C. at 321). We need not decide whether the Fifth Circuit's parsing of *Soroban I*, 161 T.C. 310, is accurate. We do observe, however, that if our reading of *K Alain* is correct, there appears to be little daylight between the Fifth Circuit's position and the Tax Court's holding in *Soroban II* that a limited partner is one who acts "*generally akin* to [a] passive investor[]." *Soroban II*, T.C.M. 2025-52, at *9; *see K Alain*, 185 F.4th at 779-80 (Graves, J., dissenting). In any case, here, the Principals clearly played a "significant role" in managing Soroban's business, and they would fail to qualify as limited partners under the Fifth Circuit's rule.

## III. *The Principals Do Not Qualify as "Limited Partners" Under § 1402(a)(13)*

Finally, we hold that the Principals exercised control and managerial authority over Soroban, such that they are not "limited partners" under § 1402(a)(13).

Soroban has not challenged the Tax Court's factual findings. And on appeal, it does not meaningfully dispute that the Principals managed and ran Soroban, aside from one solitary -- and somewhat conflicting -- sentence in its opening brief. *See* Appellants' Br. at 52 ("[W]hile Messrs. Mandelblatt, Kapadia, and Friedman *each worked in various management capacities* for Soroban, that doesn't count as participating in control of the business *under Delaware law*." (emphases added)); *see generally State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004) ("When a party fails adequately to present arguments in an appellant's brief, we consider those arguments abandoned."). Nor could it. As discussed above, the Principals -- who were Soroban's Managing Partner and Chief Investment Officer, Co-Managing Partner, and Head of Trading and Risk Management -- worked full time for Soroban, managed its investments, played critical roles in generating its income, sat on all of its governing committees in 2016 and all but one in 2017,

and participated in the decisions to hire, fire, promote, terminate, and evaluate Soroban's employees. In short, the Principals "exercised managerial control over Soroban" and "played an essential role in generating [Soroban]'s income." *Soroban II*, T.C.M. 2025-52, at *1.

Accordingly, the Principals are not limited partners within the meaning of § 1402(a)(13). Their distributive shares are thus subject to the Medicare and Social Security taxes on self-employment income.

## *CONCLUSION*

For the foregoing reasons, we AFFIRM the Tax Court's orders and decisions.